Case No. 25-40549

# In the
# United States Court of Appeals
# for the Fifth Circuit

---

IN THE MATTER OF FRED ALAN BROWN,
*Debtor*

VERITAS VINCIT, L.L.C.; WILLIAM BERRY DEAN, III,
*Appellees/Cross-Appellant*
v.

BIRNAM WOOD CAPITAL, L.L.C.; CHARLES WILLIAM DURHAM, II,
*Appellants/Cross-Appellees.*

---

On Appeal from the United States District Court for the Eastern District of Texas, Sherman Division

---

**APPELLANTS/CROSS-APPELLEES CHARLES WILLIAM DURHAM II AND BIRNAM WOOD CAPITAL, LLC'S OPENING BRIEF**

---


Meredith B. Parenti
Texas Bar No. 00797202
PARENTI LAW
800 Town & Country Blvd.
Ste. 500
Houston, TX 77024
Tel. (281) 224-5848
meredith@parentilaw.com

Rogge Dunn
Texas Bar No. 06249500
Lane M. Webster
Texas Bar No. 24089042
ROGGE DUNN GROUP, PC
500 N. Akard Street, Suite 1900
Dallas, TX 75201
Tel. (214) 888-5000
Dunn@trialtested.com
Webster@roggedunngroup.com
*Counsel for Appellants/Cross-Appellees*

## CERTIFICATE OF INTERESTED PERSONS

Case No. 25-40549

In the Matter of Fred Alan Brown,
*Debtor*

Veritas Vincit, L.L.C.; William Berry Dean, III,
*Appellees/Cross-Appellants*
v.

Birnam Wood Capital, L.L.C.; Charles William Durham, II,
*Appellants/Cross-Appellees.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Veritas Vincit, LLC
William Berry Dean, III
Fred Alan Brown
Reticulum Management, LLC
Charles William Durham II
Birnam Wood Capital, LLC
Jacob Watters
Fiduciario, LLC
4222014, LLC
Paul Thompson
Will Walters
William B. Dean, III Irrevocable Trust
William B. Dean, Jr.
VV Funding LLC

**Defendants-Appellants/Cross-Appellees**

Charles William Durham II
Birnam Wood Capital, LLC

**Appellate Counsel for Defendants-Appellants/Cross-Appellees**

Meredith B. Parenti
Texas Bar No. 00797202
PARENTI LAW
800 Town & Country Blvd., Ste. 500
Houston, TX 77024
Tel. (281) 224-5848
Fax (281) 605-5677
meredith@parentilaw.com

**Appellate & Trial Counsel for Defendants-Appellants/Cross-Appellees**

Rogge Dunn
Texas Bar No. 06249500
Dunn@trialtested.com
Lane M. Webster
Texas Bar No. 24089042
Webster@roggedunngroup.com
ROGGE DUNN GROUP, PC
500 N. Akard Street, Suite 1900
Dallas, TX 75201
Tel. (214) 888-5000
Fax (214) 220-3833

**Former Trial Counsel for Defendants-Appellants/Cross-Appellees**

Alexandria M. Risinger
Texas Bar No. 24095215
THE DÍAZ FIRM, PLLC
9600 Great Hills Trail. Ste. 150W
Austin, TX 78759
Tel. (512) 655-3513

Christopher B. Trowbridge
Texas Bar No. 24008182
ctrowbridge@bellnunnally.com
Scott R. Larson
Texas Bar No. 24097971
BELL NUNNALLY & MARTIN LLP
2323 Ross Avenue, Suite 1900
Dallas, TX 75201-2429
(214) 740-1400 Telephone
(214) 740-1499 Facsimile

**Plaintiffs-Appellees/Cross-Appellants**

Veritas Vincit, LLC
William Berry Dean, III

**Current and Former Counsel for Plaintiffs-Appellees/Cross-Appellants**

Brett Charhon
Texas State Bar No. 24040674
bcharhon@ccrglaw.com
Steven Callahan
Texas State Bar No. 24053122
scallahan@ccrglaw.com
Anthony M. Garza
Texas State Bar No. 24050644
agarza@ccrglaw.com
Christopher T. Bovenkamp
Texas State Bar No. 24006877
cbovenkamp@ccrglaw.com
Jill Frances Lynch
Texas State Bar No. 24012946
CHARHON CALLAHAN
ROBSON & GARZA, PLLC
3333 Lee Parkway, Suite 460
Dallas, TX 75219
Tel. (214) 521-6400

Fax (214) 764-8392

Michael C. Smith
Texas Bar No. 18650410
Michael.Smith@solidcounsel.com
SCHEEF & STONE, LLP
113 East Austin Street
Marshall, TX 75670
Tel. (903) 938-8900
Fax (972) 767-4620

John P. Lewis, Jr.
Texas State Bar No. 12294400
jplewis@haywardfirm.com
HAYWARD PLLC
10501 N. Central Expressway, Suite 106
Dallas, TX 75231
Tel. (972) 755-7106

Peter Michael Jung
Texas State Bar No. 11054600
jungm@clarkhill.com
CLARK HILL, PLC
901 Main St., Ste. 6000
Dallas, TX 75202
Tel. (214) 651-4724

**Debtor/Defendant**

Fred Alan Brown

**Current or Former Counsel for Debtor/Defendant Brown**

Thomas C. Barron
Texas State Bar No. 01821290
LAW OFFICES OF THOMAS C. BARRON
P.O. Box 141323
Dallas, TX 75214

Tel. (214) 855-6631
Fax (214) 855-6633

Robert DeMarco, III
Texas State Bar No. 24014543
DEMARCO MITCHELL, PLLC
12770 Coit Road, Ste. 850
Dallas, TX 75251
Tel. (972)-991-5591

**Defendant**

Reticulum Management, LLC

**Former Counsel for Defendant Reticulum**

Julie Pettit
Texas State Bar No. 24065971
David Urteago
Texas State Bar No. 24079493
THE PETTIT LAW FIRM
1900 N. Pearl St., Ste. 1740
Dallas, TX 75201
Tel. 214-329-0151
Fax 214-329-4076

*/s/ Meredith B. Parenti*
Meredith B. Parenti
Attorney of Record for
Appellants/Cross-Appellees

## Statement Regarding Oral Argument

This case presents significant jurisdictional issues and issues of Texas law, including whether there is a constitutional case or controversy after an entity controlled by Plaintiffs purchased the Defendant company accused of committing malicious criminal prosecution, while continuing to assert claims against the company's agent who was acting on its behalf to recover a debt owed to the company. Complex issues of Texas law are also presented, including whether an individual who is not a prosecutor can "initiate" a prosecution and whether conspiracy to commit malicious criminal prosecution is recognized in Texas.

Oral argument would also benefit the Court because the record is lengthy, stretching back to its beginnings in 2021 in Texas state district court, and continuing to removal to federal bankruptcy court before the reference was withdrawn to the district court for trial.

**TABLE OF CONTENTS**

Certificate of Interested Persons....................i

Statement Regarding Oral Argument .................... vi

Table of Authorities....................x

Jurisdictional Statement....................1

Issues Presented....................3

Introduction....................4

Statement of the Case....................7

A. Total Operating Has a Cash Crunch....................7

B. Things Go South....................10

C. The Arbitration Panel Awards Damages ....................12

D. Dean and Watters File for Bankruptcy ....................13

E. Reticulum Emails Criminal Complaint Forms....................14

F. This Litigation Begins in State Court ....................16

G. Plaintiffs Remove the Case to Federal Court....................17

H. The Reference Is Withdrawn for Trial ....................19

I. Plaintiffs Purchase Defendant Reticulum ....................19

J. Defendants Move to Dismiss for Lack of Case or Controversy ....................22

K. Trial Proceedings ....................27

Summary of the Argument ........ 31

Argument ........ 33

I. There Is No Constitutional Case or Controversy After Plaintiffs Purchased Defendant Reticulum ........ 33

A. This Case Ceased to Be Adverse When Plaintiffs Purchased Brown's Interests in Reticulum ........ 37

B. Brown's Conduct Cannot Be Separated from Reticulum's ........ 42

C. The Conspiracy Claims Against Durham and Birnam Wood Also Fail ........ 50

II. The Court Erred by Granting Summary Judgment That Brown "Initiated" the Criminal Prosecution ........ 53

A. The Elements of Malicious Criminal Prosecution Reflect a Delicate Balance ........ 54

B. Texas Courts Have Long Recognized a Distinction Between Initiating and Procuring a Prosecution ........ 55

1. "Initiates" requires formal charges ........ 56

2. "Procures" requires causation and materially false information ........ 60

C. The District Court's Reasoning Makes the Initiates or Procures Distinction a Nullity and Disrupts the Careful Balance Struck by Texas Courts ........ 61

III. There Is Legally Insufficient Evidence of Civil Conspiracy ........ 64

A. There Is an Uncertain Question as to Whether Texas Recognizes Claims for Conspiracy to Commit Criminal

Malicious Prosecution ....................................................................66

B. Birnam Wood Could Not Conspire with Its Owner ...................70

C. There Is No Legally Sufficient Evidence of a Conspiracy ..........71

1. There Is No Legally Sufficient Evidence That Birnam Wood Engaged in a Conspiracy .........................................72

2. There Is No Legally Sufficient Evidence That Durham Engaged in a Conspiracy .....................................................75

IV. There Was Legally Insufficient Evidence to Support the Compensatory and Exemplary Damages Awards ................................78

A. Plaintiffs' Reputational Damages Were Wholly Speculative ....78

B. Plaintiffs' Claims for Mental Anguish, Pain and Suffering Do Not Support the Damages Awarded ...........................................84

C. There Was Legally Insufficient Evidence to Support the Punitive Damages Awarded .........................................................86

Conclusion ..........................................................................................................90

Certificate of Service ........................................................................................92

Certificate of Compliance..................................................................................92

**Table of Authorities**

**Cases**

*ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*,
501 F.3d 1307 (Fed. Cir. 2007) .................................................... 65

*ACS Invs., Inc. v. McLaughlin*,
943 S.W.2d 426 (Tex. 1997) .................................................... 43

*Agar Corp., Inc. v. Electro Circuits Int'l, LLC*,
580 S.W.3d 136 (Tex. 2019) .................................................... 50

*Am. Akaushi Ass'n, Inc. v. Twinwood Cattle Co.*,
No. 14-21-00701-CV, 2025 WL 450750, ___ S.W.3d ___
(Tex. App.—Houston [14th Dist.] Feb. 11, 2025, pet. filed)............ 70-71

*Atlantic Richfield Co. v. Misty Prods., Inc.*,
820 S.W.2d 414 (Tex. App.—Houston [14th Dist.] 1991,
writ denied)........................................................................ 71

*Bayou Terrace Inv. Corp. v. Lyles*,
881 S.W.2d 810 (Tex. App.—Houston [1st Dist.] 1994, no writ).......... 71

*Bearden v. LeClair*,
No. 02-20-00177-CV, 2022 WL 3273598 (Tex. App.—Fort Worth
Aug. 11, 2022, no pet.) .................................................... 79

*Bellefonte Underwriters Ins. Co. v. Brown*,
704 S.W.2d 742 (Tex. 1986) .................................................... 87

*Bentley v. Bunton*,
94 S.W.3d 561 (Tex. 2002) .................................................... 85, 86

*In re Brown*,
No. 22-41110-BTR-7 (Bankr. E.D. Tex.) .......................................... 18

*Browning-Ferris Indus., Inc. v. Lieck*,
881 S.W.2d 288 (Tex. 1994) ........................................................*passim*

*Brumfield v. Williamson*,
634 S.W.3d 170 (Tex. App.—Houston [1st Dist.] 2021,
pet. denied) ............................................................................................67

*Burkhart Grob Luft Und Raumfahrt GmbH & Co. KG v. E–Sys., Inc.*,
257 F.3d 461 (5th Cir. 2001) ...............................................................79

*Cantu v. State*,
253 S.W.3d 273 (Tex. Crim. App. 2008) ...........................................57, 58

*Carswell v. Sw. Bell Tel. Co.*,
449 S.W.2d 805 (Tex. Civ. App.—Houston [1st Dist.] 1969,
no writ) .................................................................................................58

*Castille v. Port Arthur Patrolmen's Hunting Club*,
No. 09-18-00395-CV, 2020 WL 1879475 (Tex. App.—Beaumont
Apr. 16, 2020, pet. denied) ...................................................................68

*In re Cipolla*,
476 F. App'x 301 (5th Cir. 2012) .........................................................64

*Cleveland v. Chamberlain*,
1 Black 419, 66 U.S. 419 (1861) ....................................................34, 36, 52

*Dickson v. Am. Gen. Life Ins. Co.*,
698 S.W.3d 234 (Tex. 2024) .................................................................36

*Dupree v. Younger*,
598 U.S. 729 (2023) ..............................................................................53

*ERI Consulting Eng'rs, Inc. v. Swinnea*,
318 S.W.3d 867 (Tex. 2010) ...............................................72, 74, 75, 76, 90

*Erie R.R. Co. v. Tompkins*,
304 U.S. 64 (1938) ................................................................................69

*Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*,
51 S.W.3d 573 (Tex. 2001) .......................................................................67

*Fed. Exp. Corp. v. Dutschmann*,
846 S.W.2d 282 (Tex. 1993) .....................................................................86

*Ferrara Fire Apparatus, Inc. v. JLG Indus., Inc.*,
581 F. App'x 440 (5th Cir. 2014) (per curiam) .......................................66

*First United Pentecostal Church of Beaumont v. Parker*,
514 S.W.3d 214 (Tex. 2017) ...........................................................67, 72, 77

*Gregory v. Chohan*,
670 S.W.3d 546 (Tex. 2023) (plurality) .......................................84, 85, 86

*Griffith v. State*,
55 S.W.3d 598 (Tex. Crim. App. 2001) ....................................................59

*Gunville v. Gonzales*,
508 S.W.3d 547 (Tex. App.—El Paso 2016, no pet.) ..............................57

*Hancock v. Variyam*,
400 S.W.3d 59 (Tex. 2013) .......................................................................86

*Holloway v. Skinner*,
898 S.W.2d 793 (Tex. 1995) .....................................................................43

*Horizon Health Corp. v. Acadia Healthcare Co.*,
520 S.W.3d 848 (Tex. 2017) .....................................................................89

*Hurlbut v. Boaz*,
4 Tex. Civ. App. 371, 23 S.W. 446 (1893, no writ) .................................55

*Ins. Co. of N. Am. v. Morris*,
981 S.W.2d 667 (Tex. 1998) ...............................................................75, 76

*Johnson v. Miller*,
98 F.4th 580 (5th Cir. 2024) .......... 69

*Juhl v. Airington*,
936 S.W.2d 640 (Tex. 1996) .......... 72

*King v. Graham*,
126 S.W.3d 75 (Tex. 2003) (per curiam) .......... 28, 56, 60, 61, 62

*Kroger Tex. Ltd. P'ship v. Suberu*,
216 S.W.3d 788 (Tex. 2006) .......... 55, 62

*Kunstoplast of Am., Inc. v. Formosa Plastics Corp.*,
937 S.W.2d 455 (Tex. 1996) .......... 37

*In re Lakeside Resort JV, LLC*,
689 S.W.3d 916 (Tex. 2024) .......... 36

*Latch v. Gratty, Inc.*,
107 S.W.3d 543 (Tex. 2003) .......... 43

*Lermon v. Minyard Food Stores, Inc.*,
No. 05–13–00034–CV, 2014 WL 6466840 (Tex. App.—Dallas, Nov. 19, 2014, pet. denied) .......... 57

*Leyendecker & Assocs., Inc. v. Wechter*,
683 S.W.2d 369 (Tex. 1984) .......... 43

*Lord v. Veazie*,
8 How. 251, 49 U.S. 251 (1850) .......... 5, 34, 35

*Mem'l Hermann Health Sys. v. Gomez*,
649 S.W.3d 415 (Tex. 2022) .......... 79, 83

*Metzger v. Sebek*,
892 S.W.2d 20 (Tex. App.—Houston [1st Dist.] 1994, writ denied) .......... 68, 77

*Mieco L.L.C. v. Targa Gas Mktg. L.L.C.*,
161 F.4th 828 (5th Cir. 2025) ........................................................54, 65

*Mo., K. & T. Ry. Co. v. Groseclose*,
50 Tex. Civ. App. 525, 110 S.W. 477 (1908, no writ) ..............................56

*Moore v. Harper*,
600 U.S. 1 (2023) ..........................................................................................34

*Murthy v. Missouri*,
603 U.S. 43 (2024) ........................................................................................33

*Nelson Radio & Supply Co. v. Motorola, Inc.*,
200 F.2d 911 (5th Cir. 1952) ........................................................................71

*Ortiz v. Collins*,
203 S.W.3d 414 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ........50

*Perez v. City of San Antonio*,
115 F.4th 422 (5th Cir. 2024) ........................................................68, 69

*Poe v. Ullman*,
367 U.S. 497 (1961) ..............................................................6, 35, 47, 50, 52

*Reed v. Lindley*,
240 S.W. 348 (Tex. Civ. App.—Fort Worth 1922, no writ) ....................56

*In re Reticulum Mgmt., LLC*,
No. 21-10935 (5th Cir.) ................................................................................19

*Roehrs v. Conesys, Inc.*,
332 F. App'x 184 (5th Cir. 2009) ..............................................................79

*Rothgery v. Gillespie Cnty.*,
554 U.S. 191 (2008) ......................................................................................58

*Ruth v. Crow*,
No. 03-16-00326-CV, 2018 WL 2031902 (Tex. App.—Austin May 2, 2018, pet. denied) ........................................................................68

*Saenz v. Fidelity & Guar. Ins. Underwriters*,
925 S.W.2d 607 (Tex. 1996) ........................................................................85, 86

*Safeshred, Inc. v. Martinez*,
365 S.W.3d 655 (Tex. 2012) ........................................................................89, 90

*Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*,
435 S.W.2d 854 (Tex. 1968) ........................................................................74

*Simon v. E. Ky. Welfare Rights Org.*,
426 U.S. 26 (1976) ........................................................................33

*S. Spring Hill Gold Min. Co. v. Amador Medean Gold Min. Co.*,
145 U.S. 300 (1892) ........................................................................34

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) ........................................................................33

*TGIP, Inc. v. AT&T Corp.*,
527 F. Supp. 2d 561 (E.D. Tex. 2007) ........................................................................65

*Tex. Democratic Party v. Abbott*,
961 F.3d 389 (5th Cir. 2020) ........................................................................71

*Tex. Dep't of Fam. & Protective Servs. v. Grassroots Leadership, Inc.*,
717 S.W.3d 854 (Tex. 2025) ........................................................................36

*Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*,
877 S.W.2d 276 (Tex. 1994) ........................................................................79

*Tilton v. Marshall*,
925 S.W.2d 672 (Tex. 1996) ........................................................................50, 67

*Torres v. GSC Enters., Inc.*,
242 S.W.3d 553 (Tex. App.—El Paso 2007, no pet.) ...............................57

*Transverse, L.L.C. v. Iowa Wireless Servs., L.L.C.*,
992 F.3d 336 (5th Cir. 2021) ....................................................................64

*Tri v. J.T.T.*,
162 S.W.3d 552 (Tex. 2005) ......................................................................71

*U-Haul Int'l, Inc. v. Waldrip*,
380 S.W.3d 118 (Tex. 2012) ................................................................87, 88

*Umphress v. Hall*,
133 F.4th 455 (5th Cir. 2025) ....................................................................70

*In re U.S. Grant Hotel Assoc. Ltd. Sec. Lit.*,
740 F. Supp. 1460 (S.D.Cal.1990) ............................................................76

*United States v. Johnson*,
319 U.S. 302 (1943)...............................................................................35, 36

*Walker v. Hartman*,
516 S.W.3d 71 (Tex. App.—Beaumont 2017, pet. denied) ....................68

*Wallace v. Methodist Hosp. Sys.*,
271 F.3d 212 (5th Cir. 2001) ....................................................................65

*Ware v. Paxton*,
359 S.W.2d 897 (Tex. 1962) ......................................................................90

*Warner Bros. Ent. v. Jones*,
538 S.W.3d 781 (Tex. App.—Austin 2017), *aff'd*, 611 S.W.3d 1 (Tex. 2020) ...................................................................................................57

*Watters v. Brown, Reticulum Mgmt., LLC, Durham, & Birnam Wood Cap., LLC*,
Adv. Proc. No. 22-04052 (Bankr. E.D. Tex.)...........................................20

*Werner Enters., Inc. v. Blake*,
719 S.W.3d 525 (Tex. 2025) .......... 87

*Wheeler v. Nesbitt*,
24 How. 544, 65 U.S. 544 (1860) .......... 56

*Wood-Paper Co. v. Heft*,
8 Wall. 333, 75 U.S. 333 (1869) .......... 34, 35

**Statutes, Rules, & Constitutional Provisions**

11 U.S.C. § 523 .......... 13

11 U.S.C. §§ 701–728 .......... 1

28 U.S.C. § 157(d) .......... 1, 19

28 U.S.C. § 1291 .......... 1

28 U.S.C. § 1334 .......... 18

28 U.S.C. § 1334(b) .......... 1

28 U.S.C. § 1452 .......... 1, 17, 18

28 U.S.C. § 2111 .......... 62, 78

FED. R. APP. P. 28.1(1)(e)(2)(A) .......... 92

FED. R. APP. P. 32(a)(5) .......... 92

FED. R. APP. P. 32(a)(6) .......... 92

FED. R. APP. P. 32(f) .......... 92

FED. R. CIV. P. 50(a) .......... *passim*

FED. R. CIV. P. 50(a)(1) .......... 65

FED. R. CIV. P. 50(b) .......... *passim*

FED. R. CIV. P. 56(a) .......... 54

FED. R. CIV. P. 59 .......... 1, 30

FED. R. CIV. P. 61 .......... 62, 78

TEX. BUS. ORGS. CODE § 101.254(a) .......... 44

TEX. BUS. ORGS. CODE § 101.254(b) .......... 44

TEX. CIV. PRAC. & REM. CODE §§ 33.001–.004 .......... 52

TEX. CIV. PRAC. & REM. CODE § 41.001(2) .......... 88

TEX. CIV. PRAC. & REM. CODE § 41.001(7) .......... 89

TEX. CIV. PRAC. & REM. CODE § 41.003 .......... 87

TEX. CIV. PRAC. & REM. CODE § 41.004(a) .......... 87

TEX. CODE CRIM. PROC. art. 21.01 .......... 58

TEX. CODE CRIM. PROC. art. 21.20 .......... 58

TEX. CONST. art. V, § 1 .......... 36

TEX. CONST. art. V, § 3(a) .......... 36

TEX. CONST. art. V, § 3-c(a) .......... 69

TEX. R. APP. P. 58.1 .......... 69

**Other**

RESTATEMENT (SECOND) OF TORTS § 653 (1977) .......... 66

RESTATEMENT (SECOND) OF TORTS § 653 cmt. c (1977) ......................................56

RESTATEMENT (SECOND) OF TORTS § 653 cmt. g (1977) ......................................56

RESTATEMENT (SECOND) OF TORTS § 654(2)(c) (1977) ..........................................59

## Jurisdictional Statement

The Texas state tort claims in this case were originally filed in Dallas County, Texas. ROA.16141. Plaintiffs removed the case to the United States Bankruptcy Court for the Northern District of Texas under 28 U.S.C. § 1452 after Defendant Fred Brown filed a voluntary petition under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. §§ 701–728. ROA.16102. The case was transferred to the Bankruptcy Court for the Eastern District of Texas. ROA.17227, 17461-64.

The parties jointly moved under 28 U.S.C. § 157(d) to withdraw the reference to the United States District Court for the Eastern District of Texas. ROA.27, 30812. The district court granted the motion and withdrew the reference. ROA.30843, 117. The district court had jurisdiction over the state law claims under 28 U.S.C. §§ 1334(b) and 157(d).

This Court has jurisdiction under 28 U.S.C. § 1291. This is an appeal from the final judgment of the district court disposing of all claims entered on August 23, 2024. ROA.10637-39. The district court denied Defendants' motion under Fed. R. Civ. P. 50(b) and 59 by written order entered on August 18, 2025. ROA.11002, 11940.

Appellants/Cross-Appellees timely filed their notice of appeal on September 8, 2025. ROA.11961. Appellees/Cross-Appellants timely filed a notice of appeal from the court's order granting Appellants/Cross-Appellees' motion to dismiss in part, ROA.10404, and the final judgment, ROA.10637, 11966.

## Issues Presented

1. Was there a constitutional case or controversy over malicious criminal prosecution and conspiracy claims after an entity controlled by Plaintiffs purchased the Defendant company on whose behalf the criminal complaint was made, and continued to litigate those same claims against the remaining Defendants?

2. Did the district court err by granting summary judgment that Defendant Fred Brown "initiated" a malicious criminal prosecution under Texas law?

3. Was there legally sufficient evidence to support the jury's verdict of conspiracy to commit malicious criminal prosecution?

4. Was there legally sufficient evidence to support the jury's compensatory and exemplary damages awards?

## Introduction

This malicious criminal prosecution case is deeply flawed on many levels, most significantly because it undermines the integrity of our courts in safeguarding the Constitution's genuine case or controversy requirement and protecting victims reporting crimes.

This case arises out of a loan that Reticulum Management, LLC made to a company in which Plaintiffs held an interest. Plaintiffs allege Reticulum and its sole owner and agent, Fred Brown, maliciously criminally prosecuted Plaintiff William Berry Dean, III, and conspired with Appellants in an attempt to recover on the Reticulum loan. Any constitutional case or controversy ceased after an entity controlled by Plaintiffs purchased Reticulum while the case was pending. Plaintiffs nevertheless continued to litigate against Reticulum and the remaining Defendants for malicious criminal prosecution while using their new ownership of Reticulum to waive Reticulum's attorney-client privilege and compel the other Defendants to produce documents that Plaintiffs used at trial.

The district court correctly dismissed Plaintiffs' claims against Reticulum for lack of a constitutional case or controversy, but reversibly

erred by allowing the case to proceed against Brown—who signed the criminal complaint form on Reticulum's behalf for the debt owed to Reticulum. The court also erred by allowing the case to proceed against Appellants for conspiracy with Brown. While the court held that the parties could not "rely" on Reticulum's conduct, Reticulum's conduct was inextricably intertwined with that of its sole agent Brown, as demonstrated by the frequent references at trial to Reticulum. Plaintiffs even relied on Reticulum's discovery responses in cross-examination and in closing arguments to point out inconsistencies with Reticulum's criminal complaint form.

Allowing Plaintiffs to control Reticulum while continuing to litigate against the remaining Defendants for Reticulum's conduct turned this case into exactly the type of collusive or friendly suit the Supreme Court rejected in *Lord v. Veazie*, 8 How. 251, 49 U.S. 251, 255-56 (1850), because "plaintiff and defendant have the same interest, and that interest [is] adverse and in conflict with the interest of third parties, whose rights would be seriously affected" by allowing the case to proceed. The court should have dismissed the remaining claims, which were "unfit for

adjudication," in order to safeguard the integrity of the judicial process. *Poe v. Ullman*, 367 U.S. 497, 505–06 (1961).

The court misapplied governing Texas law by granting summary judgment holding that an individual citizen could "initiate" a prosecution, when Texas law is clear that only a public official may do so. By contrast, a citizen may "procure" a criminal prosecution only upon proof that (1) he made false statements and (2) the prosecution would not have been made but for those false statements. The court's misapplication of Texas law upset the careful balance set by the Supreme Court of Texas for malicious criminal prosecution claims to ensure that citizens are not penalized for reporting crimes.

The court also reversibly erred because there was no legally sufficient evidence to support the jury's findings of conspiracy. Whether conspiracy to commit malicious criminal prosecution is even a viable claim in Texas is an uncertain question of law that this Court may certify to the Supreme Court of Texas if this case survives its other jurisdictional and legal infirmities. The Supreme Court of Texas has rejected the similarly derivative tort of aiding or cooperating in a malicious criminal prosecution, and its reasoning applies equally to a conspiracy claim.

The court also reversibly erred by entering judgment for $3.8 million in reputational damages based on wholly speculative lost business opportunities for hypothetical private equity deals that never existed. The court likewise erred by entering judgment for exemplary damages without any evidence of outrageous, malicious, or otherwise reprehensible conduct, or any evidence that Appellants specifically intended for Plaintiffs to suffer substantial injury that was independent and qualitatively different from the compensable harms associated with the underlying causes of action.

For these reasons, this deeply flawed judgment must be reversed.

## Statement of the Case

### A. Total Operating Has a Cash Crunch.

In 2015, Total Operating, LLC, a pipeline construction and oil-field maintenance company, was experiencing a "cash crunch." ROA.14810, 14815, 14951. Its board members and managers, William Berry Dean, III, Jacob Watters, and Paul Thompson, came up with a plan to raise cash. ROA.14950-52, 14810, 12394. Dean and Watters were business partners who had together bought a 60 percent ownership interest in Total Operating and joined its board. ROA.1039-40, 12475. Dean also served as Total Operating's part-time CFO. ROA.14810.

Watters contacted financial advisor Charles William Durham, II by phone and email about a potential deal to raise funds for Total Operating. ROA.14953, 14956, 12411. Total Operating referred to the deal as "bridge financing," a "senior subordinated bridge debt facility," or simply the "bridge." ROA.12411-12, 14816. Watters sent a term sheet, which stated that his company, "CCA Partners, LLC suggests and will help originate a $500,000 senior subordinated bridge debt facility that will provide working capital to bridge the Company to finish the execution of the Jetta Resources contract." ROA.12412, 14954-55, 1042 n.5, 1928.

Durham was not personally interested in the deal and said it was not a good fit for his investment advisory, Birnam Wood Capital, LLC, but suggested Watters contact Fred Brown, for whom Durham was a financial advisor. ROA.14956, 15428, 15430. Watters and Brown already knew each other from a prior deal they worked on together. ROA.15430. Watters called Brown about the proposed deal, and Brown expressed interest. ROA.14957-58.

Dean, Watters, and Thompson prepared a PowerPoint presentation on behalf of Total Operating that Watters provided to Durham. ROA.12257, 12465, 14817, 14967. Brown agreed to loan Total Operating $400,000, while

Watters's father agreed to loan $100,000. ROA.14963. The parties decided to structure the loan as a Sale and Buyback Agreement (the "SBA") given concerns that Total Operating's lender, Capital One, would not approve the deal. ROA.14826-29.

Because this would be a related-party transaction involving Watters and his father, Watters asked Durham to let the parties use one of his unused companies, Reticulum Management, LLC, as a pass-through entity, and Durham agreed. ROA.1042, 14835.

Durham and Dean signed the SBA on behalf of Reticulum and Total Operating, respectively. ROA.12309, 12311-12. Reticulum purchased the right to receive future profits from the Jetta project, while Total Operating retained a buyback option on those profits and an expiration date of October 2015. ROA.1043, 12309, 14844. Total Operating agreed to pay Reticulum the "unfactored Jetta Resources receivables from Jetta Resources invoices" received after the agreement's effective date. ROA.12309. Total Operating had a practice of factoring its invoices, *i.e.*, selling its unpaid invoices to a factoring company. ROA.1043 n.7, 14822, 14786. In fact, all of the Jetta receivables were factored, leaving nothing left to pay Reticulum. ROA.14903-04.

The SBA provided remedies to Reticulum in the event that Total Operating failed to perform the buyback and pay the minimum required profit margin, including conversion of the SBA into a senior subordinated note to Total Operating. ROA.12309-10. Watters described this remedy in an email to Dean, which Watters forwarded to Durham: "Entered maximum rate of interest etc. if for some reason, we do not pay it, and it converts to a note and a 1 year term." ROA.12485. Watters detailed this provision again for Reticulum's attorney, Julie Pettit, and Durham in an email: "If the company does not pay the $553,991.85, then Reticulum may convert from a contractual agreement to senior subordinated note and file UCC etc. and the note will pay maximum allowable rate of interest, which is 1.5% month." ROA.12489.

**B. Things Go South.**

Total Operating experienced setbacks with the Jetta project, and never paid any unfactored receivables to Reticulum, nor did it exercise its buyback option. ROA.1043-44, 14842-44. Total Operating began selling its assets with its lender Capital One's approval. ROA.14845-48.

Reticulum's attorney Pettit sent Total Operating a notice of default and demand for payment of $553,991.80. ROA.12499. As Watters had

suggested before, ROA.12489, Reticulum filed a UCC financing statement. ROA.12501.

That same month, the original owners of Total Operating and equity partners of Dean and Watters sued Dean and Watters in state court for breach of contract, breach of fiduciary duty, fraudulent inducement, violations of the Texas Business & Commerce Code, and conspiracy. ROA.1044-45.

In an effort to reassure Reticulum, Watters authorized the execution of a security agreement by Total Operating in favor of Reticulum. ROA.1045, 12502, 14978. The agreement stated that the SBA "was automatically converted to a Promissory Note . . . on October 30, 2015." ROA.12502. Watters, a board member, signed the document on behalf of Total Operating, but later claimed he did not inform his fellow board members of this. ROA.12509, 14978-79, 14929-30, 1045 n.11. The security agreement was signed in the spring of 2016 to be effective as of October 30, 2015, the buyback date under the SBA. ROA.1045, 12502, 14979.

Reticulum filed suit against Total Operating and obtained a temporary restraining order halting Total Operating's sale of its assets. ROA.1045, 12514. Total Operating filed a bankruptcy petition under

Chapter 7 of the Bankruptcy Code. ROA.1045, 12536, 14848. Brown sent Pettit and Durham an email stating "It appears that there is not enough equipment (value) to satisfy Capital One's note (and therefore nothing left for us). The only way we can get any recovery, is if Barrett [Dean] & Jacob [Watters] are found to have committed a felony and we can get a personal judgement against both." ROA.12017. Brown further stated he wanted Capital One to start the criminal investigation. ROA.12017. Brown was responding to an email from Pettit, who forwarded an email from an attorney for Capital One who stated that Capital One had filed a police report about some equipment that had gone missing, which he described as an "apparent crime." ROA.12018.

Having no economic interest in the dispute, Durham sold Reticulum to Brown for $1 in 2016. ROA.10378, 15142, 15431. From that point on, Brown was the sole owner and governing member of Reticulum. ROA.10478-79, 9989.

### C. The Arbitration Panel Awards Damages.

Reticulum filed a pre-suit petition in Texas state court against Dean and Watters to investigate claims for fraud, conversion, and negligent misrepresentation relating to their actions in connection with the SBA and

the security agreement. ROA.22601-02. Watters sought and was granted a stay of the state court action and to compel arbitration pursuant to the SBA. ROA.22648, 22667. Reticulum filed a demand for arbitration. ROA.22626. The arbitration panel entered an interim award against Dean and Watters, jointly and severally in the amount of $500,000, plus attorney's fees and costs, finding they were liable to Reticulum for negligent misrepresentation, but finding insufficient evidence of fraud. ROA.22678-82.

**D. Dean and Watters File for Bankruptcy.**

Dean filed a voluntary petition pursuant to Chapter 7 of the Bankruptcy Code. ROA.1046. In light of the automatic stay resulting from Dean's filing, the arbitration panel severed the claims against Watters and entered a final award against Watters in the amount of $993,447.75, plus interest. ROA.1046. Watters filed his own Chapter 7 voluntary petition. ROA.1046.

Reticulum objected under 11 U.S.C. § 523 to the discharge of Watters's debt to Reticulum under the arbitration award. ROA.1036-37. The bankruptcy court held a trial on Reticulum's objection and issued an opinion finding that Reticulum failed to meet its burden of proof as to

fraudulent intent, justifiable reliance, or a materially false statement. ROA.1062. The court also found Dean to be a credible witness. ROA.1051. In Dean's bankruptcy proceedings, the bankruptcy court granted summary judgment disallowing Reticulum's proof of claim. ROA.724-37.

### E. Reticulum Emails Criminal Complaint Forms.

In 2018, Reticulum's attorney Pettit contacted the Dallas County District Attorney's Office to email complaint forms against Dean and Watters. ROA.12345. Pettit, who drafted the complaints on behalf of Reticulum, sent an email to Rick Watson in the DA's office attaching the complaints, a narrative, and documents. ROA.15109-10, 12199, 12345, 7295-96.

The complaint form against Dean listed the complaining party and witness as follows:

> Fred Alan Brown of Reticulum Management, LLC
> Your Full Name (and Company Name if applicable)

ROA.12350. The complaint described the offense as follows:

> 1. Date of offense or beginning and ending dates if a lengthy time period: On or about July 2015, the negotiations began for the extension of the loan which is evidenced by the Sale and Buyback Agreement dated July 27, 2015. The amount of $483,258 was wired by Reticulum to Total Operating on July 27, 2015. The collateral was wrongfully disposed of starting in approximately spring to summer of 2016.

ROA.12350.

The attached narrative detailed the SBA giving Reticulum the right to the profits obtained from the Jetta project and Total Operating's failure to buy back those profits or pay Reticulum. ROA.12355. The narrative continued that, as a result, the SBA "was converted to a promissory note . . . on October 30, 2015" and the note "was secured by a Security Agreement . . . executed by the parties on or about October 30, 2015." ROA.12355.[1] The narrative listed various statements made by Dean and Watters to Reticulum, which Reticulum stated were false. ROA.12355-56.

The complaint form against Dean included a summary of events drafted by Durham and also attached appendices. ROA.12360, 15410.

In 2020, Brown hired former DA Rick Watson, who had gone into private practice, to help follow up on the complaint. ROA.12027, 15026-27, 15121. Durham was not involved in those discussions. ROA.15146; *see* ROA.12020-26 (emails between Watson, Brown, and Pettit). Watson prepared a memorandum for DA Andrea Ingram and had a meeting with her to discuss a possible indictment against Dean. ROA.12538, 12027,

---

[1] As noted above, the security agreement was signed in the spring of 2016 to be effective as of October 30, 2015, the buyback date under the SBA. ROA.1045, 12502, 14979.

15122. Watson reported back to Brown and Pettit about his meeting with Ingram and her plan to get the case to the grand jury. ROA.12027, 15122-23.

In June of 2020, the Grand Jury returned two indictments against Dean for theft of property and securing execution of a document by deception. ROA.12577-78. Both indictments were based on harm to Reticulum and Brown. ROA.12577-78. Dean was arrested and spent the night in jail. ROA.14809, 14852. He learned that "Fred Brown of Reticulum Management filed the complaint against" him. ROA.14853. After the arrest, his parents received an anonymous package containing a copy of his mugshot. ROA.14868-69, 12028. Brown admitted that Pettit obtained a copy of the mugshot for him, which he showed to family and friends at a party and emailed to Durham. ROA.15123-24, 12029.

In September of 2021, the state sought, and the district court granted, dismissal of the indictments based on the findings by the bankruptcy court in Watters's bankruptcy that Reticulum had failed to carry its burden of proof as to fraudulent intent and finding Dean credible. ROA.12579-80.

### F. This Litigation Begins in State Court.

Veritas Vincit, LLC and William Berry Dean, III (together with Veritas, "Plaintiffs") filed suit in Dallas County, Texas against Brown,

Reticulum, Durham, and Birnam Wood. ROA.16141, 17112, 15364-65. Dean's father formed Veritas to purchase Dean's claims against the Defendants in this suit—Brown, Reticulum, Durham, and Birnam Wood—from Dean's bankruptcy estate. ROA.14870, 17112 n.1. Veritas is 98 percent owned by the William B. Dean, III Irrevocable Trust, set up for Dean's benefit, 1 percent owned by Dean's father, and 1 percent owned by VV Funding, LLC. ROA.10358-59, 10382, 10409 n.5.

Plaintiffs claimed that Brown and Reticulum, his solely owned company, committed malicious criminal prosecution of Dean under Texas law by filing the criminal complaint form against Dean. ROA.17161, 10478-79, 9989. Plaintiffs also claimed Reticulum committed malicious *civil* prosecution against Dean by filing several civil lawsuits. ROA.17169. Plaintiffs brought Texas civil conspiracy claims against Brown, Reticulum, Durham, and Birnam Wood. ROA.17171.

### G. Plaintiffs Remove the Case to Federal Court.

After Brown filed a petition for relief under Chapter 7 of the Bankruptcy Code, Plaintiffs removed the case under 28 U.S.C. § 1452 to the

Bankruptcy Court for the Northern District of Texas. ROA.16102, 17215.[2] The case was transferred to the Bankruptcy Court for the Eastern District of Texas. ROA.17227, 17461-64. After the bankruptcy court questioned its jurisdiction over these state law claims, ROA.17607, Plaintiffs moved for abstention or equitable remand under 28 U.S.C. § 1334 and/or 28 U.S.C. § 1452 on the grounds that this is a "non-core" proceeding related to a bankruptcy case. ROA.17637, 17646. The bankruptcy court denied that motion. ROA.18187-88.

The bankruptcy court initially entered a default against Reticulum for failure to timely respond to the complaint, directing Plaintiffs to file a motion for default judgment. ROA.18193. Plaintiffs requested the court to amend its entry of default to order that Plaintiffs were not required to seek default judgment against Reticulum until all of the causes of action against the other Defendants were determined. ROA.18204-06. The bankruptcy court amended its order of default, directing that Plaintiffs were not required to move for default judgment against Reticulum until their causes of action against the other Defendants were determined. ROA.18219-20.

---

[2] Brown's bankruptcy case remains pending. *See In re Brown*, No. 22-41110-BTR-7 (Bankr. E.D. Tex.).

Plaintiffs' claims against Reticulum remained pending until shortly before trial, when the district court dismissed them. ROA.10404, 10423.

### H. The Reference Is Withdrawn for Trial.

After pretrial proceedings in the bankruptcy court, the parties jointly moved under 28 U.S.C. § 157(d) to withdraw the reference to the district court for a jury trial. ROA.27, 30812. The district court granted the motion and withdrew the reference. ROA.17, 30829-34.

### I. Plaintiffs Purchase Defendant Reticulum.

A discovery dispute arose when Durham and Birnam Wood withheld certain documents on the grounds that they disclosed Reticulum's attorney-client privileged communications and attorney work product of Reticulum's attorney, Pettit. ROA.7287, 7295-96.[3] Plaintiffs subsequently purchased Reticulum, through a third-party controlled by them, Fiduciario, LLC, in Brown's bankruptcy. ROA.7384. The Bill of Sale and Assignment of Membership Interests conveyed:

> All rights, titles, and interests of Fred Brown and/or the Trustee and/or the bankruptcy Estate in Reticulum

---

[3] The dispute over Reticulum's privileged communications was not new. After Brown acquired Reticulum, Reticulum filed a petition for writ of mandamus in this Court seeking relief from an order in Dean's bankruptcy proceedings requiring Reticulum to turn over communications between Brown and Reticulum's counsel Pettit prior to Brown's acquisition of Reticulum. *See In re Reticulum Mgmt., LLC*, No. 21-10935 (5th Cir.). The Court denied the petition.

> Management, LLC, including, without limitation, all membership or other equity interests in Reticulum Management, LLC and all rights, privileges, and benefits of such membership or other equity interests under all applicable documents and applicable laws, and all rights, titles, and interests of Fred Brown and/or the Trustee and/or the bankruptcy Estate in the books and records of Reticulum Management, LLC . . . .

ROA.7384.

Plaintiffs' counsel informed all parties that "Reticulum has a new owner" and that "[i]n view of the change of ownership, and Reticulum's directive and consent in the attached letter, please promptly produce all materials withheld on the attached Durham Defendants' privilege log." ROA.7393. The attached letter stated that "Fiduciario, LLC owns Reticulum" and directs the recipients to produce the disputed documents withheld based on any privilege held by Reticulum. ROA.7394. Dean and Watters signed the letter on behalf of Reticulum.[4]

---

[4] Watters and Dean both worked for Total Operating during the transactions at issue, assert the same malicious criminal prosecution claims against the same Defendants, and are represented by the same counsel. ROA.17417-60, 10415. Watters's suit is still pending. *Watters v. Brown, Reticulum Mgmt., LLC, Durham, & Birnam Wood Cap., LLC*, Adv. Proc. No. 22-04052 (Bankr. E.D. Tex.).

**RETICULUM MANAGEMENT, LLC**

By: ___________________________

William Berry Dean, III, on behalf of Veritas Vincit LLC, a member of Fiduciario, LLC

By: ___________________________

Jacob F. Watters, on behalf of 4222014, LLC, a member of Fiduciario, LLC

ROA.7394.

Plaintiffs filed a motion to compel, stating that "While the Durham Defendants may have had a valid basis for withholding these documents when they prepared their privilege log in 2022, Reticulum recently expressly ***waived*** any privilege over the withheld documents in April 2024." ROA.9988-89.[5] As Plaintiffs' motion explained, at the time of Brown's bankruptcy petition, "Brown owned 100% of Reticulum, and Brown's interest in Reticulum became the property of Brown's estate." ROA.9989. Plaintiffs contended that the documents must be produced because Fiduciario had purchased Reticulum and Fiduciario and Reticulum waived the privilege over the withheld documents. ROA.9991.

[5] The court denied without prejudice Plaintiffs' original motion to compel, ROA.7284, because it was untimely filed, but the court invited Plaintiffs to refile and seek leave of court, which Plaintiffs did. ROA.9960-61, 9979, 9988.

Plaintiffs' motion to compel also cited Pettit's testimony "that her involvement with the criminal referral was on [sic] only on behalf of Reticulum, not Brown, Durham, or Birnam Wood" and quoting the following testimony by Pettit:

> Q. (BY MS. RISINGER) And who retained you to communicate with the Dallas County District Attorney's Office with regards to Exhibit 10, the criminal complaint form?
>
> A. Anything regarding the criminal complaint form, my representation was on behalf of Reticulum Management, LLC.
>
> Q. (BY MS. RISINGER) Okay. So for communications that occurred after the filing of the criminal complaint, what client would you have been making those communications on behalf of?
>
> A. As I've stated, anything involving the criminal complaint or communications related to it was on behalf of Reticulum Management, LLC.

ROA.7295-96 (highlighting by Plaintiffs).

The court granted Plaintiffs' motion to compel, requiring Defendants to turn over Reticulum's privileged communications with its attorneys. ROA.10124-33.

### J. Motions to Dismiss for Lack of Case or Controversy.

Durham and Birnam Wood filed a motion to dismiss based on the lack of a case or controversy under Article III of the Constitution because

"Veritas and Dean now own and control Reticulum." ROA.10330.[6] Plaintiffs responded, contending that Plaintiff Veritas "is only a 50% owner of Reticulum's current owner," Fiduciario, while the other 50% is held by Watters, and that their claims against the other Defendants survive their purchase of Reticulum. ROA.10350, 10356-57.

The district court granted the motion to dismiss in part, finding that "Plaintiffs do in fact control Defendant Reticulum and that no case or controversy exists between Plaintiffs and Reticulum, necessitating Reticulum's dismissal from the present case." ROA.10404, 10414. Examining Dean's and Watters's ownership interests in Fiduciario and Reticulum, the court found that "Jacob Watters is not some disinterested third party as Plaintiffs seem to suggest." ROA.10415. "Quite to the contrary, Watters was the CEO of Total Operating at the time the initial dispute arose between these parties, was himself the subject of numerous lawsuits brought by Reticulum over the same transaction—at least three of which feature in Plaintiffs' claims of malicious civil and criminal prosecution in this case—and was himself brought to bankruptcy by

[6] Brown also adopted the motion to dismiss. ROA.10348.

Reticulum's suits." ROA.10415. Moreover, the court noted that Plaintiffs have relied on testimony and declarations submitted by Watters to support their case. ROA.10415. "To argue that Watters is some disinterested third party, as opposed to one aligned in interest with Plaintiffs, strains credulity; rather, Watters is a central figure in both the underlying dispute and many of the cases which Plaintiffs now point to in support of their claims for malicious prosecution." ROA.10415.

The court concluded that, "[w]hen Plaintiffs, acting through an entity who they control (Fiduciario), acquired Defendant Reticulum, they eliminated any genuine case or controversy between themselves and Reticulum." ROA.10416. In support of its conclusion, the court cited the evidence in the record that: "(1) Plaintiff Dean is a Manager of Fiduciario; (2) Plaintiff Dean is authorized to sign for Plaintiff Veritas; (3) Plaintiff Veritas is a member of Fiduciario; (4) interested-party Jacob Watters, through 4222014, LLC, is the only other member of Fiduciario; (5) Fiduciario owns Defendant Reticulum; and (6) Fiduciario is the designee and assignee of Plaintiff Dean and Jacob Watters." ROA.10417 (citations omitted). The court also cited Reticulum's waiver of privilege signed by Dean and Waters, stating it was clear that they purchased Reticulum "for

the purpose of gaining a material advantage in this lawsuit." ROA.10417-18. "Simply put, Plaintiffs were too clever by a half. In so doing, they have deprived this Court of jurisdiction over their claims against Reticulum." ROA.10418. Accordingly, the court stated it had "no alternative but to dismiss Plaintiffs' claims against Defendant Reticulum, as no genuine case or controversy exists any longer between those parties." ROA.10418.

The court agreed with Plaintiffs, however, "that the dismissal of Reticulum provides no basis to dismiss Plaintiffs' claim for malicious criminal prosecution in its entirety," allowing those claims to proceed against Brown, Durham, and Birnam Wood. ROA.10420. The court found, however, "that does **not** mean that Plaintiffs can continue to make their claim for conspiracy to commit malicious *civil* prosecution, in which Reticulum was the only entity alleged to have committed the underlying tort." ROA.10420.

The court held that Plaintiffs could not "rely upon the actions of Reticulum (as opposed to Brown and the Durham Defendants) to support their claim of conspiracy to commit malicious criminal prosecution" because "[t]o hold otherwise would allow Plaintiffs to collude with Reticulum to the detriment of the other defendants in this case."

ROA.10420. "[B]y acquiring and controlling Reticulum with respect to this action, Plaintiffs cannot now seek to hold Reticulum's co-defendants liable for Reticulum's actions in any conspiracy." ROA.10422.

Thus, the court found that "the only parties that remain in this case are Plaintiffs, Defendant Brown, and the Durham Defendants, and no acts or omissions of Reticulum, now owned and controlled by Plaintiffs (in conjunction with Watters), may be used to prove or support Plaintiffs' claims against Brown and the Durham Defendants." ROA.10423. The court dismissed Plaintiffs' claims against Reticulum without prejudice, and ordered that "Plaintiffs may not rely upon any actions or conduct of Reticulum to prove or support Plaintiffs' claim of malicious criminal prosecution against Brown or Plaintiffs' claim of conspiracy against Brown and the Durham Defendants." ROA.10423.

After the court's ruling on Durham and Birnam Wood's motion to dismiss, entered just twenty days before trial, Brown shortly thereafter filed a motion to dismiss for lack of a case or controversy under Article III, arguing that all of the evidence regarding his involvement with the criminal complaint form against Dean is inadmissible because "Brown's actions were all taken as an agent of Reticulum, which is now

constitutionally barred from being involved in any dispute brought by Plaintiffs." ROA.10475. Moreover, Brown asserted that "Brown was at all times during the pendency of the criminal complaint against Dean, an agent of Reticulum, acting on Reticulum's behalf." ROA.10476. Brown's declaration stated in pertinent part as follows:

> 2. "Since September 26, 2016, through the initiation of this litigation, I was the sole owner and governing member of Reticulum Management, LLC ("Reticulum"). There have been no other owners or governing members of Reticulum since September 26, 2016, through the initiation of this litigation. After I became the sole owner and governing member of Reticulum, as part of carrying out the company's business, I attempted to recover funds owed to Reticulum under the Sale and Buyback Agreement, and to report crimes for which Reticulum was the victim. (ECF 33-1, A-1). As sole owner and governing member of Reticulum, and not in my
>
> . . . .
>
> 3. "All actions I took with regard to the criminal complaint and prosecution, including prior and subsequent communications with the Dallas District Attorneys' Office, were done as an agent of Reticulum on Reticulum's behalf for the purpose of carrying out the business of Reticulum. Any communications that I had with Andrea Ingram, Rick Watson, Kyson Johnson and any other member of the Dallas District Attorneys' office were done on behalf of Reticulum.

ROA.10478-79; *see also* ROA.9989 (stating Brown owned 100% of Reticulum).

**K. Trial Proceedings.**

The court made several rulings at the pretrial hearing, memorialized in a written order. ROA.14469, 10572. Among other things, the court (1) denied as untimely Brown's motion to dismiss for lack of subject matter jurisdiction, ROA.10573; and (2) granted Plaintiffs' motion for summary

judgment on their affirmative claims, holding that (a) the criminal proceedings terminated in Dean's favor, and (b) Brown "initiated" the criminal proceedings against Dean under Texas law, ROA.472, 14513, 10574. Given its ruling that Brown "initiated" the prosecution, the court excluded any evidence regarding issues of "procurement" of the prosecution, which requires proof of the material falsity of the statements made to law enforcement. ROA.14526-27, 14530-31; *see King v. Graham*, 126 S.W.3d 75, 78 (Tex. 2003) (per curiam).

The court also clarified its order that the parties may not "rely" on Reticulum's conduct, stating that "[w]hatever Reticulum did or has been alleged to have done can be brought up in the evidence in this case." ROA.14475-76. The court explained that "[w]hat's been excluded is effectively a legal argument at the conclusion of the evidence that . . . the Plaintiffs' claims have been established because Reticulum did this or Reticulum's conduct proves the claims." ROA.14477. The court further explained that "[t]he conduct of Defendants is what's going to have to prove the claims raised by Plaintiff" even if that conduct "may be in conjunction with Reticulum." ROA.14477.

The court held a four-day jury trial. ROA.14625, 14797, 15158, 15306. After the close of evidence, Durham and Birnam Wood moved for judgment as a matter of law under FED. R. CIV. P. 50(a). ROA.15204-28.

The jury reached a unanimous verdict that (1) Brown committed malicious criminal prosecution, (2) Brown conspired to commit malicious criminal prosecution, (3) Durham conspired to commit malicious criminal prosecution, (4) and Birnam Wood conspired to commit malicious criminal prosecution. ROA.10627. The jury awarded Plaintiffs $3.8 million in compensatory damages. ROA.10628. The jury found clear and convincing evidence that Brown's, Durham's, and Birnam Wood's conduct was done with fraud, malice, or gross negligence and awarded exemplary damages of $1 million against Brown, $125,000 against Durham, and $125,000 against Birnam Wood. ROA.10629-30.

The district court entered a final judgment on the verdict on August 23, 2024, awarding Plaintiffs $3.8 million against Defendants jointly and severally, the exemplary damages found by the jury, pre-judgment interest, post-judgment interest, and costs. ROA.10637-39.

Durham and Birnam Wood filed a renewed motion for judgment as a matter of law under FED. R. CIV. P. 50(b), or, in the alternative, motion for

new trial or to alter or amend the judgment under FED. R. CIV. P. 59, or remittitur. ROA.11002. The district court denied the motion on August 18, 2025. ROA.11940.

Durham and Birnam Wood timely filed their notice of appeal on September 8, 2025. ROA.11961. Plaintiffs timely filed a notice of appeal from the court's memorandum opinion and order granting Durham and Birnam Wood's motion to dismiss in part, ROA.10404, and the final judgment, ROA.10637, 11966.[7]

Plaintiffs, Durham, and Birnam Wood filed an agreed motion for an order setting a reduced bond, which the court granted. ROA.11054, 11061.

---

[7] Brown did not file an appeal.

## SUMMARY OF THE ARGUMENT

The district court reversibly erred by denying in part Durham and Birnam Woods' motion to dismiss for lack of a constitutional case or controversy. Once Plaintiffs purchased Reticulum, any adversity ceased because Reticulum's conduct could not be separated from that of its sole owner and agent, Brown. Brown expressly signed the criminal complaint form on behalf of Reticulum for a debt owed to Reticulum. The conspiracy claims against Durham and Birnam Wood likewise fail because they are derivative of the malicious criminal prosecution claims against Reticulum and Brown.

The court also reversibly erred by granting summary judgment that Brown—rather than a prosecutor—could "initiate" a prosecution under Texas law, erasing the distinction between "initiates"—something a public official does by filing formal criminal charges—and "procures"—something a citizen may do only if he provides materially false information that caused the prosecution. This disrupts the Supreme Court of Texas's careful balance to ensure that citizens are not penalized for reporting crimes.

The court erroneously granted judgment on Plaintiffs' conspiracy claims against Durham and Birnam Wood, despite the lack of legally sufficient evidence to support those claims. There is an uncertain question of Texas law as to whether conspiracy to commit malicious criminal prosecution is even a viable claim in Texas, which this Court may certify to the Supreme Court of Texas if this case survives its other infirmities. The Supreme Court has disapproved of a similarly derivative tort of aiding or cooperating in a malicious criminal prosecution. Moreover, Birnam Wood could not conspire with its owner, Durham. There was no legally sufficient evidence of a specific intent to agree to accomplish something unlawful or to accomplish something lawful by unlawful means.

The compensatory damages were unsupported by legally sufficient evidence because they were based on hypothetical income Dean would have received from theoretical deals his investment firm would have closed had his prosecution not occurred. Dean's claim for mental anguish and pain and suffering could not support the award either because there was no evidence to justify the amount awarded by the jury.

The exemplary damages awarded were legally insufficient because there was no clear and convincing evidence of outrageous, malicious, or

otherwise reprehensible conduct by Durham or Birnam Wood or that they specifically intended for Plaintiffs to suffer substantial injury that was independent and qualitatively different from the compensable harms associated with the underlying causes of action.

## ARGUMENT

### I. THERE IS NO CONSTITUTIONAL CASE OR CONTROVERSY AFTER PLAINTIFFS PURCHASED DEFENDANT RETICULUM.

Article III of the Constitution limits "[t]he judicial power of the United States to 'cases' or 'controversies,' ensuring that federal courts act only as a necessity in the determination of real, earnest and vital disputes." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (internal quotations omitted). "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976); *see also Murthy v. Missouri*, 603 U.S. 43, 56 (2024) (same).

As the Supreme Court has explained, "[i]f a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *Murthy*, 603 U.S. at 57. "As [a] corollary to this case-or-controversy requirement, there must exist a dispute at all

stages of review, not merely at the time the complaint is filed." *Moore v. Harper*, 600 U.S. 1, 14 (2023) (internal quotations omitted). As with mootness, a lack of adversity may arise requiring dismissal for lack of a constitutional case or controversy. *Id*.

Such a lack of adversity may arise when, as here, a party acquires or controls its opponent yet continues to litigate against it in order to adversely affect the rights of third parties. When a party controls both the plaintiff and defendant to a lawsuit, there is no constitutional case or controversy for a court to adjudicate. *S. Spring Hill Gold Min. Co. v. Amador Medean Gold Min. Co.*, 145 U.S. 300, 301 (1892) ("We cannot . . . consent to determine a controversy in which the plaintiff has become the *dominus litis* on both sides."); *Wood-Paper Co. v. Heft*, 8 Wall. 333, 75 U.S. 333, 336-37 (1869) (dismissing case where one of multiple defendants sold his interest in patents to complainant); *Cleveland v. Chamberlain*, 1 Black 419, 66 U.S. 419, 425-26 (1861) (dismissing case for lack of adversity where "Chamberlain became the equitable owner of Cleveland's judgment, and the '*dominus litis*' on both sides"); *Lord v. Veazie*, 8 How. 251, 49 U.S. 251, 255-56 (1850) (dismissing case for lack of adversity where "the plaintiff and defendant have the same interest").

The federal courts have "refus[ed] to entertain cases which disclosed a want of a truly adversary contest, of a collision of actively asserted and differing claims." *Poe v. Ullman*, 367 U.S. 497, 505–06 (1961). As the Court explained in *Poe*, "[s]uch cases may not be 'collusive' in the derogatory sense of *Lord v. Veazie*, 8 How. 251, 12 L.Ed. 1067—in the sense of merely colorable disputes got up to secure an advantageous ruling from the Court." *Id.* at 505. "The Court has found unfit for adjudication any cause that 'is not in any real sense adversary,' that 'does not assume the 'honest and actual antagonistic assertion of rights' to be adjudicated—a safeguard essential to the integrity of the judicial process, and one which we have held to be indispensable to adjudication of constitutional questions by this Court.'" *Id.* (quoting *United States v. Johnson*, 319 U.S. 302, 305 (1943)).

The courts have been especially mindful of the interests of third parties affected by collusive or friendly suits. *See Lord*, 49 U.S. at 255 (dismissing appeal where "plaintiff and defendant have the same interest, and that interest [is] adverse and in conflict with the interest of third parties, whose rights would be seriously affected if the question of law was decided in the manner that both of the parties to th[e] suit desire it to be"); *Wood-Paper*, 75 U.S. at 336 (quoting *Lord* regarding the rights of third

parties and explaining that defendant who sold his interest to complainant had agreed to hold his co-defendants harmless); *Cleveland*, 66 U.S. at 426 (dismissing appeal where a party had "purchased the debt" at issue and "now carries on a pretended controversy . . . for the evident purpose of obtaining a decision injurious to the rights and interests of third parties"). Dismissal is required in such circumstances to maintain the public interest in the integrity of the courts. *Johnson*, 319 U.S. at 305 ("It is the court's duty to [dismiss] where, as here, the public interest has been placed at hazard by the amenities of parties to a suit conducted under the domination of only one of them.").[8]

[8] Under the Texas Constitution, the courts' "judicial power" similarly "implicates the authority to resolve actual, non-collusive legal disputes brought by adverse parties who have a genuine legal interest and a live stake in the outcome, which can be reduced to an enforceable judgment." *Tex. Dep't of Fam. & Protective Servs. v. Grassroots Leadership, Inc.*, 717 S.W.3d 854, 868 (Tex. 2025); *see also* TEX. CONST. art. V, § 1; *In re Lakeside Resort JV, LLC*, 689 S.W.3d 916, 921 n.6 (Tex. 2024). ("Courts reject the exercise of jurisdiction in such cases because they cannot entertain collusive suits."); *Dickson v. Am. Gen. Life Ins. Co.*, 698 S.W.3d 234, 239 (Tex. 2024) (Young, J., concurring in denial of petition for review) ("[I]f subject-matter jurisdiction is lacking for any reason—the lack of standing, collusive litigation, mootness, whatever—the appellate court must dismiss the appeal."). The Texas Supreme Court has treated the Texas Constitution's "cases" provision as identical to the federal "case or controversy" provision." *Grassroots Leadership*, 717 S.W.3d at 869-70; TEX. CONST. art. V, § 3(a).

### A. This Case Ceased to Be Adverse When Plaintiffs Purchased Brown's Interests in Reticulum.

Perhaps seeking an easy resolution to a pretrial discovery dispute about privileged attorney-client communications belonging to Reticulum, just four months prior to trial, Plaintiffs purchased Reticulum in Defendant Brown's bankruptcy proceedings through an entity controlled by them, Fiduciario. ROA.7384, 10383, 10385, 10417. Plaintiffs' counsel promptly informed all parties that "Reticulum has a new owner" and directed Defendants to produce all documents withheld based on any privilege held by Reticulum. ROA.7393-94.[9] Dean and Watters signed the letter on behalf of Reticulum. ROA.7394.

Fiduciario is 50 percent owned by Plaintiff Veritas and 50 percent owned by Watters, through an entity, 4222014, LLC. ROA.10356, 10383, 10385, 10417. Watters is closely aligned with Dean and asserts the same malicious prosecution claims against the same Defendants. ROA.10417; *see supra* note 4. Veritas is 98 percent owned by the William B. Dean, III

[9] Defendants questioned whether Plaintiffs' counsel were now representing Reticulum given that they were transmitting Reticulum's instructions. ROA.10333; *see Kunstoplast of Am., Inc. v. Formosa Plastics Corp.*, 937 S.W.2d 455, 456 (Tex. 1996) ("Generally a corporation may be represented only by a licensed attorney . . . ."). Plaintiffs' counsel deny that they ever represented Reticulum. ROA.10359, 10388-91.

Irrevocable Trust, set up for Dean's benefit, 1 percent owned by Dean's father, and 1 percent owned by VV Funding, LLC. ROA.10358-59, 10382, 10409 n.5.

Plaintiffs dispute that they control Fiduciario, contending that Plaintiff Veritas "is only a 50% owner of Reticulum's current owner," Fiduciario, while the other 50% is held by Watters, and that their claims against the other Defendants survive their purchase of Reticulum. ROA.10356-57.

The district court correctly rejected that argument, finding that "Plaintiffs do in fact control Defendant Reticulum and that no case or controversy exists between Plaintiffs and Reticulum, necessitating Reticulum's dismissal from the present case." ROA.10414. The court found that "Jacob Watters is not some disinterested third party as Plaintiffs seem to suggest." ROA.10415. "Quite to the contrary, Watters was the CEO of Total Operating at the time the initial dispute arose between these parties, was himself the subject of numerous lawsuits brought by Reticulum over the same transaction—at least three of which feature in Plaintiffs' claims of malicious civil and criminal prosecution in this case—and was himself brought to bankruptcy by Reticulum's suits." ROA.10415. Moreover, the

court noted that Plaintiffs have relied on testimony and declarations submitted by Watters to support their case. ROA.10415. "To argue that Watters is some disinterested third party, as opposed to one aligned in interest with Plaintiffs, strains credulity; rather, Watters is a central figure in both the underlying dispute and many of the cases which Plaintiffs now point to in support of their claims for malicious prosecution." ROA.10415. The court explained that

> The form of ownership of Reticulum being currently structured such that Plaintiffs share full ownership of that entity with a fully aligned individual (Jacob Watters) does not allow or permit the Court to blind itself to the plain facts of this case. To permit such an apparent artifice of form over substance to rule the day would effectively destroy the Constitution's limitation on federal courts' authority to adjudicate only genuine cases or controversies.

ROA.10416.

The court concluded that, "[w]hen Plaintiffs, acting through an entity who they control (Fiduciario), acquired Defendant Reticulum, they eliminated any genuine case or controversy between themselves and Reticulum." ROA.10416. The court cited the evidence in the record that: "(1) Plaintiff Dean is a Manager of Fiduciario; (2) Plaintiff Dean is authorized to sign for Plaintiff Veritas; (3) Plaintiff Veritas is a member of Fiduciario; (4) interested-party Jacob Watters, through 4222014, LLC, is the

only other member of Fiduciario; (5) Fiduciario owns Defendant Reticulum; and (6) Fiduciario is the designee and assignee of Plaintiff Dean and Jacob Watters." ROA.10417 (citations omitted).

The court also cited Reticulum's waiver of privilege signed by Dean and Watters, stating it was clear that they purchased Reticulum "for the purpose of gaining a material advantage in this lawsuit." ROA.10417-18. "Simply put, Plaintiffs were too clever by a half. In so doing, they have deprived this Court of jurisdiction over their claims against Reticulum." ROA.10418. Accordingly, the court stated it had "no alternative but to dismiss Plaintiffs' claims against Defendant Reticulum, as no genuine case or controversy exists any longer between those parties." ROA.10418.

Recognizing correctly that Plaintiffs' ownership of Reticulum fundamentally changed the adversity between the parties, the district court dismissed Plaintiffs' claims against Reticulum without prejudice, and held that Plaintiffs could not rely on the actions of Reticulum to support their claims for conspiracy to commit malicious criminal prosecution because "[t]o hold otherwise would allow Plaintiffs to collude with Reticulum to the detriment of the other defendants in this case." ROA.10420. As the court explained, "by acquiring and controlling Reticulum with respect to

this action, Plaintiffs cannot now seek to hold Reticulum's co-defendants liable for Reticulum's actions in any conspiracy." ROA.10422. Thus, the court held that "no acts or omissions of Reticulum, now owned and controlled by Plaintiffs (in conjunction with Watters), may be used to prove or support Plaintiffs' claims against Brown and the Durham Defendants." ROA.10423.

The court reversibly erred, however, by holding that Brown's conduct could be separated from Reticulum's, and that Plaintiffs could maintain the same claims for malicious criminal prosecution and conspiracy against Brown, Durham, and Birnam Wood even after Plaintiffs purchased Reticulum. ROA.10420, 10423. As detailed below, it was impossible to divorce Brown's conduct from Reticulum's given that all of Brown's conduct was on behalf of Reticulum based on a debt owed to Reticulum. ROA.10478-79. Moreover, Plaintiffs alleged no separate claims against Brown, but alleged the exact same malicious criminal prosecution claim based on the same criminal complaint form and the same conduct.

In taking ownership and control of Reticulum, whose loan to Total Operating formed the basis of the criminal complaint form, Plaintiffs effectively put themselves on both sides of the "v." On one side, they allege

malicious criminal prosecution and conspiracy claims against Reticulum, Brown, Durham, and Birnam Wood, while on the other, they now control the entity whose criminal complaint form serves as the basis of their malicious criminal prosecution claim. Once Plaintiffs purchased Reticulum, they were no longer adverse to it or the other Defendants, and there was no longer a constitutional case or controversy.

**B. Brown's Conduct Cannot Be Separated from Reticulum's.**

As the sole owner and agent of Reticulum, ROA.10478-79, 9989, Brown's individual conduct on behalf of Reticulum was inseparable from Reticulum's conduct. Plaintiffs' allegations confirm this, alleging that Brown and Reticulum, together, maliciously prosecuted Dean by filing a criminal complaint form with the DA's office. ROA.17118-19, 17161. Plaintiffs alleged no separate causes of action against Brown that could have been litigated without relying on Reticulum's conduct. Plaintiffs even alleged Brown was the alter ego of Reticulum and should be liable for its actions:

> 173. While Brown has been the owner of Reticulum, he has been the alter ego of Reticulum, a company that is merely a business conduit of Brown, whose corporate form is used as a sham for Brown to avoid legal obligations. As such, Brown should be directly or jointly liable for any actions by or through Reticulum since the time he has owned Reticulum.

ROA.17176.

While the district court agreed with Plaintiffs' that Brown could be liable for his own tortious conduct, ROA.10370, 10420; *see Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 375 (Tex. 1984) (corporation's employee is personally liable for tortious acts), that was impossible in this case because Brown's conduct could not be separated from Reticulum's as he was acting its sole owner and agent at the time he signed the criminal complaint form on Reticulum's behalf. ROA.10478-79, 9989. Reticulum's conduct and Brown's were one and the same. *See Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995); ROA.17176.

Indeed, Reticulum could not have acted without Brown or some other human agent. "Corporations, by their very nature, cannot function without human agents." *Holloway*, 898 S.W.2d at 795. Under governing Texas law, "[g]enerally, a corporate officer's acts on the corporation's behalf are deemed corporate acts." *ACS Invs., Inc. v. McLaughlin*, 943 S.W.2d 426, 432 (Tex. 1997); *see also Latch v. Gratty, Inc.*, 107 S.W.3d 543, 545 (Tex. 2003) (same). Under the Texas Business Organizations Code, "each governing person of a limited liability company and each officer of a limited liability company vested with actual or apparent authority by the governing authority of the company is an agent of the company for

purposes of carrying out the company's business." TEX. BUS. ORGS. CODE § 101.254(a). Agents may also execute instruments on the company's behalf unless:

> (1) the agent does not have actual authority to act for the company; and
>
> (2) the person with whom the agent is dealing has knowledge of the agent's lack of actual authority.

TEX. BUS. ORGS. CODE § 101.254(b).

There was no allegation or evidence that Brown acted outside the scope of his authority as the sole owner and agent of Reticulum when he signed the criminal complaint form as "Fred Alan Brown of Reticulum Management, LLC" and Reticulum's attorney Pettit emailed it to the DA's office on Reticulum's behalf. ROA.12345, 12350, 12353, 14899, 10478-79, 9989. The form describes the offense solely in terms of harm to Reticulum, discussing the following:

- negotiations regarding the SBA between Reticulum and Total Operating. ROA.12350.
- the $483,258 wired by Reticulum to Total Operating. ROA.12350.
- representations that "property was being sold to pay off other liabilities before Reticulum could sell the property." ROA.12351.
- civil lawsuits filed by Reticulum. ROA.12351.

- "Reticulum purchased the right to any profits that Total Operating may realize from the Project for $500,000." ROA.12355.

- ". . . Total Operating was to pay Reticulum the profits earned from the Project with a minimum guaranteed profit margin of 15%." ROA.12355.

- "Total Operating failed to buy back the Project or pay Reticulum its minimum guaranteed earnings . . . ." ROA.12355.

- "To induce Reticulum to lend Total Operating over $500,000 and enter into the Agreement," and listing representations. ROA.12355.

- "Except for Capital One, Total Operating's other creditors had consented to Reticulum's loan taking priority over all other security interests." ROA.12356.

- "[U]nknown to Reticulum, Total Operating was essentially a sinking ship destined for insolvency." ROA.12356.

- "[A]fter receiving notices of default and foreclosure sent by Reticulum, Watters told Charles Durham, at that time the President of Reticulum, that Total Operating was in the process of selling the collateral subject to the Security Agreement." ROA.12356.

- "Reticulum immediately filed suit against Total Operating" and obtained a TRO. ROA.12356.

- "In violation of the TRO and in violation of the Security Agreement, Total Operating removed its equipment that Reticulum had a security interest in from its warehouse, concealed or otherwise hid the equipment, and then proceeded to sell nearly all of the collateral." ROA.12356.

- "Regarding the equipment, Total Operating had represented to Reticulum that it owned a significant amount of equipment

which would be used as collateral to secure the loan." ROA.12356.

- "Reticulum knows that some of Total Operating's assets were moved from its property to property owned and/or controlled by Waterhouse." ROA.12357.
- "The equipment contained in the Conex boxes is the only collateral that Reticulum believes that Total Operating has not sold." ROA.12357.
- "The exact same thing which happened to Reticulum happened to [other Total Operating investors] as well." ROA.12357.
- Listing witnesses including Brown as "[c]urrent owner of Reticulum" and Durham as "[f]ormer owner of Reticulum." ROA.12358.

Brown described his conduct as taken on behalf of Reticulum to recover the money owed it under the SBA. ROA.10478. Brown was the "sole owner and governing member of Reticulum," and "[a]ll actions [he] took with regard to the criminal complaint and prosecution . . . were done as an agent of Reticulum on Reticulum's behalf for the purpose of carrying out the business of Reticulum." ROA.10478-79, 9989. Brown testified that, on behalf of Reticulum, he was attempting to recover monies against Dean and Watters individually. ROA.15132-33. Brown testified he "relied on Ms. Julie Pettit the attorney for Reticulum to draft and file the criminal complaint on behalf of Reticulum, that [he] signed on behalf of Reticulum." ROA.15138. Pettit likewise testified that she represented Reticulum in

preparing and submitting the complaint form on behalf of Reticulum via email. ROA.15359-60, 7295-96. Brown signed the complaint form prepared by Pettit as an agent of Reticulum. ROA.15138, 15148. Pettit testified her office later ordered a copy of Dean's mugshot on behalf of Reticulum. ROA.15360.

Despite the district court's order that the parties could not "rely" on the actions of Reticulum to support Plaintiffs' claims for conspiracy to commit malicious criminal prosecution, ROA.10420, the court later limited its order, explaining that "[w]hatever Reticulum did or has been alleged to have done can be brought up in the evidence in this case." ROA.14476. The court explained that the only limit it was placing on discussing Reticulum's conduct was to prohibit making "a legal argument at the conclusion of the evidence that . . . the Plaintiffs' claims have been established because Reticulum did this or Reticulum's conduct proves the claims." ROA.14477. This was inadequate to safeguard the court's integrity in hearing only actual cases or controversies. *See Poe*, 367 U.S. at 505–06.

As a result, Reticulum's role in the transactions at issue was a frequent topic at trial. In opening statements, Plaintiffs' counsel argued that:

- Dean "was accused of unlawfully harming Reticulum Management, LLC, and Mr. Brown by deception, by causing them to execute" the SBA. ROA.14760-61.

- Dean "never had any contact with Fred Brown or any representative of Reticulum on or before the 27th day of July, 2015." ROA.14761.

- "We're going to talk to you about who was involved in communications with Fred Brown and Reticulum regarding that that agreement, and what, if any, communications Mr. Dean had with Fred Brown, Bill Durham, and Reticulum about that agreement." ROA.14761.

- "Mr. Brown was going to lend $400,000 to Mr. Durham's company Reticulum, . . . and then Reticulum, LLC, would loan that $500,000 to Total Operating." ROA.14763.

- "Ultimately they discuss a different structure where, instead of Reticulum, LLC, loaning money to Total Operating, there would be a[n SBA], essentially a purchase of a profit interest whereby Reticulum would be receiving profits related to one particular project." ROA.14764-65.

- "Reticulum was not paid back the $500,000 . . . ." ROA.14767.

- "You're going to hear that Reticulum hired an attorney, Julie Pettit . . . ." ROA.14767.

- "Here is an email from Mr. Durham to Reticulum's attorney . . . ." ROA.14770.

Plaintiffs' counsel cross-examined DA Ingram regarding statements made in the criminal complaint form that conflicted with Reticulum's statements made in discovery. ROA.15184-86, 12346. Plaintiffs' counsel

again referenced Reticulum's inconsistent discovery responses in closing arguments. ROA.15288.

Plaintiffs did all of this without ever having to acknowledge that they now own and control Reticulum. The case became "unfit for adjudication" because it was no longer "in any real sense adversary" and did "not assume the honest and actual antagonistic assertion of rights to be adjudicated." *Poe*, 367 U.S. at 505–06 (internal quotations omitted). Plaintiffs specifically purchased all of *Brown's interests* in Reticulum, ROA.7384; waived Reticulum's attorney-client privilege, ROA.7393-94; used Reticulum's discovery responses as a cudgel at trial, ROA.15184-86, 15288; yet continued to litigate against Reticulum and Brown for Reticulum's conduct. If not for the district court's dismissal of Reticulum, Plaintiffs intended to litigate against their own company in order to obtain an adverse ruling against it, the bankrupt Brown, Durham, and Birnam Wood.[10] Even with the dismissal of Reticulum, the case was no longer genuinely adverse. In order to "safeguard . . . the integrity of the judicial

---

[10] Plaintiffs asked the bankruptcy court to defer entering default judgment against Reticulum so they could keep the claims against it live. ROA.18204-06, 18219-20. Plaintiffs still wish to litigate against their own company, filing a notice of appeal challenging the district court's dismissal of Reticulum. ROA.11966.

process," *id.*, the case against Brown and the remaining Defendants Durham and Birnam Wood should have been dismissed.

### C. The Conspiracy Claims Against Durham and Birnam Wood Also Fail.

Lacking jurisdiction over Reticulum and Brown, the court had no jurisdiction over the conspiracy claims against the Durham and Birnam Wood either. "Conspiracy is not an independent cause of action but requires an underlying tort." *Ortiz v. Collins*, 203 S.W.3d 414, 422 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (citing *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)). "[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Tilton*, 925 S.W.2d at 681; *see also Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 138 (Tex. 2019) ("civil conspiracy is a derivative tort"). "[A] civil conspiracy claim is connected to the underlying tort and survives or fails alongside it." *Agar*, 580 S.W.3d at 141. Thus, if there is no jurisdiction over Plaintiffs' claims against Reticulum and Brown, there is no underlying tort to support Plaintiffs' conspiracy claim, either.

Any evidence of a conspiracy by Durham and Birnam Wood with Brown also would necessarily implicate Reticulum. Durham acted for

Reticulum when he was its owner. Durham created the entity Reticulum as a vehicle to hold a rental property, which he later sold in 2014. ROA.15432. Watters asked Durham if he had an empty entity to use for the SBA. ROA.15432. In exchange for lending his entity, Watters offered Durham half of Watters's origination fee for the deal, or $2500, which was paid to Reticulum. ROA.15432. Durham signed the SBA on behalf of Reticulum in July 2015. ROA.15434, 12309, 12311. Durham sold Reticulum to Brown for $1 in September of 2016, more than a year before Reticulum's attorney emailed the criminal complaint form. ROA.10378, 15142, 12345. As with Brown, Plaintiffs allege that Durham was Reticulum's alter ego when he was owner of Reticulum. ROA.17175.

After purchasing Reticulum, Plaintiffs continued to prosecute claims against Durham and Birnam Wood for conspiring with Brown, whose conduct was on behalf of Reticulum. This is equivalent to Durham and Birnam Wood buying Plaintiff Veritas while still defending against Dean's claims. The claims are no longer adverse. As the district court correctly explained, "[i]f Plaintiffs are allowed to collude with Reticulum to hold the remaining defendants jointly and severally liable for the resulting damages, Reticulum's co-defendants will be injured by 'the pretended

controversy.'" ROA.10421-22 (quoting *Cleveland*, 66 U.S. at 426). That is precisely what happened here. Defendants were injured by the pretended controversy between Plaintiffs and Reticulum. Plaintiffs could freely discuss Reticulum's conduct in submitting the criminal complaint form and act as if they were still adverse to it, while seeking to hold the remaining Defendants liable for Reticulum's conduct. And even though the district court dismissed Reticulum from the case, it allowed the parties to freely discuss its conduct while denying Defendants' motion to designate Reticulum as a responsible third party under Texas's proportionate responsibility statute. ROA.14505-07, 14546-57, 14475-76; TEX. CIV. PRAC. & REM. CODE §§ 33.001–.004. Plaintiffs were effectively allowed to collude with Reticulum to the detriment of the other Defendants.

The district court's lack of adversity over Reticulum and Brown extends to Durham and Birnam Wood as well. In order to "safeguard . . . the integrity of the judicial process," *Poe*, 367 U.S. at 505–06 (internal quotations omitted), Plaintiffs' claims against Durham and Birnam Wood must also be dismissed for lack of jurisdiction.

## II. THE COURT ERRED BY GRANTING SUMMARY JUDGMENT THAT BROWN "INITIATED" THE CRIMINAL PROSECUTION.

Even if the district court had a continuing constitutional case or controversy, it reversibly erred by granting Plaintiffs summary judgment that Brown "initiated" the criminal prosecution by signing a complaint form that Reticulum's attorney emailed to the DA's office. ROA.14513, 10574, 12345, 12350, 12353.[11] The court equated a private citizen's making a complaint with law enforcement with a prosecutor filing formal charges against a defendant. ROA.14513 (the court stating, "It's clear under Texas law that one initiates a criminal proceeding when he makes a formal charge to law enforcement authorities . . . ."). To the contrary, Texas law is clear that formal charges are initiated by an indictment, information, or other form of legal process. The court's holding erases the distinction between "initiates" and "procures" and allows anyone whose prosecution was based on a citizen complaint to satisfy this necessary element of a malicious

[11] While "a post-trial motion under Rule 50 is not required to preserve for appellate review a purely legal issue resolved at summary judgment," *Dupree v. Younger*, 598 U.S. 729, 736 (2023), Durham and Birnam Wood raised this legal issue in their motion under FED. R. CIV. P. 50(a) and (b), and by objecting to the jury instructions, which were denied. ROA.15206, 15212-13, 15214, 15217, 15221, 15223, 15232, 11006-07, 11940, 11949.

criminal prosecution claim without a showing that materially false claims procured the prosecution.

This Court "review[s] the grant of a summary judgment *de novo*, applying the same standards as the district court." *Mieco L.L.C. v. Targa Gas Mktg. L.L.C.*, 161 F.4th 828, 835 (5th Cir. 2025). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The Court "view[s] evidence and factual inferences in the light most favorable to the nonmoving party." 161 F.4th at 835 (internal quotations omitted).

### A. The Elements of Malicious Criminal Prosecution Reflect a Delicate Balance.

"It is frequently said that actions for malicious prosecution are not favored in the law." *Browning-Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 291 (Tex. 1994). While the Supreme Court in *Lieck* noted that "aphorism is far too vague to serve as an analytical tool," "[w]hat is distinctive about malicious prosecution is that there is little room for error in applying the law." *Id.* "Even a small departure from the exact prerequisites for liability may threaten the delicate balance between protecting against wrongful prosecution and encouraging reporting of criminal conduct." *Id.*

Under Texas law, a plaintiff in a malicious criminal prosecution claim must establish: (1) a criminal prosecution commenced against the plaintiff, (2) the defendant initiated or procured that prosecution, (3) the prosecution terminated in the plaintiff's favor, (4) the plaintiff was innocent of the charges, (5) the defendant lacked probable cause to initiate the prosecution, (6) the defendant acted with malice, and (7) the plaintiff suffered damages. *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 792 n.3 (Tex. 2006).

These elements "reflect [the] balance" between recognizing "a cause of action for those subjected unjustifiably to criminal proceedings," while "also ma[king] clear that the cause of action must sometimes yield to society's greater interest in encouraging citizens to report crimes, real or perceived." *Suberu*, 216 S.W.3d at 792.

### B. Texas Courts Have Long Recognized a Distinction Between Initiating and Procuring a Prosecution.

Texas courts have long recognized a distinction between "initiating" and "procuring" a malicious criminal prosecution claim. *See Hurlbut v. Boaz*, 4 Tex. Civ. App. 371, 376, 23 S.W. 446, 448 (1893, no writ) ("To support an action for malicious criminal prosecution, the plaintiff must prove, in the first place, the fact of the prosecution, and that *the defendant was himself the prosecutor*, or that he instigated its commencement . . . ."

(emphasis added) (quoting *Wheeler v. Nesbitt*, 24 How. 544, 65 U.S. 544, 544 (1860)); *see also Reed v. Lindley*, 240 S.W. 348, 351 (Tex. Civ. App.—Fort Worth 1922, no writ) (same); *Mo., K. & T. Ry. Co. v. Groseclose*, 50 Tex. Civ. App. 525, 531, 110 S.W. 477, 480 (1908, no writ) (same).

The Texas Supreme Court has described initiation as something that a public official does, while a private person is not responsible for that decision to prosecute unless he satisfies the requisite elements for procurement:

> In order to charge a private person with responsibility for the *initiation of proceedings by a public official*, it must therefore appear that his desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the prosecution, or that the information furnished by him *upon which the official acted* was known to be false.

*King v. Graham*, 126 S.W.3d 75, 78 (Tex. 2003) (per curiam) (first emphasis added) (quoting with approval RESTATEMENT (SECOND) OF TORTS § 653 cmt. g (1977)).

### ***1. "Initiates" requires formal charges.***

"A person initiates a criminal prosecution if he makes a formal charge to law enforcement authorities." *Lieck*, 881 S.W.2d at 292 (citing RESTATEMENT (SECOND) OF TORTS § 653 cmt. c (1977)). In Texas, a "formal

charge" is considered an indictment, information, or some other form of legal process. *See Cantu v. State*, 253 S.W.3d 273, 284 (Tex. Crim. App. 2008) (stating that "invocation of the speedy trial provision . . . need not await indictment, information, or *other formal charge*" (emphasis added)); *Warner Bros. Ent. v. Jones*, 538 S.W.3d 781, 815 (Tex. App.—Austin 2017), *aff'd*, 611 S.W.3d 1 (Tex. 2020) ("While a formal charge by indictment or information against the plaintiff is not a requirement for a malicious-prosecution cause of action, at a minimum, it appears that a criminal prosecution does not commence until a person is arrested or a warrant for his arrest (or some other form of process) is issued" (internal quotations omitted)); *Gunville v. Gonzales*, 508 S.W.3d 547, 557 (Tex. App.—El Paso 2016, no pet.) ("Initiating the action describes executing the charging instrument which goes before the magistrate, who then may issue an arrest warrant."); *Lermon v. Minyard Food Stores, Inc.*, No. 05–13–00034–CV, 2014 WL 6466840, at *5 (Tex. App.—Dallas, Nov. 19, 2014, pet. denied) (voluntary statement made by defendant was not a "formal charge" nor did it actually operate to initiate the criminal prosecution when detective presented his own probable cause affidavit to a magistrate); *Torres v. GSC Enters., Inc.*, 242 S.W.3d 553, 562 (Tex. App.—El Paso 2007, no pet.) ("The summary judgment evidence conclusively

established that the criminal prosecution against Torres was initiated by [the police detective] filing a formal criminal complaint against Torres.”); *Carswell v. Sw. Bell Tel. Co.*, 449 S.W.2d 805, 816–17 (Tex. Civ. App.—Houston [1st Dist.] 1969, no writ) (“The prosecution was instituted by that officer [assistant district attorney] through a grand jury investigation.”); *see also* TEX. CODE CRIM. PROC. art. 21.01 (“An ‘indictment’ is the written statement of a grand jury accusing a person therein named of some act or omission which, by law, is declared to be an offense.”); TEX. CODE CRIM. PROC. art. 21.20 (“An ‘information’ is a written statement filed and presented in behalf of the State by the district or county attorney, charging the defendant with an offense which may by law be so prosecuted.”).

That a “formal charge” requires an indictment, information, or similar process by the state is consistent with the general understanding of the phrase in criminal law. *See Rothgery v. Gillespie Cnty.*, 554 U.S. 191, 198 (2008) (“We have, for purposes of the right to counsel, pegged commencement to the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment[.]” (internal quotations omitted)); *Cantu*, 253 S.W.3d at 284 (stating that “invocation of the speedy trial

provision . . . need not await indictment, information, or other formal charge"); *Griffith v. State*, 55 S.W.3d 598, 603 (Tex. Crim. App. 2001) (stating that Sixth Amendment right to counsel "protects an accused's right to counsel only at or after the time that adversary judicial proceedings have been initiated, whether by way of formal charge, preliminary hearing, indictment, information, or arraignment" (internal quotations omitted)).

This understanding is also consistent with the Restatement, which the Texas Supreme Court has cited with approval regarding malicious criminal prosecution:

> Criminal proceedings are instituted when (a) process is issued for the purpose of bringing the person accused of a criminal offense before an official or tribunal . . . or (b) without the issuance of process an indictment is returned or an information filed against him; or (c) he is lawfully arrested on a criminal charge.

RESTATEMENT (SECOND) OF TORTS § 654(2)(c) (1977); *Warner Bros.*, 538 S.W.3d at 815 (quoting same); *see also King*, 126 S.W.3d at 78 (first emphasis added) (quoting with approval RESTATEMENT (SECOND) OF TORTS § 653).

As a matter of Texas law, Brown's submitting a complaint form to the DA's office did not constitute a "formal charge" against Dean. That did not happen until the Grand Jury returned its indictments. ROA.12577-78.

### 2. *"Procures" requires causation and materially false information.*

As the authorities above make clear, an individual citizen cannot bring formal charges, but he can procure a criminal prosecution "if his actions are enough to cause the prosecution, and but for his actions the prosecution would not have occurred." *Lieck*, 881 S.W.2d at 292. "In other words, procurement requires that a person's actions be both a necessary and a sufficient cause of the criminal prosecution." *Id.* "Thus, a person cannot procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another person, a law enforcement official or the grand jury." *Id.* An exception to this "occurs when a person provides information which he knows is false to another to cause a criminal prosecution." *Id.*

Merely providing false information is not enough, however. "[T]o recover for malicious prosecution when the decision to prosecute is within another's discretion, the plaintiff has the burden of proving that that decision would not have been made but for the false information supplied by the defendant." *King*, 126 S.W.3d at 78. As the Supreme Court explained in *King*, "a person who knowingly provides false information to the grand jury or a law enforcement official who has the discretion to decide whether

to prosecute a criminal violation cannot be said to have caused the prosecution if the information was *immaterial* to the decision to prosecute." *Id.* (emphasis added). "If the decision to prosecute would have been made with or without the false information, the complainant did not cause the prosecution by supplying false information." *Id.*

Thus, to overcome the discretion of law enforcement or the grand jury in bringing the prosecution, the plaintiff must show that the defendant provided false information, and that the decision to prosecute "would not have been made but for the false information supplied by the defendant." *Id.*

While Plaintiffs contended that Brown made certain false statements in the complaint form, in light of the district court's incorrect summary judgment ruling, as discussed below, the jury was not required to determine whether those statements were material to the decision to prosecute.

### C. The District Court's Reasoning Makes the Initiates or Procures Distinction a Nullity and Disrupts the Careful Balance Struck by Texas Courts.

The district court effectively erased the historic distinction between initiates and procures and made it far easier to bring malicious criminal

prosecution cases. If a private citizen's making a report of criminal conduct to law enforcement constitutes an "initiation" of a criminal prosecution equivalent to the "formal charges" required by the Court in *Lieck* for that element, the separate category of "procures" becomes a nullity. Every criminal prosecution involving a citizen complaint would satisfy this element, regardless of whether it was based on the false information needed to satisfy the procured element. This is contrary to the delicate balance required by Texas courts so as not to dissuade the public from reporting criminal behavior. *Lieck*, 881 S.W.2d at 291; *Suberu*, 216 S.W.3d at 792.

The district court's error adversely affected the substantial rights of Durham and Birnam Wood and was harmful. *See* 28 U.S.C. § 2111; FED. R. CIV. P. 61. Plaintiffs were not required to prove that any false statements by Brown were material, and that but for those false statements the prosecution would not have been commenced. *King*, 126 S.W.3d at 78. Instead, the jury was asked only whether Plaintiffs proved by a preponderance of the evidence that "Defendant Fred Alan Brown committed malicious criminal prosecution." ROA.10627. This was contrary to the Texas Supreme Court's instruction in *Lieck* that "the jury should be

asked, not whether the defendant "caused" criminal proceedings, but whether he either 'initiated' or 'procured' them, depending on the nature of the case." 881 S.W.2d at 293. The court in *Lieck* further provided a definition of procurement that should be used in a jury charge. *Id.*

No such instruction was provided to the jury here because the district court instructed the jury that it had "already determined that the Defendant Fred Alan Brown initiated the criminal prosecutions of Plaintiff William Berry Dean, III, and you must accept the Court's determination as to this element of the Plaintiffs' claim for malicious criminal prosecution." ROA.15247.

Nor can the judgment be affirmed on the ground that there was sufficient evidence of "procurement" based on false statements in the complaint form because the court excluded any evidence regarding procurement and prevented the jury from deciding whether those statements were material. ROA.14526-27, 14530-31.

Because there was no basis for the district court to hold that Brown's signing a complaint form was the equivalent of a formal charge against Dean, there was no basis to hold Brown liable for malicious criminal prosecution, or to hold Durham and Birnam Wood liable for conspiracy to

commit malicious criminal prosecution. *See supra* Part I.D (conspiracy claim cannot survive absent underlying tort).

Durham and Birnam Wood were held jointly and severally liable for conspiracy to commit an underlying tort that was not established as a matter of Texas law. *See In re Cipolla*, 476 F. App'x 301, 308 (5th Cir. 2012) ("An error is not harmless if the lower court may have come to a different conclusion had it applied the correct legal standard."); *Transverse, L.L.C. v. Iowa Wireless Servs., L.L.C.*, 992 F.3d 336, 348-49 (5th Cir. 2021) (holding error was harmful where court failed to apply correct state law). The judgment must be reversed.

## III. THERE IS LEGALLY INSUFFICIENT EVIDENCE OF CIVIL CONSPIRACY.

Even if Plaintiffs' conspiracy claims against Durham and Birnam Wood could survive the jurisdictional and legal issues raised above, *see supra* Parts I, II, there is legally insufficient evidence to support the jury's verdict that Durham and Birnam Wood conspired with Brown to commit malicious criminal prosecution. ROA.10627. The district court reversibly erred by denying Durham and Birnam Wood's motion for judgment as a matter of law on this issue. ROA.15208, 15210, 11005-06, 11945-47; FED. R. CIV. P. 50(a), (b).

The district court applied the wrong standard of review, incorrectly holding that Durham and Birnam Wood had to provide "substantial evidence" to support their assertions in their Rule 50 motions. ROA.11940-41, 11946, 11952, 11955 (citing *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 569 (E.D. Tex. 2007)). That is the standard of review for "[a] finding of patent infringement by a jury in a federal district court in Texas . . . ." *TGIP*, 527 F. Supp. 2d at 569; *ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1311 (Fed. Cir. 2007) ("A determination of infringement is a question of fact that is reviewed for substantial evidence when tried to a jury."). This was error.

This Court "review[s] the district court's denial of a motion for judgment as a matter of law *de novo*, applying the same standard as the district court." *Mieco*, 161 F.4th at 844 ("There is no legally sufficient evidentiary basis when the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict."); *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001) (internal quotations omitted); FED. R. CIV. P. 50(a)(1), (b).

### A. There Is an Uncertain Question as to Whether Texas Recognizes Claims for Conspiracy to Commit Malicious Criminal Prosecution.

As an initial matter, the Texas Supreme Court has cast doubt on whether a cause of action for conspiracy to commit malicious criminal prosecution even exists in Texas.[12] In *Lieck*, the Court observed that "[t]he Restatement rule does not subject a person to liability for merely aiding or cooperating in causing a criminal prosecution. We agree that liability should be thus restricted." *Lieck*, 881 S.W.2d at 292 (discussing RESTATEMENT (SECOND) OF TORTS § 653 (1977)). "Were it otherwise, persons only incidentally involved in a criminal investigation might find themselves facing allegations in a civil suit." *Id.* "The prospect of such liability poses too great a disincentive for people to cooperate freely with law enforcement officials." *Id.* Thus, the Court in *Lieck* disapproved of the following jury question: "Did [defendant], acting without probable cause

[12] Durham and Birnam Wood did not specifically raise this issue below, but the applicable Texas law is fairly included in their challenge to the legal sufficiency of the evidence to support Plaintiffs' conspiracy claims. *See, e.g., Ferrara Fire Apparatus, Inc. v. JLG Indus., Inc.*, 581 F. App'x 440, 445 (5th Cir. 2014) (per curiam) ("[B]y challenging the sufficiency of the evidence of all of Ferrara's claims, Ferrara and the court were on notice that Gradall believed Ferrara's unjust enrichment claim lacked proof").

and with malice, cause, *or aid or cooperate in causing*, a criminal prosecution to be commenced against [plaintiff]?" *Id.* at 291-92 (emphasis in original).

While the Court in *Lieck* did not address claims for conspiracy to commit a malicious criminal prosecution, which were not at issue, it rejected liability for simply aiding or cooperating someone else who caused a criminal prosecution. *Id.* "Aiding and abetting, like civil conspiracy, is also a derivative tort—to the extent it is actionable in Texas . . . ." *Brumfield v. Williamson*, 634 S.W.3d 170, 208 (Tex. App.—Houston [1st Dist.] 2021, pet. denied); *see also First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 224 (Tex. 2017) (explaining that "this Court has not expressly decided whether Texas recognizes a cause of action for aiding and abetting"); *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 583 n.7 (Tex. 2001) (declining to consider "whether Texas law recognizes a cause of action for 'aiding and abetting' fraud separate and apart from a conspiracy claim"). In other words, "a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Tilton*, 925 S.W.2d at 681. Thus, the Supreme Court's rejection of liability for aiding or

cooperating malicious criminal prosecution appears to apply equally to conspiring to commit malicious criminal prosecution.

To ascertain Texas law, this Court looks first to the final decisions of the Supreme Court of Texas. *Perez v. City of San Antonio*, 115 F.4th 422, 428 (5th Cir. 2024). While lower Texas courts have considered cases alleging claims for both malicious criminal prosecution and conspiracy, mostly dismissing those claims, there is no Texas Supreme Court decision, and no lower Texas court decision, expressly approving a claim for conspiracy to commit malicious criminal prosecution. *See Castille v. Port Arthur Patrolmen's Hunting Club*, No. 09-18-00395-CV, 2020 WL 1879475, at *6 (Tex. App.—Beaumont Apr. 16, 2020, pet. denied) (affirming dismissal of claims for malicious criminal prosecution and civil conspiracy); *Ruth v. Crow*, No. 03-16-00326-CV, 2018 WL 2031902, at *7 (Tex. App.—Austin May 2, 2018, pet. denied) (affirming dismissal of claims for malicious prosecution and conspiracy); *Metzger v. Sebek*, 892 S.W.2d 20, 45-46 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (affirming directed verdict on conspiracy to maliciously criminally prosecute). *But see Walker v. Hartman*, 516 S.W.3d 71, 84 (Tex. App.—Beaumont 2017, pet. denied) (affirming order denying motion to dismiss under Texas Citizens' Participation Act because plaintiff

met burden to demonstrate elements of malicious criminal prosecution and civil conspiracy and defendant did not demonstrate each essential element of a valid defense to claims).

If this case survives its jurisdictional and other legal infirmities raised above, the Court should certify this question to the Texas Supreme Court. Where there is no definite pronouncement from the Supreme Court of Texas on an issue, this Court may choose to certify a question to that court. *Perez*, 115 F.4th at 428.[13] "[F]ederal-to-state certification is prudent when consequential state-law ground is to be plowed, such as defining and delimiting state causes of action." *Johnson v. Miller*, 98 F.4th 580, 585 (5th Cir. 2024). "An *Erie* guess in these circumstances would be a leap into the dark." *Id.* at 586 (referring to *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).

When making the decision as to whether to certify a question, this Court has "often—but not invariably—considered"

> (1) the closeness of the question and the existence of sufficient sources of state law; (2) the degree to which considerations of comity are relevant in light of the particular issue and case to be

---

[13] Under Texas law, "[t]he Supreme Court of Texas may answer questions of law certified to it by any federal appellate court if the certifying court is presented with determinative questions of Texas law having no controlling Supreme Court precedent." TEX. R. APP. P. 58.1; *see also* TEX. CONST. art. V, § 3-c(a); *Perez*, 115 F.4th at 428 n.8.

> decided; and (3) practical limitations of the certification process: significant delay and possible inability to frame the issue so as to produce a helpful response on the part of the state court.

*Umphress v. Hall*, 133 F.4th 455, 471 (5th Cir. 2025) (citation omitted).

Here, (1) there are insufficient sources of state law given that no Texas court has expressly recognized a claim for conspiracy to commit malicious criminal prosecution; (2) comity is highly relevant to the interpretation by a federal court of these state law claims; and (3) there are no practical limitations of the certification process. Any delay caused by certification would be warranted in order to ensure that Texas law is correctly interpreted and applied by this federal Court. As a matter of comity, a federal court should not be the first court to affirm a judgment for conspiracy to commit malicious criminal prosecution under Texas law.

### B. Birnam Wood Could Not Conspire with Its Owner.

Even if a claim for conspiracy to commit malicious criminal prosecution were viable under Texas law, Birnam Wood and Durham cannot both be liable for conspiracy because Birnam Wood cannot conspire with its owner. ROA.15364-65. "[A] corporation cannot conspire with its own management personnel or employees when they act within the scope of their employment or in an agency relationship." *Am. Akaushi Ass'n, Inc. v. Twinwood Cattle Co.*, No. 14-21-00701-CV, 2025 WL 450750, at *32, ___

S.W.3d ___ (Tex. App.—Houston [14th Dist.] Feb. 11, 2025, pet. filed); *Bayou Terrace Inv. Corp. v. Lyles*, 881 S.W.2d 810, 815 (Tex. App.—Houston [1st Dist.] 1994, no writ); *Atlantic Richfield Co. v. Misty Prods., Inc.*, 820 S.W.2d 414, 421 (Tex. App.—Houston [14th Dist.] 1991, writ denied); *see also Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1952) ("A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation."); *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 410 (5th Cir. 2020) (same).

Thus, Durham and Birnam Wood cannot both be liable for a conspiracy with Brown to commit malicious criminal prosecution.

**C. There Is No Legally Sufficient Evidence of a Conspiracy.**

Under Texas law, an action for civil conspiracy has five elements: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result. *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005).

"[M]erely proving a joint 'intent to engage in the conduct that resulted in the injury' is not sufficient to establish a cause of action for civil

conspiracy." *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996). Instead, "[a]n actionable civil conspiracy requires specific intent to agree to accomplish something unlawful or to accomplish something lawful by unlawful means." *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 881 (Tex. 2010). "This inherently requires a meeting of the minds on the object or course of action." *Parker*, 514 S.W.3d at 222. "[A]n actionable civil conspiracy exists only as to those parties who are aware of the intended harm or proposed wrongful conduct at the outset of the combination or agreement." *Id.* (internal quotations omitted).

There is no legally sufficient evidence that Durham or Birnam Wood had a specific intent to agree to accomplish something unlawful or to accomplish something lawful by unlawful means. *Swinnea*, 318 S.W.3d at 881.

#### ***1. There Is No Legally Sufficient Evidence That Birnam Wood Engaged in a Conspiracy.***

There was no evidence that Birnam Wood was involved in any conspiracy to commit malicious criminal prosecution. The sum total of evidence at trial as to Birnam Wood was the following:

- Durham started his own firm, Birnam Wood, to manage assets in 2015. ROA.15364-65.

- Birnam Wood earns a fixed fee on a percentage of assets. ROA.15365.

- Birnam Wood earns a management fee in connection with a family charitable organization. ROA.15365-67.

- Brown was one of Birnam Wood's clients. ROA.15370.

- Birnam Wood earned fees for managing Brown's assets. ROA.15374.

- Brown had approximately $2.6 million invested through Birnam Wood in 2015, for which Birnam Wood earned $18,344.41 in fees. ROA.15374-75.

- Birnam Wood received no origination fee in connection with the SBA; Reticulum did. ROA.15379-80. A prior discovery response by Durham in a bankruptcy proceeding incorrectly stated that Birnam Wood received the fee. ROA.15381.

- Birnam Wood focused on private investments. ROA.15427.

- Durham told Watters he and Birnam Wood were not interested in the SBA because they do not invest in oil and gas services businesses. ROA.15428.

- The SBA was not a Birnam Wood investment, *i.e.*, one that Durham showed to all of his clients, and Birnam Wood made no fees on it. ROA.15431.

- Birnam Wood's logo and address appeared on some of Durham's emails. ROA.12050.

In response to Durham and Birnam Wood's Rule 50(b) motion on this point, Plaintiffs argued that:

- Durham was impeached by his prior discovery response on whether Birnam Wood earned $2500 in origination fees from the deal. ROA.15209.

- Birnam Wood was Brown's financial advisor and earned $18,000 in fees from him in 2015. ROA.15209.
- A woman in Birnam Wood's office gathered materials for Rick Watson. ROA.15209, 12098.
- Durham is an agent of Birnam Wood. ROA.15209.
- Birnam Wood's name appeared on emails. ROA.15209, 12050.
- Birnam Wood's ShareFile system was used to send documents to the district attorney. ROA.15209.[14]

Even if all of this were true (which it is not), none of this evidence shows a "specific intent to agree to accomplish something unlawful or to accomplish something lawful by unlawful means." *Swinnea*, 318 S.W.3d at 881. There is no evidence of any "meeting of the minds" between Birnam Wood and Brown to achieve any unlawful object or course of action. *See Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 857 (Tex. 1968) ("There must be an agreement or understanding between the conspirators to inflict a wrong against, or injury on, another, a meeting of minds on the object or course of action, and some mutual mental action coupled with an intent to commit the act which results in injury; in short,

---

[14] There is no evidence that the ShareFile system in question belonged to Birnam Wood rather than Durham personally. *See* ROA.15414, 12050. The email containing the ShareFile link states that "Bill Durham uses ShareFile to share documents securely." ROA.12050. Nor was there evidence that Durham or Birnam Wood sent any documents to the DA's office. Instead, Pettit and Watson did. ROA.12345, 12538.

there must be a preconceived plan and unity of design and purpose, for the common design is of the essence of the conspiracy." (internal citations omitted)); *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 675 (Tex. 1998) (same).

### 2. *There Is No Legally Sufficient Evidence That Durham Engaged in a Conspiracy.*

There is no legally sufficient evidence that Durham had a "specific intent to agree to accomplish something unlawful or to accomplish something lawful by unlawful means." *Swinnea*, 318 S.W.3d at 881.

The evidence showed that Durham:

- wrote a summary of events that Reticulum's counsel attached to the criminal complaint form. ROA.15413, 12360.
- assisted Brown in setting up a meeting with the DA's office through a friend who worked there as an insurance fraud prosecutor, and attended the meeting held at a restaurant in his office complex. ROA.15404-08.
- requested comments on the summary of events from his friend in the DA's office. ROA.12109.
- met with a woman at the DA's office. ROA.15423.
- offered that a woman in his office could go through Total Operating's bank records to see where Dean and Watters were misappropriating funds prior to the deal with Reticulum. ROA.15418-19, 12098.
- exchanged or was copied on emails with Brown and Reticulum's counsel. ROA.12199, 15411, 12010.

None of this evidence shows a "specific intent to agree to accomplish something unlawful or to accomplish something lawful by unlawful means." *Swinnea*, 318 S.W.3d at 881. There is no evidence of any "meeting of the minds" between Durham and Brown to achieve any unlawful object or course of action. *Morris*, 981 S.W.2d at 675. Simply because Brown copied Durham on an email to Reticulum's attorney Pettit regarding his hope to get a recovery if Dean was found to have committed a felony, *see* ROA.12017, does not show any intent by Durham to achieve an unlawful course of action. *Cf. Morris*, 981 S.W.2d at 675 ("Mere receipt and review of drafts . . . does not constitute substantial assistance in the alleged fraud." (quoting *In re U.S. Grant Hotel Assoc. Ltd. Sec. Lit.*, 740 F. Supp. 1460, 1465 (S.D.Cal.1990))).

Moreover, it is noteworthy that Durham's and Brown's actions were guided by counsel. Pettit emailed the complaint form on behalf of Reticulum, and Brown later hired attorney Watson to assist in following up on the complaint. ROA.12027, 15026-27, 15121, 15133, 15359. Durham reasonably could have believed the advice of counsel that Brown's reporting of a possible crime was lawful, especially considering that in the same time period, counsel for Capital One, Total Operating's lender, also

filed a criminal complaint form and was coordinating with Pettit. ROA.12017-18.

Even if Brown committed an unlawful, tortious act when he signed the complaint form, that act does not tack on to Durham merely because he engaged in lawful conduct of providing information to Reticulum's lawyer, who then passed it on to law enforcement so that they could investigate the conduct and decide whether to prosecute. ROA.12345; *Parker*, 514 S.W.3d at 224 ("But even where a conspiracy is established, wrongful acts by one member of the conspiracy that occurred before the agreement creating the conspiracy do not simply carry forward, tack on to the conspiracy, and support liability for each member of the conspiracy as to the prior acts."). Assisting a client with setting up meetings with law enforcement, drafting a factual summary, and receiving emails were not unlawful acts. *See Metzger*, 892 S.W.2d at 44 ("[L]awfully furnishing information to law enforcement officers is not an act for which they may be held liable." ). To the contrary, these were all lawful acts to assist law enforcement with its investigation.

The district court's error in denying Durham and Birnam Wood's Rule 50 motions on this issue adversely affected the substantial rights of

Durham and Birnam Wood and was harmful. *See* 28 U.S.C. § 2111; FED. R. CIV. P. 61. There was legally insufficient evidence to support the jury's conspiracy findings as to Durham and Birnam Wood. The Court should reverse and render judgment in their favor.

## IV. THERE WAS LEGALLY INSUFFICIENT EVIDENCE TO SUPPORT THE COMPENSATORY AND EXEMPLARY DAMAGES AWARDS.

The jury's awards of $3.8 million in compensatory damages and $250,000 in exemplary damages against Durham and Birnam Wood were legally insufficient. ROA.10628, 10630. The district court reversibly erred by denying Durham and Birnam Wood's motions for judgment as a matter of law on these grounds. ROA.15215-19, 11009-10, 11951-55; FED. R. CIV. P. 50(a), (b).

The compensatory damages were entirely speculative, based on legally insufficient evidence of hypothetical income Dean would have received from theoretical deals his investment firm would have closed had his prosecution not occurred. The evidence to support the award was wholly speculative.

### A. Plaintiffs' Reputational Damages Were Wholly Speculative.

"Under Texas law, neither the fact [nor] amount of damages alleged can be speculative; both must be established with 'reasonable certainty.'"

*Roehrs v. Conesys, Inc.*, 332 F. App'x 184, 186 (5th Cir. 2009) (citing *Burkhart Grob Luft Und Raumfahrt GmbH & Co. KG v. E–Sys., Inc.*, 257 F.3d 461, 467 (5th Cir. 2001)); *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994). "A plaintiff's failure to show either acts as a bar to recovery." *Roehrs*, 332 F. App'x at 186.

This is likewise true for the reputational damages sought by Plaintiffs. *See* ROA.11094. While general damages for noneconomic harms such as mental anguish or loss of reputation "are not susceptible to precise calculation," "there must be proof of actual injury," which "must be more than theoretical." *Mem'l Hermann Health Sys. v. Gomez*, 649 S.W.3d 415, 427 (Tex. 2022). Two types of evidence can support an award of reputation damages: direct evidence that "people within the community 'thought less of' the plaintiff," and "evidence of a lost job or business opportunity." *Id.* at 427-28; *Bearden v. LeClair*, No. 02-20-00177-CV, 2022 WL 3273598, at *16 (Tex. App.—Fort Worth Aug. 11, 2022, no pet.) (quoting same). Plaintiffs offered neither, instead speculating about hypothetical deals Dean's investment firm would have made had he not been indicted. This is legally insufficient.

At trial, Plaintiffs sought reputational damages based on lost opportunities Dean alleges he experienced in his work for Craftsman Capital Partners ("Craftsman"), a private equity firm formed in 2014 that makes investments in predominantly technology and software businesses. ROA.14813, 14861-62, 14874-75, 15336. A trust for which Dean is a beneficiary owned a 40 percent equity interest in Craftsman. ROA.14876.

Dean's evidence of damages consisted of his own testimony that he (1) paid $25,000 in attorney's fees to defend against the indictment and (2) paid $850 to post a bond, and (3) lost unspecified business opportunities as a result of the indictments. ROA.14874. Plaintiffs offered no evidence of specific deals that Craftsman lost due to the indictments.

Dean testified that he had to inform Craftsman's investors about the indictments and lost opportunities as a result. ROA.14864. Craftsman did no business deals while Dean was under indictment, which occurred during the COVID-19 pandemic. ROA.14868, 15335-36, 15488. Dean testified that he "[couldn't] say with certainty," but he "fe[lt] like [he] lost two to three" opportunities over a three-year period as a result of the indictments in 2020, for a total of $4.5 million in damages. ROA.14876, 14881. He based this on Craftsman's track record before and after the

indictments, stating that Craftsman closed "approximately a little over a deal a year." ROA.14877.

Dean's business partner Paul Thompson testified that Craftsman did three transactions after its inception in 2014 until 2019, prior to the indictments, and two transactions after the indictments were dismissed. ROA.15336, 15498-99, 14813, 14873.

Using Craftsman's limited track record, Dean based his alleged $4.5 million in lost opportunities on an "average" deal Craftsman had with Scan Data that closed in 2020 in which his trust earned $110,000 in closing fees, $240,000 in management fees, and approximately $1.54 million in exit fees. ROA.14866, 14881, 14878-79, 12581-82. Dean contrasted the Scan Data deal with an "exceptional" deal in a separate transaction involving CMIT Solutions, LLC, for which Dean testified his trust received over $6.5 million in 2022. ROA.12034-36, 14879-81.

Durham and Birnam Wood's expert forensic accountant, Kathleen Elliott testified that, based on her review of the evidence, leading up to the 2020–2021 time period, on average "it took about 21-and-a-half months for the [Craftsman] deals to close." ROA.15487. She testified that Plaintiffs' damages number of $4.5 million failed to account for the shutdown and

subsequent slowdown of the private equity market in 2020 due to the pandemic. ROA.15487-88. Elliott also referenced Dean's testimony that some of the Craftsman portfolio companies were impacted by COVID, and, as a result, Dean had to spend 40 hours a week at one company, Box, making it hard for him to originate new deals. ROA.15488. In addition, Dean did not explain how Craftsman would have funded deals that they would have entered in 2020 and 2021. ROA.15488. In fact, Craftsman declined to consider a second deal during that time period because it did not believe it could get the funding until the CMIT deal exited in 2022. ROA.15488. Thus, Elliott testified "there's no indication to me that there were funds sitting available ready to invest in 2020 and 2021." ROA.15489.

Elliott also testified that Craftsman's revenues would have been earned over a period of years, not all at one time. ROA.15489-90. While closing fees occur when a deal closes, maintenance fees occur over a holding period, which could be four to nine years, and exit fees are earned upon exit. ROA.15490. In addition, Elliott noted that Dean had testified that he had not deducted expenses from his damages calculations. ROA.15490. Dean's requested damages also failed to discount for the time value of money or account for the risk that a deal would not occur. ROA.15491-92.

Plaintiffs' evidence was legally insufficient because it failed to point to evidence of any specific deal that Craftsman lost due to Dean's indictments. *Gomez*, 649 S.W.3d at 428. There was no proof of any "actual," nontheoretical injury to Craftsman's business. *Id.* at 427. In *Gomez*, the Texas Supreme Court pointed to examples of sufficient evidence of a lost job or business opportunity due to reputational damage, such as where "the plaintiff lost his job in such a way that a reasonable juror could conclude it was related to the" harmful conduct or "the employer cut off the hiring process with the plaintiff . . . and would not consider the plaintiff for another position unless the plaintiff's name were cleared." *Id.* at 427-28.

Plaintiffs offered no such evidence, instead assuming in conclusory fashion that Craftsman would have closed three deals in three years despite a global pandemic and without accounting for the risks and costs of those hypothetical deals. ROA.14876, 14881. Nothing in the record connects any specific loss of Craftsman business with Defendants' conduct. *Gomez*, 649 S.W.3d at 429.

Thus, the jury's award of $3.8 million in compensatory damages should be reversed and judgment rendered for Durham and Birnam Wood. *Gomez*, 649 S.W.3d at 429.

### B. Plaintiffs' Claims for Mental Anguish, Pain and Suffering Do Not Support the Damages Awarded.

The jury's $3.8 million damages award cannot be supported based on Plaintiffs' claim for mental anguish and pain and suffering, either.[15] Dean requested an unspecified amount of damages for mental anguish and pain and suffering to his family. ROA.14882. He asked the jury to award a "fair number." ROA.14882. There was no evidence or argument as to what a "fair number" might be. *See* ROA.14758-72 (Plaintiffs' opening argument), 15251-63 (Plaintiffs' closing argument), 15284-94 (Plaintiff's rebuttal closing argument), 15292-93 (discussing mental anguish).

"Assigning a dollar value to non-financial, emotional injuries such as mental anguish or loss of companionship will never be a matter of mathematical precision." *Gregory v. Chohan*, 670 S.W.3d 546, 550 (Tex. 2023) (plurality). "But when properly called upon, appellate courts have a duty to ensure that the damages awarded for a noneconomic injury are the result of a rational effort, grounded in the evidence, to *compensate* the plaintiff for the injury." *Id.* "[W]hen reviewing mental anguish damages, '[t]here must be evidence that the *amount* found is fair and reasonable

[15] The damages question on the jury verdict form was written in broad form and did not break out categories of compensatory damages. ROA.10628.

*compensation*, just as there must be evidence to support any other jury finding.'" *Id.* at 550-51 (quoting *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996) (emphasis added by court)). The Texas Supreme Court's "precedent instead requires evidence of both the 'existence of compensable mental anguish' and 'evidence to justify the amount awarded.'" *Id.* at 551 (quoting *Saenz*, 925 S.W.2d at 614). "While the impossibility of any exact evaluation of mental anguish requires that juries be given a measure of discretion in finding damages, that discretion is limited." *Id.* (quoting *Bentley v. Bunton*, 94 S.W.3d 561, 606 (Tex. 2002) (internal quotations omitted)). "Juries cannot simply pick a number and put it in the blank." *Id.* (quoting *Bentley*, 94 S.W.3d at 606).

Drawing from the Court's prior precedent, the plurality in *Gregory* opined that "[t]o guard against arbitrary outcomes and to ensure that damages awards are genuinely compensatory," a plaintiff "should be required to demonstrate a rational connection, grounded in the evidence, between the injuries suffered and the dollar amount awarded." *Id.* The plurality observed that "nothing in the record or in the plaintiffs' arguments demonstrates a rational connection between the injuries suffered and the *amount* awarded." *Id.* The same is true here. There is

nothing in the record to demonstrate a rational connection between the claimed injuries and the amount awarded.

Although *Gregory* was a plurality opinion, it relied on settled Texas law that there must be evidence of both the 'existence of compensable mental anguish' and 'evidence to justify the amount awarded.'" 670 S.W.3d at 550-51 (quoting *Saenz*, 925 S.W.2d at 614); *see also Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013) ("There must be both evidence of the existence of compensable mental anguish and evidence to justify the amount awarded."); *Bentley*, 94 S.W.3d at 606 ("There must be evidence that the amount found is fair and reasonable compensation, just as there must be evidence to support any other jury finding."). Because there was no evidence to justify the amount awarded by the jury as damages for mental anguish and pain and suffering, the award cannot be sustained on that ground either.

### C. There Was Legally Insufficient Evidence to Support the Punitive Damages Awarded.

Because there was legally insufficient evidence of the predicate conspiracy claims and actual damages, *see supra* Parts III, IV.A, B, the exemplary damages award likewise must be reversed. *See Fed. Exp. Corp. v. Dutschmann*, 846 S.W.2d 282, 284 (Tex. 1993) ("Recovery of punitive

damages requires a finding of an independent tort with accompanying actual damages."); *Bellefonte Underwriters Ins. Co. v. Brown*, 704 S.W.2d 742, 745 (Tex. 1986) (explaining that "as a predicate to recovery [of punitive damages] the plaintiff must show that he has suffered actual damages"); TEX. CIV. PRAC. & REM. CODE § 41.004(a) (". . . exemplary damages may be awarded only if damages other than nominal damages are awarded."). In addition, for the same reasons that Birnam Wood and Durham cannot both be liable for conspiracy, they may not both be liable for punitive damages. *See supra* Part III.B.

Regardless, there was legally insufficient evidence to support the jury's awards of $125,000 in exemplary damages each against Durham and Birnam Wood. ROA.10630. Texas "law imposes onerous burdens before punitive damages are even available." *Werner Enters., Inc. v. Blake*, 719 S.W.3d 525, 544 (Tex. 2025) (Young, J., concurring) (citing TEX. CIV. PRAC. & REM. CODE § 41.003). "In reviewing an award for exemplary damages, [courts] conduct a legal sufficiency review under the 'clear and convincing' evidence standard." *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012). "'Clear and convincing' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to

the truth of the allegations sought to be established." TEX. CIV. PRAC. & REM. CODE § 41.001(2); *U-Haul*, 380 S.W.3d at 137 (quoting same).

There was no clear and convincing evidence to support the jury's findings of fraud, malice, or gross negligence by Durham or Birnam Wood to support the exemplary damages awards against them. ROA.10629-30.

Plaintiffs claimed that the evidence supporting the jury's finding included:

> Durham was well aware that the goal was to get Dean indicted to threaten and pressure Dean to pay Total Operating's debt to Reticulum (even though Dean was not a party to, or guarantor of the [SBA]);
>
> Durham clearly was "involved" with Watson, as he helped set up the meeting with Watson and hosted the meeting with Watson in Durham's office at Birnam Wood[16] for the purpose of enlisting Watson's help in getting Dean indicted on felony charges;
>
> Durham lied to support Brown's story by corroborating Brown's fabrication that Dean actually met with Brown in Birnam Wood's office, and he was impeached with his own words and his own e-mail where he stated he had no recollection of any such meeting;
>
> Durham made sworn false statements, including with respect to the timing of the security agreement.

ROA.11098 (citations omitted).

---

[16] The meeting took place at a restaurant, not Birnam Wood's office. ROA.15408.

First, there was no claim or evidence of fraud or gross negligence by Durham or Birnam Wood, leaving malice as the only possible basis for exemplary damages. The Texas Civil Practice and Remedies Code defines "malice" as "a specific intent by the defendant to cause substantial injury or harm to the claimant." TEX. CIV. PRAC. & REM. CODE § 41.001(7). To recover exemplary damages based on malice, Plaintiffs "needed to prove actual damages and submit clear and convincing evidence of outrageous, malicious, or otherwise reprehensible conduct." *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 867 (Tex. 2017) (citing *Safeshred, Inc. v. Martinez*, 365 S.W.3d 655, 660 (Tex. 2012)). Plaintiffs were "also required to prove that the defendants *specifically intended* for [Plaintiffs] to suffer substantial injury that was 'independent and qualitatively different' from the compensable harms associated with the underlying causes of action." *Id.* (emphasis added).

Plaintiffs fail to point to any "outrageous, malicious, or otherwise reprehensible conduct" by Durham or Birnam Wood. *Id.* Nor does the alleged conduct by Durham and Birnam Wood show that they specifically intended for Plaintiffs to suffer substantial injury that was "independent and qualitatively different" from any compensable harms. *Id.* Indeed,

Plaintiffs rely on the same conduct they allege supports the conspiracy claim. *Compare* ROA.11098 (discussing exemplary damages) *with* ROA.11081-83 (discussing conspiracy). And because "[a]n actionable civil conspiracy requires specific intent to agree to accomplish something unlawful or to accomplish something lawful by unlawful means," *Swinnea*, 318 S.W.3d at 881, Plaintiffs cannot rely on that same alleged specific intent to support punitive damages as well. *Safeshred*, 365 S.W.3d at 662 ("But when a tort requires willful harm as a necessary element of liability, that willfulness alone cannot also justify a punitive damages award."); *Ware v. Paxton*, 359 S.W.2d 897, 899 (Tex. 1962) ("The fact that an act is [tortious] is not itself ground for an award of exemplary or punitive damages."). "More is required." *Safeshred*, 365 S.W.3d at 662. Plaintiffs cannot come up with anything more. For that reason, the jury's exemplary damages awards against Durham and Birnam Wood must be reversed.

## CONCLUSION

For the above reasons, the Court should reverse and render judgment for Durham and Birnam Wood, or, in the alternative, certify any uncertain issues of Texas law to the Supreme Court of Texas, or reverse and remand for a new trial or other further proceedings. Durham and Birnam Wood

also request that the Court order that the alternative security set by the district court in lieu of a supersedeas bond, ROA.11061, be released and their obligations under the judgment discharged. Durham and Birnam Wood ask for all other relief to which they are justly entitled.

Respectfully submitted,

*/s/ Meredith B. Parenti*
Meredith B. Parenti
Texas Bar No. 00797202
PARENTI LAW
800 Town & Country Blvd., Ste. 500
Houston, TX 77024
Tel. (281) 224-5848
Fax (281) 605-5677
meredith@parentilaw.com

Rogge Dunn
Texas Bar No. 06249500
Dunn@trialtested.com
Lane M. Webster
Texas Bar No. 24089042
Webster@roggedunngroup.com
ROGGE DUNN GROUP, PC
500 N. Akard Street, Suite 1900
Dallas, TX 75201
Tel. (214) 888-5000
Fax (214) 220-3833
**Counsel for Appellants/Cross-Appellees Charles William Durham II and Birnam Wood Capital, LLC**

## CERTIFICATE OF SERVICE

I certify that a copy of this filing was served upon all parties and counsel of record using the Court's CM/ECF system in accordance with the Federal Rules of Appellate Procedure on February 23, 2026.

/s/ Meredith B. Parenti
Meredith B. Parenti

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of FED. R. APP. P. 28.1(1)(e)(2)(A) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), this document contains 17,662 words,

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft® Word for Mac Version 16.105.1 in 14-point Book Antiqua font, or 12-point Book Antiqua font for footnotes.

/s/ Meredith B. Parenti
Meredith B. Parenti