NO. 25-40549

---

In the United States Court of Appeals
For the Fifth Circuit

---

IN THE MATTER OF FRED ALAN BROWN,
*Debtor*,

VERITAS VINCIT, L.L.C.; WILLIAM BERRY DEAN, III;
*Appellees/Cross-Appellants*,

v.

BIRNAM WOOD CAPITAL, L.L.C.; CHARLES WILLIAM DURHAM, II;
*Appellants/Cross-Appellees*.

---

On Appeal from the United States District Court for the
Eastern District of Texas, Sherman Division

---

# APPELLEES' PRINCIPAL & RESPONSE BRIEF

---

JOHN P. LEWIS, JR.
Texas State Bar No. 12294400
**HAYWARD PLLC**
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7106

P. MICHAEL JUNG
Texas State Bar No. 11054600
**CLARK HILL PLC**
901 Main St., Ste. 6000
Dallas, Texas 75202
Telephone: (214) 651-4724

Dated: April 23, 2026

BRETT CHARHON
Texas State Bar No. 24040674
STEVEN CALLAHAN
Texas State Bar No. 24053122
ANTHONY M. GARZA
Texas State Bar No. 24050644
**CHARHON CALLAHAN ROBSON & GARZA, PLLC**
3333 Lee Parkway, Ste. 460
Dallas, Texas 75219
Telephone: (214) 521-6400
Telecopier: (214) 764-8392

*Counsel for Veritas Vincit, L.L.C. & William Berry Dean, III*

# CERTIFICATE OF INTERESTED PERSONS

Case No. 25-40549
In the Matter of Fred Alan Brown,
*Debtor*,

Veritas Vincit, L.L.C.; William Berry Dean, III;
*Appellees/Cross-Appellants*,

v.

Birnam Wood Capital, L.L.C.; Charles William Durham, II;
*Appellants/Cross-Appellees*.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Veritas Vincit, LLC
William Berry Dean, III
Fred Alan Brown
Reticulum Management, LLC
Charles William Durham II
Birnam Wood Capital, LLC
Jacob Watters
Fiduciario, LLC
4222014, LLC
Paul Thompson
Will Walters
William B. Dean, III Irrevocable Trust
William B. Dean, Jr.
VV Funding LLC

Counsel/Former Counsel for Plaintiffs-Appellees/Cross-Appellants

Brett Charhon
Steven Callahan
Christopher T. Bovenkamp
Jill Lynch
Anthony M. Garza
CHARHON CALLAHAN ROBSON & GARZA, PLLC

Michael C. Smith
SCHEEF & STONE, LLP

John P. Lewis, Jr.
HAYWARD PLLC

Peter Michael Jung
CLARK HILL PLC

Counsel/Former Counsel for Defendants-Appellants/Cross-Appellees

Meredith B. Parenti
PARENTI LAW PLLC

Rogge Dunn
Lane M. Webster
ROGGE DUNN GROUP, PC

Alexandria M. Risinger
THE DÍAZ FIRM, PLLC

Christopher B. Trowbridge
Brent A. Turman
Troy L. Hales
BELL NUNNALLY & MARTIN LLP

Counsel/Former Counsel for Debtor/Defendant Brown

Robert DeMarco, III
DEMARCO MITCHELL, PLLC

Thomas C. Barron
LAW OFFICES OF THOMAS C. BARRON

Former Counsel for Defendant Reticulum

Julie Pettit
David Urteago
THE PETTIT LAW FIRM

/s/ Anthony M. Garza
ANTHONY M. GARZA

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not needed in this case. The dispute primarily concerns sufficiency-of-the-evidence challenges on a lengthy record. For these issues, oral argument is of marginal use. Further, as shown in more detail below, Appellants have forfeited certain of the legal arguments they press here, narrowing the outstanding issues further. Finally, the Court may resolve Appellants' legal challenge to Article III jurisdiction on the briefs.

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES ..... 1

INTRODUCTION ..... 2

STATEMENT OF THE CASE ..... 4

I. Reticulum Loans $400,000 to Total Operating Based on Durham and Birnam's Advice to Brown ..... 4

II. To Recover Reticulum's Loan to Total Operating, Brown, Durham, and Birnam Cause Dean's Criminal Prosecution ..... 6

III. Veritas and Dean Sue Reticulum, Brown, Durham, and Birnam for Malicious Criminal Prosecution, Malicious Civil Prosecution, and Civil Conspiracy ..... 9

IV. Brown Files for Bankruptcy and Fiduciario Buys Reticulum from Brown's Bankruptcy Estate ..... 10

V. Veritas and Dean Move for Summary Judgment on the Causation Element of Malicious Criminal Prosecution ..... 11

VI. The District Court Finds Common Control Among Veritas, Dean, and Reticulum ..... 14

VII. The Jury Finds for Veritas and Dean ..... 15

SUMMARY OF THE ARGUMENT ..... 17

ARGUMENT ..... 19

I. Veritas's and Dean's Common Control of Reticulum Does Not Undermine the Court's Article III Jurisdiction Over the Claims Against Brown, Durham, and Birnam ..... 19

A. The Dismissal of the Claims Against Reticulum for Lack of Article III Jurisdiction Does Not Destroy Article III Jurisdiction Over the Claims Against Brown, Durham, and Birnam ........ 21

B. The District Court Properly Exercised Article III Jurisdiction Over the Malicious Criminal Prosecution Claim Against Brown, Even After Dismissing Reticulum ........ 26

1. The District Court's Finding of Common Control over Reticulum Does Not Extend to Brown ........ 26

2. Coextensive Past Conduct Does Not Undermine Adversity ........ 28

3. Durham and Birnam Forfeited Any Challenges Based on a Failure to Join Reticulum or Evidentiary Prejudice ........ 31

4. Brown's and Reticulum's Past Conduct Is Not Coextensive ........ 33

C. The District Court Properly Exercised Article III Jurisdiction Over the Claims Against Durham and Birnam for Conspiracy to Commit Malicious Criminal Prosecution ........ 35

II. The District Court Improperly Dismissed the Claims, against Brown, Durham, and Birnam, for Conspiracy to Commit Malicious Civil Prosecution ........ 37

A. Veritas and Dean Remain Adverse to the Remaining Defendants ........ 38

B. Because the Parties Are Adverse, the Claims Are Not Collusive ........ 39

C. Under Texas Law, Veritas and Dean May Proceed With the Civil-Conspiracy Claims Without Simultaneously Prosecuting the Underlying Tort ........ 41

III. The District Court Correctly Held, on Summary Judgment, that Brown "Initiated" a Prosecution Under Texas Law ........ 45

IV. The Court Should Uphold the Jury's Conspiracy Findings Against Durham and Birnam ........ 54

A. Durham and Birnam Forfeited Both Legal Arguments by Failing to Raise Them in the District Court ........ 55

B. Texas Law Does Not Forbid Claims for Conspiracy to Commit Malicious Criminal Prosecution ........ 59

C. Third Parties Destroy the Intra-Corporate Conspiracy Exception ........ 62

D. The District Court Held that Durham and Birnam Waived Their Factual Challenge to the Conspiracy Finding ........ 64

E. The Record Includes Sufficient Evidence to Support a Finding that Durham and Birnam Had Specific Intent ........ 65

V. The Court Should Uphold the Compensatory-Damage Award ........ 72

A. The Record Includes Sufficient Evidence to Support the Actual Damages Awarded by the Jury ........ 73

B. Because Durham and Birnam Have Forfeited Their Remittitur Arguments, to Prevail They Must Show That the Record

Does Not Include "Some Evidence" of Damages ........ 83

VI. The Record Supports the Award of Punitive Damages Against Durham and Birnam ........ 87

A. Birnam Forfeited its Challenge to Punitive Damages ........ 88

B. The Record Includes Sufficient Evidence of Conspiracy and Actual Damages ........ 88

C. The Record Includes Sufficient Evidence of Malice to Support the Jury's Exemplary-Damage Award ........ 89

D. Durham and Birnam Forfeited Arguments Based on Legal Standards Absent from Jury Instructions ........ 92

CONCLUSION ........ 96

# TABLE OF AUTHORITIES

## Cases

*Agar Corp., Inc. v. Electro Circuits Int'l, LLC*,
580 S.W.3d 136 (Tex. 2019) .......... 62

*Akin, Gump, Strauss, Hauer & Feld, LLP v. Nat'l Dev. & Res. Corp.*,
299 S.W.3d 106 (Tex. 2009) .......... 85, 86

*Alamo Country Club Owners Ass'n v. Shelton*,
No. 13-10-00300-CV, 2012 WL 3792753 (Tex. App.—Corpus Christi Aug. 31, 2012, no pet.) (mem. op.) .......... 47, 48, 50, 51

*Alaniz v. 3 Netts Inc.*,
No. 08-24-00058-CV, 2024 WL 4575359 (Tex. App.—El Paso Oct. 24, 2024, no pet.) (mem. op.) .......... 49, 50

*Alvarez v. Anesthesiology Assocs.*,
967 S.W.2d 871 (Tex. App.—Corpus Christi 1998, pet. denied) .......... 61

*Am. Akaushi Ass'n, Inc. v. Twinwood Cattle Co.*,
No. 14-21-00701-CV, 2025 WL 450750 (Tex. App.—Houston [14th Dist.] Feb. 11, 2025, pet. filed) (mem. op.) .......... 63

*Anderson v. Goodwin*,
No. 05-23-00343-CV, 2024 WL 725669 (Tex. App.—Dallas Feb. 22, 2024, no pet.) (mem. op.) .......... 52, 53

*Archer W. Contractors, L.L.C., v. McDonnel Grp., L.L.C.*,
No. 25-30321, 2026 WL 839113 (5th Cir. Mar. 26, 2026) .......... 25

*Atl. Richfield Co. v. Misty Prods., Inc.*,
820 S.W.2d 414 (Tex. App.—Houston [14th Dist.] 1991, writ denied) .......... 63

*Baker v. Carr*,
369 U.S. 186 (1962) .......... 23

*Bayou Terrace Inv. Corp. v. Lyles*,
881 S.W.2d 810 (Tex. App.—Houston [1st Dist.] 1994, no writ) ........ 63

*Bearden v. LeClair*,
No. 02-20-00177-CV, 2022 WL 3273598 (Tex. App.—Fort Worth Aug. 11, 2022, no pet.) (mem. op.) ........ 76, 79

*Bevill v. City of Quitman*,
No. 19-406, 2025 WL 2306849 (E.D. Tex. Aug. 11, 2025) ........ 83

*Brady v. Klentzman*,
515 S.W.3d 878 (Tex. 2017) ........ 76

*Browning-Ferris Indus., Inc. v. Lieck*,
881 S.W.2d 288 (Tex. 1994) ........ passim

*Cantu v. State*,
253 S.W.3d 273 (Tex. Crim. App. 2008) ........ 52

*Carswell v. Sw. Bell Tel. Co.*,
449 S.W.2d 805 (Tex. App.—Houston [1st Dist.] 1969, no writ) ........ 46

*Chu v. Hong*,
249 S.W.3d 441 (Tex. 2008) ........ 41

*City of Emory v. Lusk*,
278 S.W.3d 77 (Tex. App.—Tyler 2009, no pet.) ........ 85

*Cortes v. NLRB*,
145 F.4th 57 (D.C. Cir. 2025) ........ passim

*Cuadra v. Houston ISD*,
No. 07-3300, 2009 WL 10703694 (S.D. Tex. Aug. 17, 2009) ........ 64

*Dar v. Am. Eagle Outfitters, Inc.*,
No. 17-830, 2019 WL 13255469 (S.D. Tex. Jan. 16, 2019) ........ 61

*Dasma Invs., LLC v. Realty Assocs. Fund III, L.P.*,
459 F. Supp. 2d 1294 (S.D. Fla. 2006) ........ 23

*Ferrara Fire Apparatus, Inc. v. JLG Indus., Inc.*,
581 F. App'x 440 (5th Cir. 2014) .............................................. 57, 58

*Frazier v. Prince George's Cnty.*,
140 F.4th 556 (4th Cir. 2025).................................................. 23, 40

*Free v. Baker*,
469 F. App'x 786 (11th Cir. 2012)............................................. 81, 86

*French v. French*,
385 S.W.3d 61 (Tex. App.—Waco 2012, pet. denied)....... 50, 52, 53

*Gasperini v. Ctr. for Humanities, Inc.*,
518 U.S. 415 (1996)......................................................................... 84

*Gautreaux v. Ins. Co. of N. Am.*,
811 F.2d 908 (5th Cir. 1987)............................................................ 82

*Globe & Rutgers Fire Ins. Co. v. Hines*,
273 F. 774 (2d Cir. 1921) ..................................................................19

*Golden Corral Corp. v. Noble Austin Apartments LLC*,
No. 03-19-00463-CV, 2021 WL 2878565 (Tex. App.—Austin July 9, 2021, no pet.) (mem. op.)..................................................... 85

*Griffith v. State*,
55 S.W.3d 598 (Tex. Crim. App. 2001) .......................................... 52

*Gunville v. Gonzales*,
508 S.W.3d 547 (Tex. App.—El Paso 2016, no pet.) ......................50

*Harmon v. Collier*,
158 F.4th 595 (5th Cir. 2025) ........................................................ 79

*Hurlbut v. Boaz*,
4 Tex. Civ. App. 371, 23 S.W. 446 (1893, no writ) .........................46

*In re Brown*,
No. 22-41110 (Bankr. E.D. Tex. Mar. 27, 2024) ............................ 10

*In re Est. of Bean*,
120 S.W.3d 914 (Tex. App.—Texarkana 2003, pet. denied) ........ 25

*In re Fairchild Aircraft Corp.*,
6 F.3d 1119 (5th Cir. 1993) ........................................................ 56, 58

*In re Greenhaw Energy, Inc.*,
359 B.R. 636 (Bankr. S.D. Tex. 2007) ............................................ 64

*In re Sanchez Energy Corp.*,
661 B.R. 522 (Bankr. S.D. Tex. 2024) ...................................... 41, 44

*INS v. Chadha*,
462 U.S. 919 (1983) ........................................................................ 21

*Int'l Bankers Life Ins. Co. v. Holloway*,
368 S.W.2d 567 (Tex. 1963) ............................................................ 66

*Jaramillo v. Tex. City*,
No. 01-20-00654-CV, 2022 WL 363271 (Tex. App.—Houston [1st Dist.] Feb. 8, 2022, no pet.) (mem. op.) ................................ 43

*Jernigan v. Wainer*,
12 Tex. 189 (1854) .......................................................................... 66

*Jordan v. Maxfield & Oberton Holdings, LLC*,
977 F.3d 412 (5th Cir. 2020) ........................................................... 33

*Kellogg v. Nichols*,
170 F.4th 20 (2d Cir. 2026) ............................................................ 24

*King v. Graham*,
126 S.W.3d 75 (Tex. 2003) ........................................................ 50, 51

*Klinek v. LuxeYard, Inc.*,
596 S.W.3d 437 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) ................................................................... 41, 42, 44

*Kroger Tex. Ltd. P'ship v. Suberu*,
113 S.W.3d 588 (Tex. App.—Dallas 2003) .................. 47, 48, 50, 51

*Larson v. Cactus Utility Co.*,
730 S.W.2d 640 (Tex. 1987) .......... 84

*Learmonth v. Sears, Roebuck & Co.*,
631 F.3d 724 (5th Cir. 2011) .......... 33

*Lermon v. Minyard Food Stores, Inc.*,
No. 05-13-00034-CV, 2014 WL 6466840 (Tex. App.—Dallas Nov. 19, 2014, pet. denied) (mem. op.) .......... 48

*Lewis v. Bickham*,
91 F.4th 1216 (5th Cir. 2024) .......... 84

*Lewis v. Continental Airlines, Inc.*,
80 F. Supp. 2d 686 (S.D. Tex. 1999) .......... 51, 52, 53

*Lindke v. Tomlinson*,
31 F.4th 487 (6th Cir. 2022) .......... 24, 40

*Lingle v. Sage Architecture, Inc.*,
No. 04-24-00539-CV, 2025 WL 2976755 (Tex. App.—San Antonio Oct. 22, 2025, no pet.) (mem. op.) .......... 41, 42, 44

*Ma v. CVS Pharm., Inc.*,
833 F. App'x 10 (7th Cir. 2020) .......... 64

*Matter of S.L.E. Inc.*,
674 F.2d 359 (5th Cir. 1982) .......... 21

*Mays v. Chevron Pipe Line Co.*,
968 F.3d 442 (5th Cir. 2020) .......... 84

*McCaig v. Wells Fargo Bank (Tex.), N.A.*,
788 F.3d 463 (5th Cir. 2015) .......... 84

*McShirley v. Lucas*,
No. 02-23-00229-CV, 2024 WL 976512 (Tex. App.—Fort Worth Mar. 7, 2024, pet. denied) (mem. op.) .......... 47, 48, 50, 51

*Mem'l Hermann Health Sys. v. Gomez*,
649 S.W.3d 415 (Tex. 2022) .......... 78

*Mines v. Murphy*,
No. 14-18-00800-CV, 2021 WL 5458833 (Tex. App.—
Houston [14th Dist.] Nov. 23, 2021) (mem. op.) .......................... 85

*Mo., K. & T. Ry. Co. v. Groseclose*,
50 Tex. Civ. App. 525, 110 S.W. 477 (1908, no writ)...................... 46

*Moore v. Novak*,
1995 WL 571854 (Tex. App.—Houston [14th Dist.], Sept. 28,
1995, pet. denied) ......................................................................... 62

*Nautilus Ins. Co. v. 8160 S. Memorial Dr., LLC*,
436 F.3d 1197 (10th Cir. 2006) ................................................ 24, 40

*Nelson Radio & Supply Co. v. Motorola, Inc.*,
200 F.2d 911 (5th Cir. 1952) ........................................................... 63

*NLRB v. Constellium Rolled Prods. Ravenswood, LLC*,
43 F.4th 395 (4th Cir. 2022) .................................................... passim

*Osterberg v. Peca*,
12 S.W.3d 31 (Tex. 2000) ................................................................. 92

*Paschal v. Great W. Drilling, Ltd.*,
215 S.W.3d 437 (Tex. App.—Eastland 2006,
pet. denied) ....................................................................... 41, 42, 44

*PHH Mort. Corp. v. Old Republic Nat'l Title Ins. Co.*,
80 F.4th 555 (5th Cir. 2023) ........................................................... 32

*Price v. Short*,
931 S.W.2d 677 (Tex. App.—Dallas, 1996, no writ) ........................ 81

*Reed v. Lindley*,
240 S.W. 348 (Tex. Civ. App.—Fort Worth 1922, no writ) .......... 46

*Rhymes v. Filter Res., Inc.*,
No. 09-14-00482-CV, 2016 WL 5395548 (Tex. App.—
Beaumont Sept. 22, 2016) (mem. op.) ............................................. 86

*Richards v. Tebbe*,
No. 14-13-00413-CV, 2014 WL 2936425 (Tex. App.—Houston [14th Dist.] June 26, 2014, no pet.) (mem. op.) ............................90

*Rodriguez v. Deutsche Bank Nat'l Tr. Co.*,
No. 13-18-00262-CV, 2020 WL 1613409 (Tex. App.—Corpus Christi Apr. 2, 2020, no pet.) (mem. op.)....................................... 25

*Rollins v. Home Depot USA*,
8 F.4th 393 (5th Cir. 2021) .......................................................57, 58

*Rothergy v. Gillespie Cnty.*,
554 U.S. 191 (2008)........................................................................... 52

*S. Spring Hill Gold Mining Co. v. Amador Medean Gold Mining Co.*,
145 U.S. 300 (1892) ..........................................................................19

*Samuels v. Nasir*,
445 S.W.3d 886 (Tex. App.—El Paso 2014, no pet.) ..................... 84

*San Antonio Credit Union v. O'Connor*,
115 S.W.3d 82 (Tex. App.—San Antonio 2003, pet. denied)........ 66

*Shahrashoob v. Tex. A&M Univ.*,
125 F.4th 641 (5th Cir. 2025)......................................................... 57

*Temple v. Synthes Corp.*,
498 U.S. 5 (1990)............................................................................. 25

*Tex. Democratic Party v. Abbott*,
961 F.3d 389 (5th Cir. 2020) ..........................................................63

*Top Tobacco, L.P. v. Star Importers & Wholesalers, Inc.*,
135 F.4th 1344 (11th Cir. 2025) ....................................................... 84

*Tranum v. Broadway*,
283 S.W.3d 403 (Tex. App.—Waco 2008, pet. denied).................91

*United Biologics, LLC v. Allergy & Asthma Network/Mothers of Asthmatics, Inc.*, 819 F. App'x 204 (5th Cir. 2020) .......... 42, 43, 44

*United States v. Espino-Rangel*,
242 F. App'x 219 (5th Cir. 2007) ........ 82

*United States v. Johnson*,
319 U.S. 302 (1943) ........ 39

*United States v. McCoy*,
108 F.4th 639 (8th Cir. 2024) ........ 93

*United States v. McRae*,
702 F.3d 806 (5th Cir. 2012) ........ 93

*United States v. Quintanilla-Matamoros*,
164 F.4th 366 (5th Cir. 2026) ........ 22

*United States v. St. John*,
625 F. App'x 661 (5th Cir. 2015) ........ 62

*United States v. Windsor*,
570 U.S. 744 (2013) ........ passim

*Vodicka v. Tobolowsky*,
No. 05-17-00727-CV, 2019 WL 1986625 (Tex. App.—Dallas May 6, 2019, no pet.) (mem. op.) ........ 80

*Vosko v. Chase Manhattan Bank, N.A.*,
909 S.W.2d 95 (Tex. App.—Houston [14th Dist.] 1995, writ denied) ........ 63

*W. Fork Advisors, LLC v. SunGard Consulting Servs., LLC*,
437 S.W.3d 917 (Tex. App.—Dallas 2014, pet. denied) ........ 42, 43

*Wackman v. Rubsamen*,
602 F.3d 391 (5th Cir. 2010) ........ 83

*Walker v. Hartman*,
516 S.W.3d 71 (Tex. App.—Beaumont 2017, pet. denied) ........ 61

*Warner Bros. Enter't, Inc. v. Jones*,
538 S.W.3d 781 (Tex. App.—Austin 2017, pet. granted) ........ 48

*Wheeler v. Nesbitt*,
65 U.S. 544 (1860)........................................................................46

*Whitelock v. Stewart*,
No. 10-23-00132-CV, 2025 WL 2473021 (Tex. App.—Waco
Aug. 28, 2025, pet. denied) (mem. op.)........................ 47, 48, 50, 51

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021) ..............................................................23, 25, 40

*Ziglar v. Abbasi*,
582 U.S. 120 (2017)........................................................................62

<u>**Statutes**</u>

Tex. Civ. Prac. & Rem. Code Ch. 33 .......................................................... 25

Tex. Civ. Prac. & Rem. Code § 41.001(7)................................................... 89

## STATEMENT OF THE ISSUES

On cross-appeal, Veritas and Dean add the following issue to the four addressed in Durham and Birnam's brief (at 3):

1. Did the district court err by dismissing the claims for conspiracy to commit malicious civil prosecution against Brown, Durham, and Birnam?

## INTRODUCTION

Defendants Fred Brown, Charles Durham, and Birnam Wood weaponized the criminal-justice system, causing felony prosecutions to secure repayment of a $400,000 loan. The jury read emails, from Brown and Durham, showing their plan. ROA.11561 (Brown: "The only way we can get any recovery is if [Plaintiff Barrett Dean] and [Jacob Watters] are found to have committed a felony and we can get a personal judgment against both."); ROA.11582 (Durham: "The way things came together with the DA was about perfect. Fingers are crossed."); ROA.11828 (Brown: "I'm glad to learn [Dean] spent the night in jail."). The jury heard testimony, from Dean and his wife, describing the effects of the felony indictments on Dean and his family. ROA.14850 ("They strip searched me. They cavity searched me[.]"); ROA.15471 ("[I]f someone's capable of criminally indicting you on two felonies and sending threatening messages to your parents, it's just like what else are they capable of?"). The jury found all three defendants responsible for the malicious criminal prosecution of Dean, awarding $3.8 million in actual damages and $1.25 million in exemplary damages. ROA.10627-30.

Appellants Durham and Birnam raise a fusillade of legal and sufficiency-of-the-evidence challenges to the verdict, many of which were

never presented before the district court. Dean and Plaintiff Veritas Vincit address each of their arguments below. Veritas and Dean respectfully request that the Court (i) uphold the jury verdict and judgment thereon in their entirety and, (ii) on cross-appeal, reverse the district court's dismissal of the claims, against Brown, Durham, and Birnam, for conspiracy to commit malicious civil prosecution, and remand those claims for trial.

## STATEMENT OF THE CASE

### I. Reticulum Loans $400,000 to Total Operating Based on Durham and Birnam's Advice to Brown

This litigation traces back to an ill-fated loan to Total Operating, LLC, an oil-field-maintenance company. Plaintiff/Appellee Barrett Dean was a board member and part-time CFO of Total Operating and owned about 2% of the company. ROA.14810-11 (family members owned another 5%).

In 2015, Total Operating found itself in a cash crunch. ROA.14815. Another board member, Jacob Watters, ROA.14812, learned of a potential investor, Defendant Fred Brown, ROA.14829-30, ROA.12275, through one of Watters's friends, Defendant/Appellant Charles Durham. ROA.14824. In 2015, Watters asked Brown to make a loan to Total Operating. *See* ROA.15064.

Brown was a sophisticated investor that regularly made loans to businesses. ROA.15062. Durham was Brown's financial advisor. ROA.15063. Durham's firm, Defendant/Appellant Birnam Wood, managed the assets of its clients. ROA.15364-65. Brown worked with Durham on approximately 30 loans, investing around $2.5 million. ROA.15063, ROA.15374.

Brown loaned $400,000 to Total Operating through a shell company (or "intermediary vehicle"), Defendant Reticulum Management.[1] ROA.14835, ROA.14964, ROA.15086. Durham advised Brown on the deal and signed the deal documents on behalf of Reticulum. ROA.11345-47, ROA.15064, ROA.15070, ROA.15383. Dean signed on behalf of Total Operating, ROA.11348, even though Dean was not personally responsible for repayment, ROA.14835-36.

As Durham knew (as Brown's financial adviser), Brown invested only in asset-backed loan transactions. ROA.15062, ROA.15370, ROA.15398. Brown believed that the Total Operating deal was fully collateralized (i.e, asset backed). ROA.15094. But the Total Operating deal was not backed by assets. ROA.15095-96, ROA.15385, ROA.11345-57. Further, Durham signed the deal documents (on Reticulum's behalf), knowing the deal was not asset backed, without sending the agreement to Brown for review. ROA.15069-70, ROA.15094, ROA.15383-87, ROA.15398. Brown only reviewed the deal documents after Durham had signed them. ROA.15070.

[1] At the time of the $400,000 loan, Reticulum was owned by Durham. ROA.14964. In 2016, Durham sold Reticulum to Brown for $1. ROA.10378-80.

## II. To Recover Reticulum's Loan to Total Operating, Brown, Durham, and Birnam Cause Dean's Criminal Prosecution

In 2016, Total Operating filed for bankruptcy without having repaid Reticulum (and thus, Brown). ROA.15099. Brown had expected to be repaid. *Id.* In a wrongful attempt to obtain priority in the recovery of funds from Total Operating's bankruptcy, Durham and Watters signed a security agreement (between Reticulum and Total Operating) in 2016, but backdated the agreement to 2015. ROA.12654-62, ROA.14977-82. When Reticulum attempted to rely on the back-dated security agreement in the bankruptcy proceeding, Dean objected, frustrating Brown's scheme. *See* ROA.12840-41 ¶¶ 20-23; *see also* ROA.1061 n.52 (Brown angry with Dean).

Soon thereafter, Brown and Reticulum sued Dean, in multiple forums (Dallas County state court, AAA arbitration, Bankruptcy Court in the Northern District of Texas), alleging that Dean had (among other things) fraudulently induced Reticulum into entering the Total Operating deal. *See*, *e.g.*, ROA.12841, ROA.1060-61 (Brown has "doggedly" pursued Dean). Brown also purchased Total Operating's claims against Dean from its bankruptcy estate. ROA.1061 n.50. Dean was forced to

hire attorneys, at personal expense, to defend against these civil suits. ROA.12851 ¶ 53.

Brown and Durham also began to jointly explore ways to hold Dean personally responsible for Total Operating's debt to Reticulum. ROA.15100. One of Brown's ideas, as stated in a July 2016 email to Durham, was to criminally prosecute Dean: "The only way we can get any recovery, is if [Dean] & [Watters] are found to have committed a felony and we can get a personal judgement against both." ROA.11561, ROA.15103.

Brown, Durham, and Birnam worked together to set up meetings with prosecutors, gather information, and draft a criminal complaint. *See infra* Argument § IV(E) (summarizing evidence). After months of preparation, in January 2018, Brown submitted a formal criminal complaint to the Dallas County District Attorney's Office, claiming that Dean fraudulently induced Reticulum's $400,000 loan to Total Operating. ROA.673-80. The complaint consisted of a two-page form, an affidavit, a three-page narrative of events, and nineteen documents related to the dispute. *Id.*, ROA.12360-537 (summary of events and documents labelled Appendix 1-19). Brown's affidavit stated, in all caps: "[T]he information which I furnish . . . is true and correct . . . <u>and is furnished for</u>

<u>the sole purposes of instituting criminal prosecution</u>[.]". ROA.676 (emphasis added).[2] Durham drafted the summary of events. Appellants' Br. at 15, ROA.15412-15, ROA.12360-61.

In 2020, Dean was indicted on two felony charges: (i) theft of property over $200,000, and (ii) securing execution of a document over $200,000 by deceit. ROA.11727-28, ROA.14808-10. Dean was arrested and spent around 30 hours in jail. ROA.14849-52. After the arrest, Brown sought (and received) Dean's mugshot, because it "would have some value in [our] negotiations". ROA.11828 ("I'm glad to learn [Dean] spent the night in jail."), ROA.12029-30. The mugshot was anonymously mailed to Dean's parents. ROA.15052-54, ROA.12028.

Parallel to these events, Watters declared bankruptcy in 2020. Reticulum brought an adversary proceeding, objecting to the discharge of Reticulum's claims against Watters. ROA.393. In August 2021, the Bankruptcy Court denied the objection, finding that Reticulum had failed to prove fraudulent intent, justifiable reliance, willfulness, or malice. ROA.430.

[2] Durham and Birnam's brief argues that Brown signed the criminal complaint "on Reticulum's behalf for the debt owed to Reticulum." Br. at 5. The affidavit, however, is expressly signed by Brown as the "Complaining Party" and "Complainant." ROA.676.

Soon thereafter, Dean provided the Bankruptcy Court's ruling to the District Attorney. In light of the ruling, in September 2021, the District Attorney moved to dismiss both felony charges against Dean, and the criminal court dismissed them. ROA.11738-39, ROA.14810.

### III. Veritas and Dean Sue Reticulum, Brown, Durham, and Birnam for Malicious Criminal Prosecution, Malicious Civil Prosecution, and Civil Conspiracy

As noted earlier, Reticulum brought a civil claim against Dean in arbitration. In December 2018, the arbitration panel issued an interim award against Dean for $500,000 and unspecified attorneys' fees. ROA.13110-15. The next month, Dean declared bankruptcy. ROA.13190. Veritas Vincit (which means "truth prevails," ROA.14870) was formed to purchase, from the bankruptcy estate, Dean's claims against Brown, Durham, and Birnam. ROA.14870. Veritas purchased those claims in May 2021. ROA.14287-90.

On December 7, 2021, Veritas (holding the pre-bankruptcy-petition claims) and Dean (post-petition claims) brought the instant lawsuit in Dallas County district court. Veritas and Dean asserted claims for:

- malicious criminal prosecution against Reticulum and Brown;

- malicious civil prosecution against Reticulum; and
- conspiracy to commit malicious criminal and civil prosecution against all four defendants (Reticulum, Brown, Durham, and Birnam).

ROA.162, ROA.188-90. The case was removed to the Northern District of Texas Bankruptcy Court on September 23, 2022, ROA.16102-11, and transferred to the Eastern District of Texas Bankruptcy Court on December 14, 2022, ROA.17461-64. The district court withdrew the reference to the bankruptcy court on March 1, 2024, and set the case for jury trial in August 2024, ROA.117, ROA.130.

## IV. Brown Files for Bankruptcy and Fiduciario Buys Reticulum from Brown's Bankruptcy Estate

A few months after Veritas and Dean filed suit, Brown declared bankruptcy. ROA.29 (stipulation) ¶ 1 (August 2022). Brown's 100% interest in Reticulum became property of the bankruptcy estate. At auction, Durham bid for Reticulum, but Fiduciario LLC (a company of which Veritas is a member) won the auction.[3] Fiduciario completed the purchase of Reticulum in April 2024. ROA.7384-88 (bill of sale).

[3] *See In re Brown*, No. 22-41110, ECF No. 60, at 2 (Bankr. E.D. Tex. Mar. 27, 2024) (bankruptcy-court order stating that Durham offered to purchase Reticulum at auction, but the bankruptcy trustee sold Reticulum to Fiduciario for $16,000).

After Fiduciario gained control of Reticulum, Reticulum waived privilege over many communications on Durham and Birnam's privilege log. ROA.7394. Based on this waiver, the district court ordered Durham and Birnam to produce around 2,000 documents that had been withheld as privileged. ROA.10124-33. Veritas and Dean used some of these documents at trial. *See, e.g.*, ROA.11828-29 [PX-29], ROA.11895-97 [PX-30], ROA.12109-11 [PX-33].

### V. Veritas and Dean Move for Summary Judgment on the Causation Element of Malicious Criminal Prosecution

Veritas and Dean moved for summary judgment in April 2024. ROA.472-1012 (motion), ROA.7972-8733 (response), ROA.9735-42 (reply). Veritas and Dean argued that Brown and Reticulum "initiated"[4] the criminal proceeding by filing a sworn criminal complaint alleging that Dean "personally made eight separate representations to Reticulum[.]" ROA.480 (internal quotations removed), ROA.484-85. In support, the motion cited to the deposition of Andrea Ingram, a Dallas

[4] There are two ways to prove the "causation" prong for malicious criminal prosecution: a plaintiff can show that the defendant "initiates" the prosecution or "procures" the prosecution. *Browning-Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 291-93 (Tex. 1994) ("The Restatement concepts of initiation and procurement are better suited to malicious prosecution cases than the more general idea of causation."). Veritas and Dean moved for summary judgment only on the "initiates" prong. ROA.484-85.

County district attorney, and Exhibit 13 to that deposition. ROA.480, ROA.568-69, ROA.575, ROA.590-95, ROA.669-80. Exhibit 13 includes a "Complaint Form" for Dean, where Brown swears to the accuracy of the statements provided, which are furnished "for the sole purpose of instituting criminal prosecution[.]" ROA.676; *see also* ROA.7977, ROA.8333-40.[5] The Complaint included a narrative describing Brown's version of events, attaching nineteen documents related to the dispute. ROA.678-80.

Dean confirmed, in the verified petition attached to the motion (ROA.497 [petition], ROA.564 [verification]), that Brown's formal complaint included false statements, ROA.504, ROA.527, omitted material information, ROA.504-05, ROA.527-28, and contradicted Reticulum's discovery responses, ROA.529, *see also* ROA.923 ¶¶ 15-16 (Dean declaration). The verified petition states that (i) the district attorney generally begins investigations based on criminal referrals from outside investigative agencies, like police departments, (ii) here, there was no such criminal referral, and (iii) instead, Brown's formal complaint served as the basis for the district attorney's investigation. *See* ROA.541-

[5] Exhibit 13 also includes a similar Complaint Form seeking the criminal prosecution of Watters. ROA.669-72.

44; ROA.8631, ROA.8653 (referrals come from citizens and law-enforcement agencies); ROA.8654 (intake from private party treated like complaint from law-enforcement agency).

In response, Durham and Birnam argued that, to prevail on the causation element, Veritas and Dean must show either (i) Brown knowingly furnished false information or (ii) Brown's complaint was "the determining factor" in the decision to commence the prosecution. *See* ROA.7980. Durham and Birnam did not object, on any evidentiary basis, to Dean's summary-judgment evidence. ROA.7980-83. As noted in Veritas and Dean's reply, Durham and Birnam did not address the "initiation" causation prong, which only requires "making a formal charge to law enforcement authorities, which Reticulum and Brown clearly did when Brown filed the criminal complaint against Dean." ROA.9736.

At the pretrial conference, the district court granted Veritas and Dean's summary-judgment motion as to the causation element, ruling: "It's clear under Texas law that one initiates a criminal proceeding when he makes a formal charge to law enforcement authorities, and there is compelling evidence here that that's exactly what Mr. Brown did. Notwithstanding the extensive argument in the briefing about procurement, there seems to be no material question of fact that Brown initiat-

ed the criminal proceedings[.]" ROA.14513; *see also* ROA.11949 (JMOL ruling, citing ROA.15540 (cross-examination of Defendants' expert, stating that "[w]hat initiated the process was the complaint form that was filed")).

The district court accordingly instructed the jury that the "initiation" element was met as a matter of law: "The defendant may initiate a criminal prosecution by making a formal charge to a prosecutor or a law enforcement official. In this case, ladies and gentlemen, the Court has already determined that the Defendant Fred Alan Brown initiated the criminal prosecutions of Plaintiff William Berry Dean, III, and you must accept the Court's determination as to this element of the Plaintiffs' claim for malicious criminal prosecution." ROA.15247.

## VI. The District Court Finds Common Control Among Veritas, Dean, and Reticulum

In July 2024, Durham and Birnam moved to dismiss the case for lack of Article III subject-matter jurisdiction. ROA.10330. The district court found that Veritas and Dean (through the consent or coordination of other parties) "effectively control" Reticulum[6] and used that control

[6] While Veritas and Dean disagree with the district court's control analysis, for the purposes of this appeal, Veritas and Dean do not contest the district court's finding of control over Reticulum.

to waive privilege. ROA.10417. The court found that this common control eliminated Article III adversity among Veritas, Dean, and Reticulum. ROA.10416. On this basis, the court dismissed the claims against Reticulum (the malicious criminal prosecution claim, the malicious civil prosecution claim, and related civil-conspiracy claims against Reticulum) for lack of Article III jurisdiction. ROA.10423.

As for the claims against Brown, Durham, and Birnam, the district court issued a split decision. The court declined to dismiss (i) the remaining malicious criminal prosecution claim (against Brown) and (ii) the related claims (against Brown, Durham, and Birnam) for conspiracy to commit the same, ROA.10420, *id.* n.8. The court reached a different decision as to the remaining claims, against Brown, Durham, and Birnam, for conspiracy to commit malicious civil prosecution. The court dismissed those claims because Reticulum was the only entity alleged to have committed the underlying tort. *Id.*

## VII. The Jury Finds for Veritas and Dean

After a four-day jury trial, the jury found that (i) Brown committed malicious criminal prosecution, (ii) Brown, Durham, and Birnam conspired to commit malicious prosecution, and (iii) exemplary damages were appropriate. ROA.10627, ROA.10629. The jury awarded $3.8

million in actual damages and $1.25 million in exemplary damages. ROA.10628, ROA.10630. Durham and Birnam filed a renewed motion for judgment as a matter of law (or, in the alternative, for new trial or remittitur), ROA.11002, which the district court denied, ROA.11940, ROA.11960.

This appeal followed.

## SUMMARY OF THE ARGUMENT

Veritas and Dean's arguments proceed in six parts. *First*, purchasing Reticulum did not affect the Article III adversity between Veritas and Dean, on the one hand, and Brown, Durham, and Birnam, on the other. Veritas and Dean seek money damages against these defendants, who, in turn, resist and defend against those claims.

*Second*, relating to the cross-appeal, the district court improperly dismissed the claims for conspiracy to commit malicious civil prosecution against Brown, Durham, and Birnam. Neither Texas law nor Article III prevented Veritas and Dean from continuing to prosecute these conspiracy claims against Brown, Durham, and Birnam after the district court dismissed the claims against Reticulum.

*Third*, the district court correctly held, on summary judgment, that Brown's formal, sworn criminal complaint "initiated" the malicious criminal prosecution against Dean.

*Fourth*, Durham and Birnam's legal and factual challenges to the conspiracy verdict fail. Durham and Birnam did not preserve their arguments, but even if they had, (i) their legal arguments are against the weight of precedent, and (ii) the record sufficiently supports the jury's conspiracy findings.

*Fifth*, the Court should uphold the jury's $3.8 million actual-damages verdict. The record contains ample evidence of reputational damage, physical damage, and mental anguish that support the jury's award. Further, because they abandoned their remittitur argument on appeal, Durham and Birnam must show that the record does not include "some evidence" that supports the award, and they failed to do so.

*Sixth*, as measured by the unobjected-to jury charge, the record provides sufficient evidence of "malice" to support the exemplary-damages award. Even if the Court were to consider the other legal standards urged by Durham and Birnam (and the Court should not), the record shows both outrageous conduct and an intent to cause harm qualitatively different from the malicious prosecution itself.

In sum, the Court should (i) reverse the district court's dismissal of Veritas and Dean's claims for conspiracy to commit malicious civil prosecution against Brown, Durham, and Birnam, (ii) remand those claims for trial, and (iii) otherwise uphold the jury's verdict and the district court's judgment.

## ARGUMENT

### I. Veritas's and Dean's Common Control of Reticulum Does Not Undermine the Court's Article III Jurisdiction Over the Claims Against Brown, Durham, and Birnam

Once the district court found common control among Veritas, Dean, and Reticulum, the district court lost Article III jurisdiction over all claims among those three parties, for lack of adversity. ROA.10414 (noting that jurisdiction is assessed on a "party-by-party, claim-by-claim basis"); *S. Spring Hill Gold Mining Co. v. Amador Medean Gold Mining Co.*, 145 U.S. 300, 301 (1892) (no controversy without adversity); *see also Globe & Rutgers Fire Ins. Co. v. Hines*, 273 F. 774, 777 (2d Cir. 1921) ("It is elementary that the same person cannot be both plaintiff and defendant at the same time in the same action.").[7]

Durham and Birnam argued that the lack of Article III jurisdiction over the Reticulum claims provided a get-out-of-jail-free card for Brown, Durham, and Birnam (the "Remaining Defendants"). ROA.10330-32. The district court correctly held that the purchase of Reticulum did not defeat jurisdiction over the malicious criminal prose-

[7] Veritas' and Dean's claims against Reticulum have not been adjudicated on the merits. The district court instead dismissed the claims against Reticulum, without prejudice, for lack of jurisdiction. ROA.10423.

cution claim against Brown or the related conspiracy claims against the Remaining Defendants. ROA.10423.

On appeal, Durham and Birnam argue that the Court lacks Article III jurisdiction over these claims for three reasons:

- Due to the purchase of Reticulum, Veritas and Dean are "no longer adverse to [Reticulum] <u>or the other Defendants</u>," Br. at 42 (emphasis added);

- Because Brown's conduct cannot be separated from Reticulum's conduct, *id.* at 43, the case was "no longer genuinely adverse," "[e]ven with the dismissal of Reticulum", *id.* at 49; and

- The district court could not exercise jurisdiction over the civil-conspiracy claims because the district court had no Article III jurisdiction over the underlying tort (malicious criminal prosecution) against Brown and/or Reticulum, *id.* at 50, 52 ("The district court's lack of adversity over Reticulum and Brown extends to Durham and Birnam Wood as well.")

Veritas and Dean respond to the three arguments in the three subsections below. In sum, the dismissal of the claims against Reticulum, for lack of adversity, does not affect Article III jurisdiction over the claims against the Remaining Defendants. Veritas and Dean seek millions of dollars in damages against all three Remaining Defendants, and this adversity between the parties supports the exercise of Article III jurisdiction.

### A. The Dismissal of the Claims Against Reticulum for Lack of Article III Jurisdiction Does Not Destroy Article III Jurisdiction Over the Claims Against Brown, Durham, and Birnam

Adversity remained between Veritas and Dean, on one side, and Brown, Durham, and Birnam, on the other, after the district court dismissed the claims against Reticulum. *See Matter of S.L.E. Inc.*, 674 F.2d 359, 364 (5th Cir. 1982) ("Essential to the concept of a controversy, under Article III, is an on-going adversarial posture between the parties before the court."). Courts use numerous definitions of adversity, analyzing the relationship between particular plaintiffs and particular defendants and the real-world effect of claims between them:

- Adversity exists when "a judgment benefitting the plaintiff's concrete interests . . . adversely affect[s] a concrete interest of the defendant." *Cortes v. NLRB*, 145 F.4th 57, 61 (D.C. Cir. 2025).

- "[T]ypical adverseness is easy enough to describe: It is where one party asserts its right and the other party is resisting." *NLRB v. Constellium Rolled Prods. Ravenswood, LLC*, 43 F.4th 395, 400 (4th Cir. 2022).

- Adversity exists when a decision will have "real meaning." *INS v. Chadha*, 462 U.S. 919, 939-40 (1983) ("[I]f we rule for Chadha, he will not be deported; if we uphold [the statute], the INS will execute its order and deport him."); *Constellium*, 43 F.4th at 402-403 ("To have meaning in the real world, Article III requires that a judgment issued by this court have some effect in the world, that it will cause real and immediate action or inaction by one of the parties that otherwise would not occur. For example, once a federal

judgment issues, money must change hands or a party must be bound to stop doing something it otherwise would do or keep doing.”).

- Adversity exists when the plaintiff seeks funds and the defendant refuses to pay. *United States v. Windsor*, 570 U.S. 744, 758 (2013).

Here, Veritas and Dean sought a multi-million-dollar judgment against the Remaining Defendants, who, in turn, sought to avoid liability. ROA.10637-39 (judgment).[8] The demand for a money judgment, along with the fact that the parties fought (and continue to fight) over it, demonstrates adversity among the remaining parties. *Cortes*, 145 F.4th at 61; *Constellium*, 43 F.4th at 400, 402-03; *Windsor*, 570 U.S. at 758. Further, neither Veritas nor Dean enjoyed any ownership or control over the Remaining Defendants that might support a finding of common interest.[9] *See* ROA.14780, ROA.15364, ROA.15370, ROA.15427 (Durham started Birnam), ROA.14741 (Durham controls Birnam), Br. at 70 (Durham owns Birnam). Finally, the lengthy briefing and argu-

[8] Brown has not appealed the district-court judgment, presumably due to his ongoing bankruptcy. For this reason, the Court should not disturb the judgment against Brown, no matter how the Court resolves the pending appeal.

[9] *See United States v. Quintanilla-Matamoros*, 164 F.4th 366, 379 (5th Cir. 2026) (Ho, J., concurring) (Article III jurisdiction foreclosed “if the parties have common rather than conflicting interests at the outset of the suit”).

ment in the district court (and in this Court) confirms the "concrete adverseness which sharpens the presentation of issues upon which the court so largely depends[.]" *Baker v. Carr*, 369 U.S. 186, 204 (1962).

Durham and Birnam's brief improperly reframes the inquiry—it states that "the case ceased to be adverse when Plaintiffs purchased . . . Reticulum." Br. at 37 (emphasis added). But the adversity inquiry is not performed on a case-by-case basis; instead, the inquiry depends on whether there is adversity between parties on a claim-by-claim basis. Courts allow litigation to continue against adverse parties even after dismissing claims asserted against non-adverse co-defendants for lack of Article III jurisdiction:

- *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39-40, 51 (2021) (dismissing claims against state-court clerk and state-court judge because those co-defendants were not "adverse litigants" for Article III purposes, but allowing claims against four other co-defendants to continue).

- *Frazier v. Prince George's Cnty.*, 140 F.4th 556, 561-63, 566-67 (4th Cir. 2025) (dismissing claims against state-court judges for lack of Article III adversity, but maintaining claims against a county co-defendant).

- *Dasma Invs., LLC v. Realty Assocs. Fund III, L.P.*, 459 F. Supp. 2d 1294, 1304 n.5 (S.D. Fla. 2006) (noting Article III controversy over an action, in its entirety, when there is "sufficient adversity" between the plaintiff and any single co-defendant).

- *See Lindke v. Tomlinson*, 31 F.4th 487, 495, 497 (6th Cir. 2022) (upholding dismissal of claim against state-court judge because no adversity sufficient to support jurisdiction; separately upholding dismissal of claim against co-defendant sheriff for failure to state a claim).

*See also Kellogg v. Nichols*, 170 F.4th 20, 26 (2d Cir. 2026) (Article III jurisdiction is not "dispensed in gross," but instead considered claim-by-claim); *Nautilus Ins. Co. v. 8160 S. Memorial Dr., LLC*, 436 F.3d 1197, 1200-01 (10th Cir. 2006) (case is not "collusive," and court retains jurisdiction, even after one co-defendant withdraws from case because remaining co-defendants "supplied sufficient adversity"). As with these cases, after the district court dismissed the claims against Reticulum, Veritas and Dean continued to seek money damages against the Remaining Defendants. There is no adversity or case-or-controversy issue affecting the claims against the remaining, non-Reticulum defendants.

Instead, after dismissing the claims against Reticulum for lack of Article III jurisdiction, the district court was in familiar territory—a civil suit where claims proceed even though the district court is unable to join all potential defendants. This is not unusual. Other barriers to proceeding against a potential defendant include, for example, lack of personal jurisdiction, lack of diversity jurisdiction, death, or settlement. Courts are well-equipped to deal with all of these situations. *See, e.g.*,

Tex. Civ. Prac. & Rem. Code Ch. 33 (allowing factfinder to allocate responsibility among claimants, defendants, settling persons, and designated responsible third parties); *see Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990) (Rule 19 does not require that "all joint tortfeasors [be] named as defendants in a single lawsuit"); *Archer W. Contractors, L.L.C., v. McDonnel Grp., L.L.C.*, No. 25-30321, 2026 WL 839113, at *3 (5th Cir. Mar. 26, 2026) (under Rule 19, claims could proceed against members of joint venture without joining the joint venture (which would destroy diversity jurisdiction)).[10]

In short, because adversity is determined on a party-by-party basis, *see Whole Woman's Health*, 595 U.S. at 39-40, the district court's finding that Veritas and Dean controlled Reticulum did not affect the district court's Article III jurisdiction over the Remaining Defendants or the remaining claims against those defendants.

---

[10] *See also In re Est. of Bean*, 120 S.W.3d 914, 921 (Tex. App.—Texarkana 2003, pet. denied) ("A party's absence will rarely deprive the court of jurisdiction to adjudicate the dispute between the parties before it."); *Rodriguez v. Deutsche Bank Nat'l Tr. Co.*, No. 13-18-00262-CV, 2020 WL 1613409, at *2-3 (Tex. App.—Corpus Christi Apr. 2, 2020, no pet.) (mem. op.) (although trial court lost personal jurisdiction over co-defendant when he died, judgment as to other, living co-defendant still valid).

## B. The District Court Properly Exercised Article III Jurisdiction Over the Malicious Criminal Prosecution Claim Against Brown, Even After Dismissing Reticulum

Durham and Birnam next argue that Veritas and Dean are no longer "in any real sense" adverse to Brown because (i) Veritas and Dean own and control Reticulum, and (ii) Brown's conduct cannot be separated from Reticulum's conduct. Br. at 42-50. This argument fundamentally misunderstands and misapplies the idea of adversity.

Veritas and Dean respond to this argument in four subsections: (i) the finding of common control over Reticulum does not extend to Brown, (ii) coextensive past conduct does not undermine adversity, (iii) Durham and Birnam forfeited arguments related to non-joinder and evidentiary prejudice, and (iv) record evidence shows that Brown's and Reticulum's actions are not coextensive.

### *1. The District Court's Finding of Common Control over Reticulum Does Not Extend to Brown*

The district court found that Veritas and Dean are not adverse to Reticulum because Veritas and Dean effectively *control* Reticulum. ROA.10417. The district court made this finding after noting a chain of ownership and control extending from Dean and Veritas to Fiduciario, the owner of Reticulum. ROA.10414-18. This finding required dismissal

of the claims against only Reticulum. The Remaining Defendants are as fully incentivized to vigorously litigate the claims as they would have been if they had acted in collaboration with any other business entity.

The district court did not find that Veritas, Dean, or Reticulum had any sort of *control* over Brown, such that Veritas or Dean could affect or control Brown's answers at trial or otherwise distort the judicial process. There is no evidence, for example, that Veritas and Dean had an agreement whereby Brown would respond to Veritas' cross-examination according to a script. As a second example, there is no evidence that Reticulum employed Brown, whereby Brown might have had an incentive to respond as Reticulum wanted to save his job. There is no evidence of any sort of common control between Veritas, Dean, and Reticulum, on one hand, and Brown, on the other, that shows that the parties no longer hold interests adverse to one another. The judgment against Brown is as real and consequential as it would have been had Veritas and Dean not acquired control of Reticulum.

As a result, there is no factual basis to extend the district court's finding of common control over Reticulum to Brown.

### 2. *Coextensive Past Conduct Does Not Undermine Adversity*

There is no record evidence that Veritas, Dean, or Reticulum can control Brown. Durham and Birnam nevertheless argue that, because Veritas and Dean employed the same evidence at trial against Brown that they would have used against Reticulum, (because Brown's and Reticulum's conduct were "one and the same," Br. at 43), the claims against Brown implicate the same Article III adversity issues as Reticulum. *Id.* at 42-50 ("Even with the dismissal of Reticulum, the case was no longer genuinely adverse.").

But their brief cites no cases that establish either of the logical predicates needed to support this argument. Durham and Birnam do not show either that (i) dismissing claims against a co-defendant for lack of Article III jurisdiction leads to any sort of evidentiary limitation at trial against the other co-defendants (e.g., that Veritas or Dean must not employ evidence they might have used against Reticulum), or (ii) failure to abide by any such evidentiary limitation would extend, as a matter of law, the finding of Article III non-adversity to otherwise adverse co-defendants (e.g., that because Veritas and Dean used Reticulum-related evidence against Brown, the court must conclude that Veritas and Dean are not adverse to Brown).

First, dismissing claims against a non-adverse co-defendant (here, Reticulum), under Article III, does not require the plaintiff to avoid evidence related to that co-defendant.[11] After dismissal, the non-adverse co-defendant is simply recast as a third party, and the advocates for both sides may show the jury, through documents, testimony, and cross-examination, where the third party's loyalties lie. Durham and Birnam cite no cases showing the contrary. The jury may, of course, consider ownership and control over a third party (like Reticulum) in determining whether to credit its testimony. But that does not implicate Article III jurisdiction.

Second, Veritas and Dean's use of Reticulum-related evidence against Brown does not affect whether Veritas and Dean were adverse

[11] Here, the district court initially ordered that the parties could not "rely upon any actions or conduct of Reticulum to prove or support" the claims against the Remaining Defendants, ROA.10423, but the district court later changed course and clarified its ruling, ROA.14475-76 (ruling dismissing Reticulum for lack of jurisdiction "doesn't mean that somehow Reticulum evaporates and goes away and nobody can talk about them. They are part of what happened.").

In any event, Durham and Birnam do <u>not</u> argue, on appeal, that the district court erred in admitting Reticulum-related evidence or seek a new trial on that basis. Durham and Birnam instead make only a jurisdictional argument: because (i) Veritas and Dean are not adverse to Reticulum, and (ii) Reticulum and Brown's conduct are "one and the same," it follows that (iii) the district court had no basis to exercise Article III jurisdiction over claims against Brown. Br. at 42-50.

to Brown. Brown was adverse to Veritas/Dean, no matter the evidence employed against Brown, because Veritas and Dean sought money damages against Brown, and Brown resisted and defended against those claims. *Cortes*, 145 F.4th at 61; *Constellium*, 43 F.4th at 400, 402-03; *Windsor*, 570 U.S. at 758. Durham and Birnam have provided no authority showing that the evidence used at a trial affects the adversity inquiry whatsoever.

More generally, Durham and Birnam do not identify a legal framework, for determining Article III adversity, whereby pre-litigation conduct or closeness controls the analysis. In fact, there is no reason to suspect that conduct or closeness before the lawsuit has *any* impact on adversity during a lawsuit. Many lawsuits result from close, pre-litigation relations that have soured—a trustee who has managed a trust for years can make a conflicted investment, a corporate officer can switch allegiances and start working for a competitor, and a member of a partnership can embezzle joint funds. In each of these situations, the parties' historical alignment would not affect their adversarial posture during a lawsuit. The converse also holds—historical animosity does not overcome a present alignment of interests. As soon as a plaintiff and defendant resolve their dispute, adversity disappears, notwithstanding

years of bitter litigation. Adversity is determined by the *current* interests of the parties, not *historical* alignment or animosity.

Here, Veritas and Dean sued Reticulum and Brown. The district court found that Fiduciario's purchase of Reticulum aligned the interests between Veritas, Dean, and Reticulum, defeating Article III adversity between those parties. Even if Reticulum and Brown had *previously* shared a close relationship or acted in concert, that prior relationship does not undermine the *current* animosity between Veritas and Dean, on the one hand, and Brown, on the other. In other words, the purchase of Reticulum did not align or change the interests between Veritas, Dean, and Brown or otherwise defeat Article III adversity. Because Veritas and Dean sought money damages against Brown, and Brown resisted and defended against those claims, Veritas, Dean, and Brown remained adverse for Article III purposes. *Cortes*, 145 F.4th at 61; *Constellium*, 43 F.4th at 400, 402-03; *Windsor*, 570 U.S. at 758.

### *3. Durham and Birnam Forfeited Any Challenges Based on a Failure to Join Reticulum or Evidentiary Prejudice*

Although Durham and Birnam's argument here relies on the alleged prior common conduct of Brown and Reticulum, Durham and Birnam *only* argue that the prior common conduct proves that the dis-

trict court lacked Article III jurisdiction over the claims against Brown. Br. at 42-50. Durham and Birnam thus forfeited two other potential bases for reversal—that the district court should have (i) dismissed the claims against Brown for failure to join Reticulum, and (ii) granted a new trial due to prejudice, to Brown, worked by the Reticulum-related evidence admitted at trial.

**Failure to Join.** Under Rule 12(b)(7), a party may move to dismiss a claim for failure to join an indispensable party. *PHH Mort. Corp. v. Old Republic Nat'l Title Ins. Co.*, 80 F.4th 555, 560 (5th Cir. 2023). Rule 19 sets out a two-step framework for that analysis: a court should determine (i) whether a party is "required" and cannot be joined without destroying subject-matter jurisdiction, and (ii) whether litigation "can be properly pursued without the absent party." *Id.*

Here, the Remaining Defendants did not move to dismiss the claims against them under Rule 12(b)(7), cite to Rule 19, or otherwise argue that Reticulum was an indispensable party for the claims asserted against them. *See* ROA.10330-42 (motion to dismiss for only lack of Article III jurisdiction). As a result, the Court should find that Durham and Birnam forfeited all arguments based on any failure to join Reticulum to properly proceed against Brown (or Durham/Birnam).

**Evidentiary Prejudice.** A district court may grant a new trial if, "after considering the record as a whole, the court concludes that manifest injustice will result from letting the verdict stand." *Learmonth v. Sears, Roebuck & Co.*, 631 F.3d 724, 731 (5th Cir. 2011); *Jordan v. Maxfield & Oberton Holdings, LLC*, 977 F.3d 412, 417 (5th Cir. 2020) (new trial may be based on erroneous evidentiary rulings that led to prejudicial error).

Durham and Birnam's district-court new-trial motion did not argue that the introduction of Reticulum-related evidence unfairly prejudiced any party's defense. ROA.11010-11. Nor did Durham and Birnam argue, here, for a new trial based on unfairly prejudicial Reticulum-related evidence admitted at trial. As a result, the argument is forfeited, and the Court should refuse to entertain it.

*4. Brown's and Reticulum's Past Conduct Is Not Coextensive*

Finally, even if Durham and Birnam had identified a legal framework where past coextensive conduct undermined Article III adversity (they did not), the record shows that Brown's and Reticulum's past conduct is not coextensive. The record shows, instead, that Brown was <u>not</u> always acting on Reticulum's behalf, but sometimes acted on his own behalf. Because Brown's and Reticulum's conduct are not "one and the

same," Br. at 43, the predicate of Durham and Birnam's argument fails, and thus fails to undermine the Article III adversity among Veritas/Dean and Brown.

First, the record shows that Brown signed the formal complaint that caused Dean's prosecution on his own behalf, not on behalf of Reticulum. ROA.676 (complainant listed as "Fred Brown," not Reticulum). The Dallas County District Attorney's Office also understood that Brown, in his individual capacity, was a complainant (along with Reticulum). ROA.11728 (indictment listing, as complainant, both Reticulum and Brown); ROA.11727 (indictment listing both Reticulum and Brown as the property owner).

Second, at his deposition, Brown unambiguously testified under oath that he "personally" retained Attorney Watson (after Watson had resigned from the District Attorney's office) to "help [Brown] with the criminal indictment." ROA.10547 ("Q: Who engaged Rick Watson? [Brown]: I engaged Rick Watson. Q: You personally or Reticulum? [Brown]: Me personally."). This is confirmed by Watson's engagement agreement, listing "Fred Brown" as the "Client." ROA.10551. (stating that Watson will communicate, on Brown's behalf, "with the Dallas

[County] District Attorney's Office . . . with suggested offenses and indictment prosing.").

Because Brown acted on his own behalf when pursuing Dean's criminal indictment, the predicate of Durham and Birnam's argument fails, and thus fails to undermine the Article III adversity among Veritas/Dean and Brown.

### C. The District Court Properly Exercised Article III Jurisdiction Over the Claims Against Durham and Birnam for Conspiracy to Commit Malicious Criminal Prosecution

Durham and Birnam argue that, <u>if</u> the district court could not exercise Article III jurisdiction over the claims for malicious criminal prosecution against Reticulum and against Brown, <u>then</u> the district court improperly exercised jurisdiction over the related civil-conspiracy claims against Durham and Birnam. Br. at 50, 52 ("The district court's lack of adversity over Reticulum and Brown extends to Durham and Birnam Wood as well."). As shown in *supra* section I(B), however, the district court properly exercised Article III jurisdiction over the malicious-criminal-prosecution claim against Brown. Because Durham and Birnam failed to establish the predicate of their argument (that the district court could not exercise Article III jurisdiction over the claim against Brown for lack of adversity), Durham and Birnam failed to show

that the district court could not exercise Article III jurisdiction over the related conspiracy claims.

But, in any event, Durham and Birnam again fundamentally misunderstand and misapply the concept of adversity—the Article III adversity analysis does *not* turn on whether claims against Brown survive, but whether Veritas and Dean, on the one hand, retain adverse legal interests against Birnam and Durham, on the other. As with Brown, the district court did not find that Veritas, Dean, or Reticulum had any sort of common control over Durham and Birnam, such that Veritas or Dean could affect or control Durham's or Birnam's answers at trial or otherwise distort the judicial process. Even without the underlying claim against Brown, Durham and Birnam remain adverse to Veritas/Dean, because Veritas and Dean seek money damages against Durham and Birnam, and Durham and Birnam resist and defend against those claims. *Cortes*, 145 F.4th at 61; *Constellium*, 43 F.4th at 400, 402-03; *Windsor*, 570 U.S. at 758. Because Veritas and Dean remain adverse to Durham and Birnam, the district court does not lack Article III jurisdiction over the conspiracy claims against them.

To be clear, although Durham and Birnam's argument here relies on the lack of an underlying tort (against Brown and Reticulum),

Durham and Birnam argue *only* that the lack of an underlying tort shows that the district court lacked Article III jurisdiction. Br. at 42-50. Durham and Birnam have thus forfeited other potential bases for reversal, including that, as a matter of Texas substantive law, a claim for civil conspiracy requires an active underlying tort claim against a joined defendant.[12]

## II. The District Court Improperly Dismissed the Claims, against Brown, Durham, and Birnam, for Conspiracy to Commit Malicious Civil Prosecution

After dismissing the claims against Reticulum, the district court also dismissed the claims, against the Remaining Defendants (i.e., Brown, Birnam, and Durham), for conspiracy to commit malicious civil prosecution. ROA.10423. The district court justified this dismissal by noting that "Reticulum was the only entity alleged to have committed the underlying tort." ROA.10420. The district court characterized the claims by Veritas/Dean against Reticulum as "collusive," and sought to protect against "a decision injurious to the rights and interests of third parties," even when those third parties are co-defendants. *See* ROA.10421.

[12] Even if Durham and Birnam had preserved this argument, it fails for the reasons stated at *infra* § II(C).

While, here, Veritas and Dean do not challenge the district court's dismissal of the malicious-civil-prosecution claim against Reticulum, on cross-appeal, Veritas and Dean contend that the district court erred in dismissing the related civil-conspiracy claims against the Remaining Defendants. As shown below, (i) Veritas and Dean remain adverse to the Remaining Defendants, supporting Article III jurisdiction, (ii) the "collusion" concern is addressed by dismissing the non-adverse defendant (here, Reticulum), and (iii) as a matter of Texas law, Veritas and Dean may proceed on the conspiracy claim without simultaneously prosecuting the underlying tort against Reticulum. As a result, the Court should reverse the district court's dismissal of the claims against the Remaining Defendants for conspiracy to commit malicious civil prosecution and remand those claims for trial.

**A. Veritas and Dean Remain Adverse to the Remaining Defendants**

For the same reasons as noted at *supra* §§ I(A)-(C), Veritas and Dean remain adverse to Brown, Durham, and Birnam. The district court did <u>not</u> find that Veritas, Dean, or Reticulum had any sort of common control over the Remaining Defendants, such that Veritas or Dean could affect or control Brown's, Durham's, or Birnam's answers at

trial or otherwise distort the judicial process. Veritas and Dean seek to enforce a multi-million-dollar judgment against the Remaining Defendants, who, in turn, seek to avoid liability. ROA.10637-39 (judgment). The money judgment shows adversity between the parties, notwithstanding Reticulum's absence. *Cortes*, 145 F.4th at 61; *Constellium*, 43 F.4th at 400, 402-03; *Windsor*, 570 U.S. at 758.

Because the parties remain adverse, Article III jurisdiction exists over the claims against the Remaining Defendants, for conspiracy to commit malicious civil prosecution, justifying reversal of the district court's contrary decision.

### B. Because the Parties Are Adverse, the Claims Are Not Collusive

The district court suggested that the specter of collusion justified its decision, at least in part. ROA.10420. The problem of impermissibly collusive cases, however, is policed through ensuring that the parties remain adverse. A collusive case is defined as a case that "is not in any real sense adversary." *United States v. Johnson*, 319 U.S. 302, 305 (1943). As noted earlier, if the parties remain adverse and, for example, do not share common control, the lawsuit has real consequences. In other words, "collusion" and adversity are two ways of examining the same issue—if a plaintiff and defendant are not adverse, the lawsuit is

potentially collusive. *See Nautilus*, 436 F.3d at 1200-01 (case is not "collusive," and court retains jurisdiction, even after one co-defendant withdraws from case because co-defendants "supplied sufficient adversity"). Because, here, (i) Reticulum was dismissed from the lawsuit and (ii) Veritas and Dean remained adverse to the Remaining Defendants, the Court should conclude that Veritas, Dean, and the Remaining Defendants were not colluding to reach a desired result.

Durham and Birnam argue that the district court's finding that one co-defendant is no longer adverse to Veritas and Dean infects the entire lawsuit, requiring dismissal for lack of Article III jurisdiction. *See* Br. at 37. But the potential for impermissible collusion is eliminated by dismissing the non-adverse defendant (Reticulum), thereby ensuring full adversity among Veritas, Dean, and the Remaining Defendants. *See Whole Woman's Health*, 595 U.S. at 51 (lawsuit continues after dismissing claims against non-adverse co-defendants). Durham and Birnam do not contend that Veritas or Dean share common control with any other Remaining Defendant, and the stakes remain concrete and real, ensuring adversity among these parties. *See id.*; *Frazier*, 140 F.4th at 561-62, 566; *Lindke*, 31 F.4th at 495.

### C. Under Texas Law, Veritas and Dean May Proceed With the Civil-Conspiracy Claims Without Simultaneously Prosecuting the Underlying Tort

Under Texas law, civil conspiracy is a "derivative tort," meaning that it depends on some other underlying tort or other illegal act. *See Chu v. Hong*, 249 S.W.3d 441, 444 (Tex. 2008) ("Conspiracy is a derivative tort requiring an unlawful means or purpose, which may include an underlying tort."). "While civil conspiracy is not a stand-alone tort, the tortfeasor does not have to be sued in the same suit with the conspirators. Rather, a conspirator may be held liable for civil conspiracy even when the conspirator is the only defendant in the lawsuit." *Lingle v. Sage Architecture, Inc.*, No. 04-24-00539-CV, 2025 WL 2976755, at *3 (Tex. App.—San Antonio Oct. 22, 2025, no pet.) (mem. op.); *Klinek v. LuxeYard, Inc.*, 596 S.W.3d 437, 447 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (same); *Paschal v. Great W. Drilling, Ltd.*, 215 S.W.3d 437, 451 (Tex. App.—Eastland 2006, pet. denied) (same); *In re Sanchez Energy Corp.*, 661 B.R. 522, 542-43 (Bankr. S.D. Tex. 2024) (conspiracy claim may be maintained "even if no named defendant faces liability for the underlying tort").

Another Texas court has held, however, that if the underlying tort "fails," whether by summary judgment or improper pleading, the con-

spiracy claim fails as well, suggesting that a plaintiff cannot bring a civil-conspiracy claim without a supporting, underlying tort in the same lawsuit. *See W. Fork Advisors, LLC v. SunGard Consulting Servs., LLC*, 437 S.W.3d 917, 920-21 (Tex. App.—Dallas 2014, pet. denied). The Fifth Circuit, examining *West Fork* and *Klinek*, held that, even without the underlying tort and tortfeasor, a plaintiff could nevertheless pursue a civil-conspiracy claim against a co-conspirator at trial, if the underlying tortfeasor had originally been joined in the lawsuit. *See United Biologics, LLC v. Allergy & Asthma Network/Mothers of Asthmatics, Inc.*, 819 F. App'x 204, 208-09 (5th Cir. 2020) (holding that settlement with underlying tortfeasor did not defeat claim against remaining co-conspirator).

Under *Lingle*, *Klinek*, and *Paschal*, Veritas and Dean may seek to hold the Remaining Defendants liable for conspiracy to commit civil malicious prosecution even after the district court dismissed the underlying tortfeasor (Reticulum) for lack of Article III jurisdiction. Further, this case fits under *United Biologics*. At the outset of the lawsuit, Veritas and Dean pleaded the underlying tort (malicious civil prosecution) and joined the underlying tortfeasor (Reticulum), which, at that time, was

undoubtedly adverse to Veritas and Dean.[13] As in *United Biologics*, the later dismissal of that claim (here, for lack of Article III jurisdiction instead of settlement) does not affect the continuing viability of the civil-conspiracy claims against the Remaining Defendants.

Veritas and Dean recognize that one Texas court has held that a civil-conspiracy claim does not survive the dismissal of the underlying tort for lack of jurisdiction. *See Jaramillo v. Tex. City*, No. 01-20-00654-CV, 2022 WL 363271, at *4 (Tex. App.—Houston [1st Dist.] Feb. 8, 2022, no pet.) (mem. op.) ("Because the court lacks jurisdiction over Jaramillo's fraud claim, Jaramillo's civil conspiracy claim does not survive.") (citing *W. Fork*, 437 S.W.3d at 920). In *Jaramillo*, the lack of jurisdiction was <u>not</u> based on non-adverseness or settlement, but because the plaintiff "ha[d] not established a waiver of sovereign immunity." *Id.* There may be some sense, in the sovereign-immunity context, in refusing to extend liability to non-governmental conspirators when the alleged governmental tortfeasor enjoys immunity. But, here, Reticulum

---

[13] Veritas and Dean filed their suit in December 2021, against Reticulum, Brown, Durham, and Birnam. ROA.162, ROA.191. At that point, Brown was the sole owner of Reticulum. ROA.10378-80. Brown filed for bankruptcy in August 2022. ROA.29 ¶ 1. Fiduciario purchased Reticulum from Brown's bankruptcy trustee in April 2024. ROA.7384-88 (bill of sale); ROA.7390-91 (report of sale).

is not *immune* from liability, nor has the claim been found meritless; instead, the district had properly exercised subject-matter jurisdiction over the claim when Reticulum was adverse to Veritas and Dean, but dismissed the claim without prejudice after the shift in Reticulum's ownership. In this situation, the underlying tort has not "failed," and the Court should allow Veritas and Dean to proceed against Reticulum's co-conspirators without joining the underlying tortfeasor (Reticulum).

Finally—as this appeal demonstrates—co-conspirators do not need the participation of the underlying tortfeasor to challenge the legal basis of the underlying tort. Durham and Birnam (the co-conspirators) argue that this Court should reverse the civil-conspiracy judgment against them because Brown (the underlying tortfeasor) cannot be held liable for the underlying tort (malicious criminal prosecution) because Brown did not "initiate" the prosecution. Br. at 53. In other words, there is no practical bar in defending against (or prosecuting) civil-conspiracy claims without the active participation of underlying tortfeasor.

The Court should follow *Lingle*, *Klinek*, *Paschal*, *Sanchez*, and *United Biologics*, and find that the claims against the Remaining Defendants for conspiracy to commit civil malicious prosecution survive

the dismissal of the underlying tort claim against Reticulum for lack of Article III jurisdiction.

## III. The District Court Correctly Held, on Summary Judgment, that Brown "Initiated" a Prosecution Under Texas Law

Brown filed a formal, sworn criminal complaint with the Dallas County District Attorney, ROA.673-80, which led to criminal charges against Dean. The affidavit, signed by Brown, states that the complaint was "furnished for the sole purpose of instituting criminal prosecution". ROA.676 (emphasis added, all caps removed). The parties dispute whether this formal complaint may "initiate" a prosecution, which is one of two ways to satisfy the "causation" element of malicious criminal prosecution under Texas law. *Lieck*, 881 S.W.2d at 291-93. Durham and Birnam do not challenge that the record contains sufficient evidence of the five remaining elements of the underlying tort: (i) a criminal prosecution was commenced against Dean, (ii) the prosecution terminated in Dean's favor, (iii) Dean was innocent of the charges, (iv) Brown lacked probable cause, and (v) Brown acted with malice.

Durham and Birnam agree (Br. at 56) that, under Texas law, the question of "initiation" is governed by *Lieck*: "a person initiates a criminal prosecution if he makes a formal charge to law enforcement au-

thorities." *Lieck*, 881 S.W.2d at 292. But Durham and Birnam argue that *Lieck*'s "formal charge" should be limited to "an indictment, information, or some other form of legal process," and not a sworn affidavit or complaint. Br. at 57. By necessary extension, Durham and Birnam argue that "an individual citizen cannot bring formal charges [i.e., *initiate* a prosecution], but he can *procure* a criminal prosecution," Br. at 60 (emphasis added), which appears to limit *Lieck*'s "person" to prosecutors (and others) empowered to file charging instruments (e.g., an indictment or an information). In short, Durham and Birnam argue that, because Brown is a private citizen, and not a part of the law-enforcement apparatus, as a matter of law, he cannot "initiate" a criminal prosecution.

Durham and Birnam misunderstand Texas law. Four different Texas courts of appeals have recognized that private citizens may "initiate" a criminal prosecution, as that term is defined in *Lieck*:[14]

[14] Durham and Birnam cite five cases that predate *Lieck* by decades: *Hurlbut v. Boaz*, 4 Tex. Civ. App. 371, 23 S.W. 446 (1893, no writ); *Wheeler v. Nesbitt*, 65 U.S. 544 (1860); *Reed v. Lindley*, 240 S.W. 348 (Tex. Civ. App.—Fort Worth 1922, no writ); *Mo., K. & T. Ry. Co. v. Groseclose*, 50 Tex. Civ. App. 525, 110 S.W. 477 (1908, no writ); and *Carswell v. Sw. Bell Tel. Co.*, 449 S.W.2d 805 (Tex. App.—Houston [1st Dist.] 1969, no writ). Br. at 55-56, 58. Of course, none of these older cases interpret or apply *Lieck*, the 1994 case defining "initiation." The

- In *Whitelock v. Stewart*, the Waco Court of Appeals held that two farmers' complaints and reports alleging "abuse and neglect of horses" constituted "initiating" the prosecution. No. 10-23-00132-CV, 2025 WL 2473021, at *1, *3 (Tex. App.—Waco Aug. 28, 2025, pet. denied) (mem. op.) ("The evidence also shows that prosecution was initiated by the Whitelocks. . . . Police reports identify [one of the farmers] as the initial and persistent complainant.").

- In *McShirley v. Lucas*, the Fort Worth Court of Appeals held that an HOA board member "initiated [a criminal] prosecution when he filed formal charges against [the plaintiff] with the Parker County Sheriff's Department, which led to her arrest." No. 02-23-00229-CV, 2024 WL 976512, at *1, *10 (Tex. App.—Fort Worth Mar. 7, 2024, pet. denied) (mem. op.) (defendant "filed a criminal complaint against [the plaintiff] with the Parker County's Sheriff Department for 'striking and injuring' [the defendant]").

- In *Alamo Country Club Owners Ass'n v. Shelton*, the Corpus Christi Court of Appeals held that, because a golf-course owner had "signed a complaint form and provided an affidavit to press charges against [the plaintiff]," *Lieck*'s "initiate" prong was met, and thus the "trial court did not commit error by failing to define 'initiate'[.]" No. 13-10-00300-CV, 2012 WL 3792753, at *2, *5 (Tex. App.—Corpus Christi Aug. 31, 2012, no pet.) (mem. op.).

- In *Kroger Texas v. Suberu*, the Dallas Court of Appeals concluded that Kroger's "signing" of a police report, along with the request from Kroger that the police should prosecute, were sufficient to support a finding of "initiation." *Kroger Tex. Ltd. P'ship v. Suberu*, 113 S.W.3d 588, 597 (Tex. App.—Dallas 2003), *rev'd on other grounds*, 216 S.W.3d 788 (Tex. 2006); *compare Lermon v. Minyard Food Stores, Inc.*, No. 05-13-00034-CV, 2014 WL 6466840, at *5 (Tex. App.—Dallas Nov.

---

Court should instead focus on the many cases that have interpreted *Lieck* in the over 30 years since its issuance.

> 19, 2014, pet. denied) (mem. op.) (a mere "voluntary statement" identifying the plaintiff as a thief was a "witness statement," not a "formal charge" that could satisfy the "initiate" prong).

*Whitelock*, *McShirley*, *Alamo*, and *Kroger* correctly interpret *Lieck*. If only charging instruments (like an indictment or an information) counted as "formal charges" for the purposes of "initiation," *Lieck* would not have stated that the formal charge must be made to "law-enforcement authorities"—rather, the charge would be made directly to a court (such as a magistrate). Further, an indictment does not necessarily mark the *beginning* of the criminal prosecution—the proceedings are often kicked off, as here, by a private citizen's sworn complaint (less common) or a government agent's (more common). A sworn complaint, provided to law-enforcement authorities, can cause a investigation that may later lead to an indictment. *Compare Warner Bros. Enter't, Inc. v. Jones*, 538 S.W.3d 781, 815 (Tex. App.—Austin 2017, pet. granted) (finding no malicious-prosecution claim, as a matter of law, because "the police never opened an active investigation," and there was thus no evidence that "a criminal proceeding was commenced against [the plaintiff]"), *aff'd on other grounds*, 611 S.W.3d 1 (Tex. 2020).

When a private citizen takes this sort of purposeful action to initiate a criminal prosecution (i.e., filing a sworn, formal charge with the stated purpose of instituting a criminal prosecution), it is fair to charge the citizen with responsibility for that prosecution. *Lieck* included similar analysis for false statements provided to law enforcement: "What is true is that a person who provides false information cannot complain if a prosecutor acts on it; he cannot be heard to contend that the prosecutor should have known better." *Lieck*, 881 S.W.2d at 294. Here, Brown "initiated" the prosecution by providing a sworn complaint, detailing Brown's allegations of criminal activity, which Brown explicitly signed for the "sole purpose of <u>instituting</u> criminal prosecution." ROA.676-80 (emphasis added). Brown cannot now be heard to complain that the prosecutor acted on his purposeful allegations. *Cf. Lieck*, 881 S.W.2d at 294.

In contrast to the cases referenced above, the El Paso Court of Appeals has held that "initiating" prosecution is limited to "executing the charging instrument that goes before the magistrate." *Alaniz v. 3 Netts Inc.*, No. 08-24-00058-CV, 2024 WL 4575359, at *5 (Tex. App.—El Paso Oct. 24, 2024, no pet.) (mem. op.); *Gunville v. Gonzales*, 508

S.W.3d 547, 557 (Tex. App.—El Paso 2016, no pet.) (same).[15] The El Paso court notwithstanding, the Court should follow the majority view of the plain language of *Lieck*, as interpreted by the Dallas, Fort Worth, Waco, and Corpus Christi courts, and find that citizens can "institute" a criminal prosecution by making a formal charge to law-enforcement authorities. *Whitelock*, 2025 WL 2473021, at *1, *3; *McShirley*, 2024 WL 076512, at *1, *10; *Alamo*, 2012 WL 3792753, at *2, *5; *Kroger*, 113 S.W.3d at 597.

*King v. Graham*, cited in Durham and Birnam's brief, does not materially support their interpretation of "initiation". Br. at 56 (citing 126 S.W.3d 75, 78 (Tex. 2003)). *King* analyzed *Lieck*'s "procuring" prong, and did not address, analyze, or limit the "initiation" prong. *King*, 126 S.W.3d at 78 ("As we stated in *Lieck*: a person cannot procure a criminal prosecution . . .") (emphasis added). The *King* court looked to the Restatement in its analysis, but did not indicate that it intended its review of the Restatement to limit *Lieck*'s definition of "initiate." Further, *King* is a case from 2003—the four cases interpreting the "initiate"

---

[15] *Alianz* and *Gunville* appear to conflict with *French v. French*, which noted that "a formal charge by indictment or information against the plaintiff is not a requirement for a malicious-prosecution claim." *French v. French*, 385 S.W.3d 61, 70 (Tex. App.—Waco 2012, pet. denied) (emphasis added).

prong, cited above, post-date *King* and acknowledge that private parties may "initiate" criminal prosecutions, despite *King*'s discussion of the "procuring" prong. *Whitelock*, 2025 WL 2473021, at *1, *3; *McShirley*, 2024 WL 076512, at *1, *10; *Alamo*, 2012 WL 3792753, at *2, *5; *Kroger*, 113 S.W.3d at 597.

Durham and Birnam further argue that, "[i]f a private citizen's making a report of criminal conduct to law enforcement constitutes an 'initiation' of a criminal prosecution equivalent to the 'formal charges' required by the Court in *Lieck* for that element, the separate category of 'procures' becomes a nullity." Br. at 62. This is not so, however, as not every "report of criminal conduct" by a private citizen is a "formal charge" (i.e., the "procure" prong remains potentially applicable where, for example, informal allegations are made to law enforcement, especially when such allegations are fraudulent).

The Southern District of Texas, analyzing *Lieck*, has highlighted distinctions between a "formal charge" and a run-of-the-mill "report" to law enforcement in *Lewis v. Continental Airlines, Inc.*, 80 F. Supp. 2d 686, 699 (S.D. Tex. 1999) (Crone, M.J.). In that case, the court found that a complaint was not a "formal charge" because the defendant "merely gave a witness statement at the request of HPD officers," and

had not "signed" a statement or "lodged a formal charge." *Id.* The court thus found that the evidence did not support a finding of "initiation." *Id.*; *see also Anderson v. Goodwin*, No. 05-23-00343-CV, 2024 WL 725669, at *5 (Tex. App.—Dallas Feb. 22, 2024, no pet.) (mem. op.) (a "mere witness statement to law-enforcement personnel is not a formal charge"); *French*, 385 S.W.3d at 70 (considering whether verbal report to law enforcement constitutes a "formal" charge for purposes of "initiating" a prosecution under *Lieck*, but ultimately refusing to decide).[16] In other words, Durham and Birnam's rhetoric to the contrary, courts do not construe every communication with police as a "formal charge," and so "initiation" and "procurement" are conceptually distinct.

In any event, the facts here are far afield from *Lewis* or *Anderson*. Brown's criminal charge is not a "mere witness statement," *see Lewis*, 80

---

[16] Unlike *Lewis*, *Anderson*, and *French*, certain cases cited by Durham and Birnam analyze the term "formal charge" *outside* of the malicious-criminal-prosecution context analyzed in *Lieck*. *See* Br. at 57 (citing *Cantu v. State*, 253 S.W.3d 273, 283-84 (Tex. Crim. App. 2008) (discussing formal charges in the context of the speedy-trial provision, without discussing *Lieck*); *Rothergy v. Gillespie Cnty.*, 554 U.S. 191, 198 (2008) (discussing formal charges in the context of determining when the Sixth Amendment right to counsel attaches); *Griffith v. State*, 55 S.W.3d 598, 603 (Tex. Crim. App. 2001) (same). There is no reason to expect these cases to shed light on the meaning of "formal charges," as that term is used in *Lieck*, in the malicious-criminal-prosecution tort context.

F. Supp. 2d at 699, but is instead a sworn statement explicitly "furnished for the sole purpose of instituting criminal prosecution." ROA.676 (affidavit attached to Brown's criminal complaint). The formal complaint included a detailed narrative of events, ROA.678-80, attaching an appendix of 19 different documents and agreements, *see* ROA.12360-536 (including, at ROA.12360-61, a "Summary of Events with respect to . . . bad acts conducted by [Dean and Watters]").

Because the "procure" prong often deals with less-formal statements to law enforcement (e.g., those outside of formal charges), the prong is not a nullity. *See, e.g.*, *Anderson*, 2024 WL 725669, at *6 (analyzing "procure" prong after determining that witness statement was not "formal charge" sufficient to meet "initiate" prong); *Lewis*, 80 F. Supp. 2d at 699-700 (same); *French*, 385 S.W.3d at 70-71 (refusing to determine if "institute" prong met by oral charge of theft to police, but finding sufficient evidence to deny summary judgment as to the "procure" prong).

Because Brown undoubtedly made a formal charge to law-enforcement officials (the Dallas County District Attorney's Office, ROA.673), the Court should uphold the district court's summary-judgment finding that the "initiate" prong was satisfied.

## IV. The Court Should Uphold the Jury's Conspiracy Findings Against Durham and Birnam

The jury found that (i) Brown committed malicious criminal prosecution, and (ii) that Brown, Durham, and Birnam conspired to commit malicious criminal prosecution. ROA.10627. Durham and Birnam attack the conspiracy finding on two legal bases and a factual basis. First, they argue that, as a matter of law, a claim for conspiracy to commit malicious criminal prosecution does not exist in Texas, or, at least, its status is so uncertain that the Court should certify the question to the Supreme Court of Texas. Br. at 66-70. Second, they argue that, as a matter of law, both Durham and Birnam cannot be liable for a conspiracy with Brown to commit malicious criminal prosecution, because Birnam cannot conspire with its owner, Durham. Br. at 70-71. Third, Durham and Birnam argue that, as a matter of fact, there is no legally sufficient evidence in the trial record showing that either of them "had a specific intent to agree to accomplish something unlawful or to accomplish something lawful by unlawful means." Br. at 72.

Veritas and Dean respond over the next five subsections, showing that: (i) Durham and Birnam have forfeited both legal arguments; (ii) if the legal arguments are not forfeited, the Court should hold that Texas

law does not forbid claims for conspiracy to commit malicious criminal prosecution, rather than certifying the question; (iii) if the legal arguments are not forfeited, the Court should hold that the intra-corporate conspiracy exception is destroyed by the presence of a third party; (iv) the district court found that Durham and Birnam waived the factual argument, and finally, (v) if the factual argument is not waived, the record includes sufficient evidence to support the jury's finding that Durham and Birnam had "specific intent" to commit malicious criminal prosecution.

### A. Durham and Birnam Forfeited Both Legal Arguments by Failing to Raise Them in the District Court

Before trial, Durham and Birnam moved for summary judgment on Plaintiffs' civil-conspiracy claim. ROA.1863, ROA.1888-89. Although Durham and Birnam argued that the civil-conspiracy claims failed as matter of law, they did not raise either legal argument pressed here: that (i) conspiracy to commit malicious criminal prosecution does not exist in Texas, or (ii) both Durham and Birnam cannot be liable for a civil-conspiracy claim. ROA.1888-89.

At trial, the district court requested that Durham and Birnam state the relief they sought under Rule 50(a). ROA.15204. Durham and

Birnam responded with a factual challenge: that there was insufficient record evidence that Durham or Birnam conspired with the other defendants. ROA.15205-06, ROA.15208, ROA.15210-11. In their renewed Rule 50 motion, Durham and Birnam addressed the conspiracy claim, but again raised only a factual challenge. ROA.11005-06. Neither legal argument that Durham and Birnam press here is found in their district-court Rule 50 motions. ROA.11002-11.

Durham and Birnam admit they did not raise the first legal question (i.e., that conspiracy to commit malicious criminal prosecution does not exist in Texas) in the district court, Br. at 66 n.12, but fail to address whether they raised the second legal question there (i.e., that both Durham and Birnam cannot be liable for conspiracy to commit malicious criminal prosecution). In any event, Durham and Birnam contend that the legal arguments were "fairly included in their challenge to the legal sufficiency of the evidence to support Plaintiffs' conspiracy claims." *Id.*

But, to preserve an argument for appeal, it "must be pressed, and not merely intimated. In short, [it] must be raised to such a degree that the trial court may rule on it[.]" *In re Fairchild Aircraft Corp.*, 6 F.3d 1119, 1128 (5th Cir. 1993), *abrogated on other grounds by In re Dunham*,

110 F.3d 286, 288-89 (5th Cir. 1997); *see Shahrashoob v. Tex. A&M Univ.*, 125 F.4th 641, 649-50 (5th Cir. 2025) (similar). Because Durham and Birnam did not raise or press either legal issue in the district court, they have forfeited those issues. *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) ("A party forfeits an argument by failing to raise it in the first instance in the district court.").[17]

The only case that Durham and Birnam cite in support, *Ferrara*, an unreported 2014 opinion, does not allow litigants to raise their legal challenges for the first time on appeal. Br. at 66 n.12 (citing *Ferrara Fire Apparatus, Inc. v. JLG Indus., Inc.*, 581 F. App'x 440, 445 (5th Cir. 2014)). In *Ferrara*, the Court found that a Rule 50 motion challenging the sufficiency of the evidence for all claims was sufficient to preserve a sufficiency-of-the-evidence challenge as to one of the claims. *Id.* at 444-45. Here, in contrast, Brown and Durham ask the Court to hold that a

---

[17] *Rollins* allows an appellate court to consider otherwise forfeited issues of law if "failure to consider the issue [would] result in a miscarriage of justice." *Rollins*, 8 F.4th at 398 (noting that what constitutes a miscarriage of justice is "a question with no certain answer"). Despite addressing the waiver issue in their briefing, Br. at 66 n.12, Durham and Birnam did not show that this miscarriage-of-justice standard was met. Thus, the Court should refuse to apply this exception to the forfeited issue here. *Rollins*, 8 F.4th at 399 (refusing to find "manifest injustice" when "nothing prevented [the litigant] from [raising the issue] in the district court").

sufficiency-of-the-evidence challenge to a claim preserves all possible legal challenges to that claim, whether those legal points were presented to or ruled on by the district court. *Ferrera* made no such sweeping change to the law. Because Durham and Birnam failed to raise their legal challenges in the district court, they forfeited those arguments on appeal. *Fairchild*, 6 F.3d at 1128; *Rollins*, 8 F.4th at 397.

Finally, Durham and Birnam ignore the uncomfortable tension created by their request to certify one of these legal questions to the Supreme Court of Texas (whether Texas recognizes conspiracy to commit malicious criminal prosecution) and their failure to raise the same legal point in the district court. They claim that the legal question is allegedly "consequential" (Br. at 69) enough to merit consideration by the Supreme Court of Texas, but it was not consequential enough to merit raising it with the district court in the first instance. Durham and Birnam cannot have it both ways—if a legal question is important enough to merit review by the Texas high Court, there is no excuse for Durham and Birnam's failure to raise it in district court.

### B. Texas Law Does Not Forbid Claims for Conspiracy to Commit Malicious Criminal Prosecution

If the Court chooses to reach Durham and Birnam's first legal argument, even though forfeited, the Court should hold that Texas law allows civil-conspiracy claims to commit malicious criminal prosecution.

Durham and Birnam argue that (i) *Lieck* forbids the use of aiding and abetting to extend liability for the underlying tort of malicious criminal prosecution, and (ii) civil conspiracy, like aiding and abetting, extends liability for underlying torts, so (iii) it stands to reason that *Lieck* forbids the use of civil conspiracy to extend liability for the underlying tort of malicious criminal prosecution. Br. at 66-70.

But *Lieck* does <u>not</u> forbid the use of aiding and abetting with malicious-criminal-prosecution claims. *Lieck* sought to define "the causal connection a plaintiff must prove between defendant's conduct and plaintiff's criminal prosecution to establish liability," i.e., the causation standard for the tort of malicious prosecution. 881 S.W.2d at 289. *Lieck* ultimately defined that standard disjunctively ("initiates or procures"), but in reaching that formulation, held that the district court's proposed causation standard ("cause, or aid or cooperate in causing") was too broad. *Id.* at 291 ("Giving [the district court's causation standard its]

plain meaning, the jury could have concluded that it was enough for [the defendant] to have aided or cooperated with law enforcement officials in bringing about [the plaintiff's] prosecution."). *Lieck* did not address the propriety of extending civil liability, for malicious criminal prosecution (or any other potential underlying tort), through an aiding-and-abetting theory.

In other words, although *Lieck* examined the causation standard for the underlying tort (malicious criminal prosecution), *Lieck* did not consider, if a defendant were found liable for malicious criminal prosecution under the *correct* causation standard (initiates or procures), whether that underlying tort could support derivative civil liability under an aiding-and-abetting theory (or, for that matter, a civil-conspiracy theory). Because *Lieck* did not address (much less forbid) claims of aiding and abetting malicious criminal prosecution, Durham and Birnam's argument fails.

Of course, if *Lieck*, over 30 years ago, had definitively cut off derivative civil liability for claims of malicious criminal prosecution, it would be surprising to see courts today seriously considering those claims. Durham and Birnam's brief, however, identified three appellate courts that recently considered such claims. Br. at 68 (citing *Castille*,

*Ruth*, and *Walker*). One of those cases, *Walker*, refused to dismiss a claim of civil conspiracy to commit malicious criminal prosecution. *Walker v. Hartman*, 516 S.W.3d 71, 83-84 (Tex. App.—Beaumont 2017, pet. denied). Two other post-*Lieck* cases acknowledge the continuing viability of claims for conspiracy to commit malicious criminal prosecution:

- In *Dar v. American Eagle Outfitters, Inc.*, the Southern District of Texas refused to dismiss a civil-conspiracy claim based on a claim of malicious criminal prosecution. No. 17-830, 2019 WL 13255469, at *9-10 (S.D. Tex. Jan. 16, 2019).

- In *Alvarez v. Anesthesiology Associates*, the Corpus Christi Court of Appeals reversed a dismissal of a malicious criminal prosecution claim against a single defendant (Cortes), and thus reversed the civil-conspiracy charges against two other defendants (McNeil and Dirksen). 967 S.W.2d 871, 878-81 (Tex. App.—Corpus Christi 1998, pet. denied).

If the Court decides to reach this forfeited argument, the Court should find that Texas has not foreclosed claims of civil conspiracy to commit malicious prosecution.

The Texas Supreme Court recognizes that civil conspiracy serves the important function of "permit[ting] a remedy against co-conspirators. Without it, there would be no grounds for recovery against co-conspirators who did not commit the underlying unlawful act." *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 141 (Tex.

2019). The jury found Durham and Birnam as culpable co-conspirators, ROA.10627, and Texas law allows Veritas and Dean to seek redress from them.

### C. Third Parties Destroy the Intra-Corporate Conspiracy Exception

If the Court chooses to reach Durham and Birnam's second legal argument, even though forfeited, the Court should hold that the intra-corporate conspiracy exception does not apply here because Durham and Birnam conspired with Brown, a third party outside of the company.

Durham and Birnam argue that, because a corporation cannot conspire with its employees, the necessary conclusion is that "Durham and Birnam Wood cannot both be liable for a conspiracy with Brown to commit malicious prosecution." Br. at 71. This defense (often referred to as the "intra-corporate conspiracy" doctrine or exception)[18] does not ap-

[18] *See, e.g.*, *Ziglar v. Abbasi*, 582 U.S. 120, 153 (2017) (defining the intra-corporate-conspiracy doctrine as the principle that "an agreement between or among agents of the same legal entity . . . is not an unlawful conspiracy"); *United States v. St. John*, 625 F. App'x 661, 664-65 (5th Cir. 2015) (refusing to apply intra-corporate-conspiracy doctrine in criminal context); *Moore v. Novak*, 1995 WL 571854, at *15 (Tex. App.—Houston [14th Dist.], Sept. 28, 1995, pet. denied) (not designated for publication) (refusing to apply intra-corporate-conspiracy exception when defendants sued in individual capacities).

ply here, because Brown is not an employee of Birnam or Durham. *See Vosko v. Chase Manhattan Bank, N.A.*, 909 S.W.2d 95, 100 n.7 (Tex. App.—Houston [14th Dist.] 1995, writ denied) (a corporation "cannot conspire with itself").

The cases cited by Durham and Birnam are limited to the situation where a plaintiff alleged a conspiracy between only people working at the same organization (or working at parent/subsidiary corporations with common interests), not a situation where, as here, there is a third party joining the conspiracy.[19] If a third party (like Brown) joins the conspiracy—a situation not addressed by any of Durham and Birnam's cited cases—the intra-corporate-conspiracy doctrine "does not apply."

[19] *See Tex. Democratic Party v. Abbott*, 961 F.3d 389, 410 (5th Cir. 2020) (all alleged co-conspirators worked for defendant); *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1952) (all alleged co-conspirators were "officers, employees, and agents" of defendant); *Atl. Richfield Co. v. Misty Prods., Inc.*, 820 S.W.2d 414, 420-21 (Tex. App.—Houston [14th Dist.] 1991, writ denied) (all alleged co-conspirators were related companies or employees/agents of related companies); *Am. Akaushi Ass'n, Inc. v. Twinwood Cattle Co.*, No. 14-21-00701-CV, 2025 WL 450750, at *32 (Tex. App.—Houston [14th Dist.] Feb. 11, 2025, pet. filed) (mem. op.) (alleged co-conspirators were corporation, corporation's agent, and corporation's subsidiary); *compare Bayou Terrace Inv. Corp. v. Lyles*, 881 S.W.2d 810, 815 (Tex. App.—Houston [1st Dist.] 1994, no writ) (although alleged co-conspirators were company and chief executive of same company, court nevertheless found evidence sufficient to support jury finding of civil conspiracy because chief executive was involved with a third-party company with conflicting interests);

*See Cuadra v. Houston ISD*, No. 07-3300, 2009 WL 10703694, at *13 (S.D. Tex. Aug. 17, 2009) ("[T]he intra-corporate conspiracy doctrine does not apply where the corporation conspires with a third-party."); *In re Greenhaw Energy, Inc.*, 359 B.R. 636, 647 (Bankr. S.D. Tex. 2007) ("The above cases address an agent's ability to form a conspiracy with the corporation alone or with other corporate agents. The present facts are different. Morris Greenhaw is alleged to have conspired, not solely with the corporation, but also with third parties outside of the corporation."); *cf. Ma v. CVS Pharm., Inc.*, 833 F. App'x 10, 14 (7th Cir. 2020) ("Under Illinois' intra-corporate conspiracy doctrine, a conspiracy cannot exist between CVS's own agents, so Ma needed to plead that they schemed with a third party who shared a common goal.").

Because Durham and Birnam schemed with a third party, Brown, the intra-corporate conspiracy doctrine does not prevent Veritas and Dean from suing all three co-defendants for civil conspiracy.

### D. The District Court Held that Durham and Birnam Waived Their Factual Challenge to the Conspiracy Finding

Durham and Birnam's Rule 50 motion argued that "no legally sufficient evidence [supported] the jury's finding that [either Durham or Birnam were] engaged in any conspiracy to commit malicious criminal

prosecution." ROA.11005. In denying the motion, the district court held that Durham and Birnam "waived" their sufficiency-of-the-evidence argument by presenting a "wholly naked" motion: "[Durham and Birnam] fail to cite to any legal authority or specific evidence[,] include multiple conclusory sentences that there is 'no legally sufficient evidence' and 'the evidence was to the contrary,' [and] fail to provide the Court with any explanation or basis, let alone 'substantial evidence,' to support their assertions." ROA.11946. Here, Durham and Birnam fail to rebut this finding or show that it was an abuse of discretion. *See* Br. at 64-65, 71-78. On this basis alone, the Court should uphold the district court's denial of Durham and Birnam's Rule 50 factual challenge to the jury's conspiracy findings.

### E. The Record Includes Sufficient Evidence to Support a Finding that Durham and Birnam Had Specific Intent

If the Court chooses to reach Durham and Birnam's sufficiency-of-the-evidence challenge, despite the district court's holding of waiver, the Court should find that the record includes sufficient evidence to support the jury's finding of specific intent.

To prove a civil conspiracy in Texas, a plaintiff must show that each co-conspirator has a "specific intent to commit the act," which ex-

ists when the parties are "aware of the harm or the wrongful conduct at the beginning of the agreement and intend to cause the harm." *San Antonio Credit Union v. O'Connor*, 115 S.W.3d 82, 90-91 (Tex. App.—San Antonio 2003, pet. denied). In challenging the sufficiency of the evidence for the conspiracy charge, Durham and Birnam argue only that there is insufficient evidence of intent—namely, that there was no "meeting of the minds" to achieve an unlawful object. Br. at 74. They do not challenge the factual basis for any other element of civil conspiracy. *Id.* at 74-75.

Of course, in responding, Dean and Veritas need not rely on direct evidence. "When men enter into conspiracies, they are not likely to call in a witness. They resolve their scheme clandestinely and in secret. . . . In such cases the injured party must necessarily have recourse to circumstantial evidence." *Jernigan v. Wainer*, 12 Tex. 189, 193 (1854) ("Frauds of [this] character . . . can seldom be proved by direct and positive evidence."); *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581-82 (Tex. 1963) ("Conspiracy liability is sufficiently established by proof showing concert of action or other facts and circumstances from which the natural inference arises that the unlawful, overt acts

were committed in furtherance of common design, intention, or purpose of the alleged conspirators.").

Durham's firm, Birnam, managed millions of dollars in assets for its clients. ROA.15364-65. At trial, the jury learned that Birnam was a longtime financial adviser to Brown. ROA.15063, ROA.15374 (Brown invested $2.6 million through Birnam). Birnam earned significant fees from Brown and had a financial interest and incentive to create investment returns for Brown. ROA.15063, ROA.15374-75. The record shows that Birnam, through Durham, advised Brown on the Total Operating deal. ROA.15065, ROA.15383.

The record shows that Durham and Birnam should not have recommended or signed the deal with Total Operating. Specifically, as Durham knew, Brown invested only in asset-backed loan transactions. ROA.15370, ROA.15398. Brown believed that the Total Operating deal was fully collateralized (i.e, asset backed). ROA.15094. But the Total Operating deal was not asset backed. ROA.15385, ROA.11345-57. Further, Durham signed the Total Operating deal, knowing that it was not asset backed, on Reticulum's behalf, without sending the agreement to Brown for review. ROA.15069-70, ROA.15094, ROA.15383-87, ROA.15398. A jury could reasonably conclude, based on this evidence,

that, at a minimum, Brown would not be pleased with Durham and Birnam for recommending and entering into a deal against his usual preferences, and at worst, that Brown could have sued Durham and Birnam to recover the loaned funds.

In other words, on this record, a jury could reasonably conclude that both Durham and Birnam had a strong motive to help Brown recover his investment, whether to make up for their mistakes, avoid potential liability, or simply to help a longtime client. *See also* ROA.15104-05 (Durham spearheaded collection efforts when he owned Reticulum and remained involved in early 2018).

Brown told Durham that he sought to hold Dean personally responsible for the repayment of the loan. ROA.11565. Brown also told Durham that a felony charge against Dean would help in recovering the loaned funds, ROA.11561-63, ROA.15103, and Durham understood that Brown believed that "the only way to get a recovery was if Mr. Dean . . . [was] found to have committed a felony," ROA.15403. Brown thus encouraged the Dallas County District Attorney to prosecute Dean, ROA.15102-03. Durham, who was involved in the recovery efforts against Dean, ROA.15103-05, attended Brown's meeting with a prosecutor, ROA.15403, and (as shown below) assisted with creating the

criminal complaint. A jury could find, based on this circumstantial evidence, that Durham and Birnam shared Brown's objective to improperly obtain a criminal indictment against Dean to help Brown recover his investment.

The record shows, for example, that Durham assisted Brown, in myriad ways, in drafting the criminal complaint and obtaining an indictment. ROA.15416 ("Q: You were, once again, assisting Mr. Brown in connection with his goal of getting Mr. Dean indicted. Right? [Durham]: Correct."), ROA.15405. In particular:

- Durham had a "good friend" at the district attorney's office, Mr. Kyson Johnson, who connected Durham with Mr. Rick Watson, a Dallas County prosecutor. Durham set up a meeting (with Watson and Brown) to discuss the potential criminal complaint, over lunch, at Birnam's offices at Old Parkland in Dallas, ROA.15403-09. Durham noted afterwards that the "the way things came together with the DA was about perfect. *Fingers are crossed.*" ROA.11582 (emphasis added), ROA.15409-10.

- Birnam used its employees to gather materials to support the criminal complaint. ROA.15419-20, ROA.11359 ("Teresa is here tomorrow, and can start going through those.").

- Durham drafted the "summary of events" (containing numerous falsehoods) which was submitted to the District Attorney's Office. Br. at 15, ROA.15412-16, ROA.12360-61 (summary).

- Durham used Birnam's SharePoint system to transmit the files of "what [Brown] and [Durham] prepared for [Rick

Watson, the prosecutor who attend the Old Parkland meeting]," and asked Ms. Pettit (Reticulum's attorney) to forward the documents to Watson. ROA.15414, ROA.11540 (cover email), ROA.12360-537 (PX-12, transmitted documents).

- Durham was blind-copied (along with Brown) on the email from Pettit submitting the criminal complaint to Watson. ROA.11218-32. Durham also sent a draft to his friend at the DA's office, Johnson, seeking comments. ROA.11613-15, ROA.15419. A jury could interpret the blind-copy as an acknowledgement that Brown believed that Durham would be interested in the progress of the criminal complaint.

- Pettit submitted the formal charge to Watson on February 1, 2018. ROA.11218. The day before, Pettit sent a draft of the charge to the "Team" of Durham, Brown, and Jason Kathman (a lawyer, ROA.15110), seeing if any member of the team had "any questions or suggestions." ROA.11234, ROA.15110. A jury could reasonably conclude that Pettit believed Durham and Brown to be a "team" interested in obtaining criminal indictments against Dean.

- Durham met with another DA (i.e., a third person from the DA's office, besides Watson and Johnson) in connection with the criminal referral. ROA.15422-23.

The record also includes evidence that Durham lied, furthering the purpose of the conspiracy, and supporting a finding of specific intent:

- Durham lied under oath, at trial, to help bolster his case. Specifically, Durham testified that he recalled Dean being in Durham's offices in the week leading up to the deal, supporting Brown's testimony from trial the day before. ROA.15389. The record includes impeachment showing

that Durham had written the opposite years before. ROA.15392-93, ROA.11895.

- Durham's sworn declaration, which was PX-15 at trial, ROA.11585-87, included false statements. Specifically, at trial, Durham testified that he did not remember hearing Dean make any particular misrepresentations. ROA.15451. Durham had testified to the same, under oath, at an earlier deposition. ROA.15452-53. But the sworn declaration states the opposite—that Durham knew that Dean made 10 specific "representations, among others, which [Durham] later learned were false." ROA.11585-86.

On JMOL, the district court recognized that the jury could reasonably discern Durham and Birnam's "pattern of dishonesty" from the record. ROA.11950-51.

Finally, after Dean was indicted, Brown sent Durham a copy of Dean's mugshot (according to Brown, because Durham was "part of the team"). ROA.15124, ROA.15424. Although Brown admits taking the mugshot to a party to celebrate and share it with family and friends, ROA.15124, neither Brown nor Durham would take responsibility for sending the mugshot to Dean's parents. ROA.11628, ROA.14868-69, ROA.15053, ROA.15124-25, ROA.15424.

In summary, the evidence shows that Durham and Birnam (i) should <u>not</u> have entered into the Total Operating deal on behalf of Reticulum, especially without sending the deal documents to Brown for

approval, and thus shared a strong motive to help Brown recover his loaned funds, (ii) shared Brown's intent to secure a criminal indictment against Dean to assist in recovering the loaned funds, and (iii) assisted Brown in meeting with prosecutors, gathering supporting documentation, and filing the formal criminal complaint. Durham had his "fingers . . . crossed" that his efforts with the prosecutors would result in Dean's indictment, ROA.11582, and he cannot complain now that the jury found him civilly responsible for malicious prosecution. On this record, a reasonable jury could conclude that Durham and Birnam had a specific intent to maliciously prosecute Dean.

## V. The Court Should Uphold the Compensatory-Damage Award

The jury awarded Veritas and Dean $3.8 million in actual damages. ROA.10628. The district court instructed the jury, without objection, that actual damages could include: (i) reasonable attorney's fees and costs from defending against the underlying criminal proceedings, (ii) medical expenses, (iii) physical pain and suffering, (iv) mental or emotional pain, mental anguish, or emotional distress, (v) inconvenience, (vi) loss of enjoyment of life, and (vii) harm to Dean's reputation. ROA.15248. The jury verdict included one line encompassing all seven categories of damages. Durham and Birnam do not object, on appeal, to

either the consolidation of actual damages into one lump sum or any related aspect of the jury instructions.

Durham and Birnam nevertheless argue that the record is insufficient to support the jury's $3.8 million actual-damage award. Below, Veritas and Dean (i) identify the wealth of record evidence supporting the award, and (ii) note that, because Durham and Birnam forfeited remittitur on appeal, they may only prevail by showing that that the record does not contain "some evidence" that supports the $3.8 million award, and they cannot satisfy that standard on this record.

### A. The Record Includes Sufficient Evidence to Support the Actual Damages Awarded by the Jury

Dean described how the wrongful indictments destroyed his life:

> Q. Explain your state of mind [in June 2020, when you were under indictment for two felonies]:
>
> A. I was like broken. I was brought to my knees and I was broken. I was talking to attorneys and this is – this was – this was my life. I was fighting for my freedom. I was facing 99 years to life away from my family and my kids and everything I had built up until that time.

ROA.14857. The jury heard about Dean's insomnia, anxiety, panic attacks ("you think you're having a heart attack"), high blood pressure, depression, and sexual impotence. ROA.14858, ROA.14859 (medicine treating same), ROA.14874. The record shows that the indictments

damaged Dean's relationship with his wife, children, and friends. ROA.14859-61 ("It was a dark period in our relationship[.]"; "I couldn't coach [my son's] team anymore because they do background checks."; "Some people haven't looked at me the same still even after it's dismissed . . . . I'll never be able to get back to the situation I was beforehand."). Dean further testified that the indictments annihilated his business reputation. ROA.14861, ROA.14862-64 (because Dean's livelihood required acting as a fiduciary of others' investments, indictment for theft and deception "stops us in our tracks"), ROA.14864 (Dean barred from board of CMIT Solutions), ROA.14867 (track record of successful deals, pre-indictment), ROA.14868 (Dean unable to close deals between 2020 and 2022 because "banks and investors could not make an investment based on the allegations that were brought against me"), ROA.14874-77 (estimating that he lost two to three deals due to the indictments). Durham and Birnam did not object to any of this evidence. ROA.14857-77.

Stephanie Dean testified that the indictments wrecked her husband's health and wellbeing:

Q. How did you observe your husband being affected?

> A. I mean, he was affected in every way. So he began to have panic attacks, he had insomnia, he had severe anxiety, he developed high blood pressure. He was constantly, you know, it seems physically manifesting his stress. He'd like rub over his heart when he would get stressed, the panic attacks. He was just incredibly, incredibly stressed because of these – the nature of these allegations and then the potential repercussions.

ROA.15470. The indictment "just scared" the Dean family: "[I]f someone's capable of criminally indicting you on two felonies and sending threatening messages to your parents, it's just like what else are they capable of?" ROA.15471. Mrs. Dean confirmed that the indictments damaged Dean's relationship with his family, ROA.15472-74, and business reputation, ROA.15473-74. Again, Durham and Birnam did not object to this evidence. ROA.15470-76.[20]

Paul Thompson, a businessman who works with Dean, also testified that the indictment crippled Dean's reputation and ability to enter deals:

> Q. What evidence did you see?
>
> A. Well, Mr. Dean was under indictment for—I may get this wrong—theft through fraud or misrepresentations or something like that, and all lenders these days worth their

---

[20] Defendants objected, on relevance grounds, to Mrs. Dean's testimony about the effects of the indictments on her, but that objection was overruled. ROA.15474-75. Durham and Birnam have not challenged that evidentiary ruling here.

> salt do background checks and that's immediately flagged. Something like that is—it's almost untouchable to a lender.

ROA.15335 ("[I]t was just impossible for us to do another deal while he was under indictment."). The damage to Dean's reputation was reflected in business results: good results before the indictment, poor results afterwards. ROA.15336.

The record undeniably shows business-related reputational damage. The jury heard both direct evidence that the business community shunned Dean after the indictments and circumstantial evidence, in the form of decreased business opportunities that reflect Dean's reputational damage. ROA.14810, ROA.14861-64, ROA.14867-68, ROA.14874-77, ROA.15335-36, ROA.15473-74.

Reputational-harm damages, as non-economic damages, are not verifiable or subject to exact calculation.[21] In valuing these damages, the jury was entitled to credit testimony that (i) before the indictments,

---

[21] *Bearden v. LeClair*, No. 02-20-00177-CV, 2022 WL 3273598, at *21 (Tex. App.—Fort Worth Aug. 11, 2022, no pet.) (mem. op.) (considering "rarefied air of . . . the reining world, where reputations can undoubtedly be swiftly destroyed by someone determined to do so"); *Brady v. Klentzman*, 515 S.W.3d 878, 887 (Tex. 2017) ("[W]hen the damages are for non-economic losses, such as mental anguish or lost reputation, the jury must be given some latitude because these general damages are, by their nature, incapable of precise mathematical measure.").

Dean brokered multi-million dollar deals, ROA.14867, ROA.14879, increasing revenue at his company from $8 million to $20 million a year, ROA.14814, (ii) Dean's ability to do that work relied on maintaining a reputation of trust and fair dealing with his clients, ROA.14863, ROA.15335, (iii) the indictments destroyed that reputation, undermining Dean's ability to do business, ROA.14863-64, and (iv) Dean's reputation might never recover, ROA.14881.

The jury was not blind to the context of the litigation—Dean, Brown, and Durham were sophisticated businessmen managing and investing millions of dollars, ROA.14867-68, ROA.14878-80, ROA.15062-63, ROA.15364-65, ROA.15368-69, ROA.15374, in a world where a single deal could result in a multi-million-dollar return for Dean, ROA.14878 (around $2 million), ROA.14880 (around $6 million). It is reasonable to value the reputation of such businessmen (and damages thereto) on the order of millions of dollars. While Dean did not attempt to value the lost profits from any single lost deal, in assigning a dollar value to the damage to Dean's reputation, the jury could consider several lost deal opportunities resulting from the damage to Dean's reputation. ROA.14874-75, ROA.14881 (valuing at $4.5 million). The jury

could also properly consider evidence of Dean's damaged reputation in the eyes of his family and friends. ROA.14859-61.

The jury also heard evidence of bodily harm, emotional distress, loss of enjoyment of life, and mental anguish that resulted from the malicious prosecution. ROA.14857-59, ROA.14874, ROA.15470. Admittedly, it is harder to judge the emotional resonance of Dean's and his wife's testimony on a cold record than in live court. But the jury could reasonably conclude, based on the trial testimony, that Dean's injuries were severe. ROA.14857 ("I was brought to my knees and I was broken."), ROA.15470 ("[H]e was affected in every way", suffering panic attacks, insomnia, severe anxiety, and high blood pressure). The jury has a "degree of latitude" in quantifying these noneconomic damages. *See Mem'l Hermann Health Sys. v. Gomez*, 649 S.W.3d 415, 427 (Tex. 2022).

The jury was entitled to consider all of this evidence together in reaching its final award of $3.8 million. On this record, the jury could have relied on reputational damage, alone, in reaching a $3.8 million award, but, especially considering Dean's testimony, the jury could have also highly valued Dean's physical injuries and mental anguish. Considered as a whole, a jury could reasonably reach a $3.8 million verdict.

Durham and Birnam's brief focuses on contrary evidence, such as the testimony of their paid expert, Kathleen Elliott. Br. at 81-82. Durham and Birnam's analysis ignores the cardinal rule of a sufficiency-of-the-evidence review, that the Court "credit[] the non-moving party's evidence and disregard[] all evidence favorable to the moving party that the jury is not required to believe." *Harmon v. Collier*, 158 F.4th 595, 607 (5th Cir. 2025). The focus on appeal properly lies with evidence supporting the damages award.

Durham and Birnam also argue that Veritas and Dean "failed to point to evidence of any specific deal that Craftsman lost due to Dean's indictments." Br. at 83. The argument assumes that reputational damage is properly measured here by *only* the monetary value of specific deals.

That is not the case. For example, *Bearden* approved a reputational damage award even though "Leclair did not seek or prove any 'hard' damages such as lost profits." 2022 WL 3273598, at *21 (approving a $200,000 award of reputational damages based on evidence of a $300,000 drop in gross revenues). In another case, a court approved a $500,000 reputational-damage award even though the claimant admitted that he had not suffered "financial" damages, and there was no men-

tion of specific lost clients. *Vodicka v. Tobolowsky*, No. 05-17-00727-CV, 2019 WL 1986625, at *3 (Tex. App.—Dallas May 6, 2019, no pet.) (mem. op.) (affirming award when the claimant (i) testified as to his hourly fee, and (ii) showed that the harm to his reputation caused him to lose clients). While, unlike *Vodicka*, Dean did not provide evidence of an "hourly fee," the record showed (and a jury could reasonably conclude) that the opportunity for Dean to compete was worth millions, given that even closing a single deal might be worth millions. ROA.14878, ROA.14880. And, as with *Vodicka*, the jury could reasonably conclude that the harm to Dean's reputation prevented him from competing for deals. ROA.14861-64, ROA.14868, ROA.14874-77. This record evidence, especially when coupled with the record of physical suffering and mental anguish, supports the award.

Durham and Birnam also complain that the amount awarded by the jury for mental anguish, pain, and suffering is not supported by the record. Br. at 86 ("Because there was no evidence to justify the amount award by the jury as damages for mental anguish and pain and suffering, the award cannot be sustained on that ground either."). But the district court did not require the jury to quantify how much of the damages award was allocated to mental anguish, pain, and suffering.

ROA.10628. The district court instead instructed the jury that it could consider *seven* different categories of damages, together, in reaching its verdict, ROA.15248, an instruction that Durham and Birnam do not challenge here. As noted above, the record contains sufficient evidence for the jury to award significant damages based on severe mental anguish and pain and suffering, but because the jury did not break out a specific dollar figure for these categories, Durham and Birnam's argument misses the mark. *See Free v. Baker*, 469 F. App'x 786, 790 (11th Cir. 2012) ("The jury's verdict is a general one . . . . It makes no sense to contend, as the defendants do, that they are entitled to judgment as a matter of law on some categories of damages when there are no categories of damages in the award."). The evidence showing mental anguish, pain, and suffering damages—along with all of the other evidence of damage shown above—together support the $3.8 million verdict.

When, as here, the challengers fail to address whether record evidence of all potential categories of damages, considered together, might support the verdict, the sufficiency-of-the-evidence challenge must fail. *Price v. Short*, 931 S.W.2d 677, 688 (Tex. App.—Dallas, 1996, no writ) ("The only way that an appellant can successfully attack on appeal a multi-element damages award is to address all of the elements and

show that the evidence is insufficient to support the entire damages award considering all the elements. The failure to address an element of damages results in waiver of the sufficiency challenge."); *cf. Gautreaux v. Ins. Co. of N. Am.*, 811 F.2d 908, 914 (5th Cir. 1987) (on excessiveness review, Court noted four components to the jury's damages verdict and "appl[ied] the maximum recovery rule to each of these components").

Finally, Durham and Birnam failed to object when Dean testified that the jury should value his reputational damage at $4.5 million. ROA.14881. The record shows that this is not a pie-in-the-sky figure, but is instead supported by evidence—Dean had previously found and closed deals that earned him $2 million and $6 million, ROA.14878, ROA.14880, and the record shows that the damage to Dean's reputation made him "untouchable," ROA.15335, and thus unable to search for such deals, for two years. Even had Durham and Birnam objected, Rule 701 allows juries to consider opinions, like Dean's, that are based on his perception, helpful to determine a fact issue, and not based on specialized knowledge. *United States v. Espino-Rangel*, 242 F. App'x 219, 220 (5th Cir. 2007).

Because (i) Durham and Birnam failed to object to Dean's opinion, and (ii) that opinion is supported by plausible data, the opinion it-

self is "substantial evidence" that supports the verdict. *See Wackman v. Rubsamen*, 602 F.3d 391, 403 (5th Cir. 2010) (opinion testimony treated as substantial evidence supporting the verdict when the expert did not "state[] a bare opinion without offering any plausible data to support that opinion"); *cf. Bevill v. City of Quitman*, No. 19-406, 2025 WL 2306849, at *40-41 (E.D. Tex. Aug. 11, 2025) (refusing to reduce $18 million compensatory-damage award, based in part on an illegal arrest, noting testimony that plaintiff would not accept $10 million to be illegally arrested).

In sum, the record amply supports the jury's $3.8 million actual-damages award.

### B. Because Durham and Birnam Have Forfeited Their Remittitur Arguments, to Prevail They Must Show That the Record Does Not Include "Some Evidence" of Damages

In the district court, Durham and Birnam moved for both (i) judgment notwithstanding the verdict based on insufficient evidence of compensatory damages, and (ii) remittitur. ROA.11002, ROA.11005, ROA.11009-11. The district court denied both requests. ROA.11951-53, ROA.11958-59. Durham and Birnam's appeal brief does not challenge

the district court's remittitur ruling,[22] thereby forfeiting the issue. *Lewis v. Bickham*, 91 F.4th 1216, 1222 n.3 (5th Cir. 2024) (failure to challenge district-court ruling in appellate brief forfeits issue); *Top Tobacco, L.P. v. Star Importers & Wholesalers, Inc.*, 135 F.4th 1344, 1349 (11th Cir. 2025) (remittitur forfeited by failure to brief issue on appeal).

Under Texas law,[23] courts grant remittitur requests when "part of a damage verdict lacks sufficient evidentiary support." *Larson v. Cactus Utility Co.*, 730 S.W.2d 640, 641 (Tex. 1987). In contrast, courts enter a take-nothing judgment when there is "no evidence to support a damages verdict[.]" *Id.*; *Samuels v. Nasir*, 445 S.W.3d 886, 894 (Tex. App.—El Paso 2014, no pet.) (same). Thus, under Texas substantive law, if there

[22] The brief makes a naked request for a new trial in the "Conclusion" section of the brief, without any argument or citation in support, and does not request remittitur. Br. at 90.

[23] This action is governed by Texas law, so the Court applies Texas remittitur standards. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 422, 429-431 (1996) (determining that state-law remittitur standards apply "in an action for damages based on state law"); *see also Mays v. Chevron Pipe Line Co.*, 968 F.3d 442, 453 (5th Cir. 2020) ("A federal court sitting in diversity applies state remittitur standards."); *McCaig v. Wells Fargo Bank (Tex.), N.A.*, 788 F.3d 463, 482 (5th Cir. 2015) ("We apply federal standards of review to assess the *sufficiency or insufficiency* of the evidence in relation to the verdict, but in doing so we refer to state law for the *kind of evidence* that must be produced to support a verdict. In short, state law governs what the plaintiff must prove and how it may be proved; federal law governs whether the evidence is sufficient to prove it.") (emphasis in original).

is evidence supporting *some* amount of damages, but insufficient evidence to support the full amount of the verdict, the court cannot render judgment, but can only grant remittitur/new trial:

- *Akin, Gump, Strauss, Hauer & Feld, LLP v. Nat'l Dev. & Res. Corp.*, 299 S.W.3d 106, 124 (Tex. 2009) ("Ordinarily, we render judgment when we sustain a no evidence issue. **However, when there is some evidence of damages, but not enough to support the full amount, it is inappropriate to render judgment.** In such a situation, we may either remand the case to the court of appeals for a suggestion of remittitur or to the trial court for a new trial.") (emphasis added).

- *Golden Corral Corp. v. Noble Austin Apartments LLC*, No. 03-19-00463-CV, 2021 WL 2878565, at *9, *11 (Tex. App.—Austin July 9, 2021, no pet.) (mem. op.) (rendering take-nothing judgment on diminution-of-value damages because there was "no evidence," but refusing to render judgment on repair damages, because there was "some evidence" of those damages, resulting in remittitur).

- *City of Emory v. Lusk*, 278 S.W.3d 77, 89-90 (Tex. App.—Tyler 2009, no pet.) (denying defendant's no-evidence challenge to a $10,000 property-damage award because record supported $990 damage award, and instead ordering remittitur).

- *Mines v. Murphy*, No. 14-18-00800-CV, 2021 WL 5458833, at *9 (Tex. App.—Houston [14th Dist.] Nov. 23, 2021) (mem. op.), *vacated following remittitur*, 650 S.W.3d 607 (Tex. App.—Houston [14th Dist.] 2021, no pet.) (when evidence "legally sufficient" to support award of future medical expenses, but "factually insufficient to support the jury's award," remittitur is appropriate).

- *Rhymes v. Filter Res., Inc.*, No. 09-14-00482-CV, 2016 WL 5395548, at *8 (Tex. App.—Beaumont Sept. 22, 2016) (mem. op.), *vacated following remittitur*, 2016 WL 6809251 (Tex. App.—Beaumont Nov. 17, 2016, no pet.) (mem. op.) ("Because Filter proved lost profits in some amount, its entitlement to recover them survives the jury awarding an excessive amount.").

Because Durham and Birnam have forfeited remittitur, they are left with a Rule 50 motion for judgment as a matter of law on damages. Under Texas substantive law, to prevail on this motion, Durham and Birnam must show that the record does not include "some evidence of damages." *Akin*, 299 S.W.3d at 124; *accord Free*, 469 F. App'x at 790 ("Having allowed the jury to return a lump sum damages award, and having admitted that [the plaintiff] is entitled to some damages, the defendants cannot be entitled to judgment as a matter of law on the award of damages."). Given the substantial evidence of actual damage covered in the previous section, Durham and Birnam cannot meet that standard. *See*, *e.g.*, ROA.14857-59, ROA.15470 (physical symptoms, mental anguish), ROA.14859-64, ROA.14867-68, ROA.15473-74, ROA.15335-36 (reputational damage).

In sum, because (i) the record has ample evidence of actual damage, and (ii) Durham and Birnam forfeited their remittitur arguments,

the Court should refuse to disturb the jury's $3.8 million actual-damages verdict.

## VI. The Record Supports the Award of Punitive Damages Against Durham and Birnam

The jury found that Durham and Birnam's conduct was done with "fraud, malice, or gross negligence." ROA.10629. The jury assessed $125,000 in exemplary damages against Durham and $125,000 against Birnam. ROA.10630.

The district court instructed the jury that they must find clear and convincing evidence of "fraud, malice, or gross negligence" to award punitive damages, and defined each of those terms. ROA.15249-50 (defining "malice" as "a specific intent by the defendant to cause substantial injury or harm to the plaintiff"). Durham and Birnam have not challenged these instructions on appeal.

Instead, they make two arguments against punitive damages: (i) the Court should not reach punitive damages because the conspiracy claims against Durham and Birnam fail for other reasons, and (ii) the record does not include sufficient evidence of malice. Veritas and Dean respond in four subsections: (i) Birnam forfeited its punitive-damage challenge, (ii) the claims against Durham and Birnam survive their ap-

pellate challenges, (iii) the record includes sufficient evidence of malice, and (iv) Durham and Birnam have forfeited their arguments based on legal standards that they did not raise at district court and that were not included in the jury charge.

### A. Birnam Forfeited its Challenge to Punitive Damages

As a threshold matter, Durham and Birnam's pre-verdict Rule 50 motion initially argued that, "in relation to the punitive damage claims, that there is no evidence of fraud as to [Durham or Birnam]." ROA.15207. As shown below, Veritas and Dean rely on malice for this element, so this argument cannot overturn the jury's verdict. Durham and Birnam's attorney later expanded the argument to encompass malice and gross negligence, but only as to Durham, not Birnam. ROA.15217-18 ("[T]here is no evidence . . . of malice, fraud, or gross negligence on the part of Mr. Durham[.]") (emphasis added). Birnam has thus forfeited its sufficiency-of-the-evidence challenge by failing to raise it at trial.

### B. The Record Includes Sufficient Evidence of Conspiracy and Actual Damages

Durham and Birnam argue that, because Veritas and Dean have not shown sufficient evidence of conspiracy and actual damages, there is

insufficient evidence to reach the question of punitive damages. For the reasons in the sections addressing those claims, the record includes sufficient evidence to uphold the jury's (i) findings that Durham and Birnam are liable for conspiracy to commit malicious criminal prosecution, *supra* § IV, and (ii) $3.8 million actual-damages award, *supra* § V.

### C. The Record Includes Sufficient Evidence of Malice to Support the Jury's Exemplary-Damage Award

Durham and Birnam next argue that the record does not support a finding of fraud, malice, or gross negligence needed to support the exemplary-damage award against them. Br. at 88. But the record is sufficient to uphold the jury's finding that they both conspired to commit malicious prosecution, with malice, by clear and convincing evidence.

Texas's exemplary-damage statute defines "malice" as "a specific intent by the defendant to cause substantial injury or harm to the claimant." Tex. Civ. Prac. & Rem. Code § 41.001(7). The charge incorporated this definition. ROA.15249-50.

Here, the same evidence that shows that both Durham and Birnam had the specific intent to maliciously prosecute Dean (which supports the finding of civil conspiracy) also shows specific intent to cause

substantial injury or harm to Dean. For example, from the record, a reasonable jury could conclude that Durham and Birnam:

- had a strong incentive to help Brown recover his investment, because Durham and Birnam should not have entered into the Total Operating deal, especially without sending it to Brown for approval, ROA.11345-57, ROA.15069-70, ROA.15094, ROA.15370, ROA.15383-87, ROA.15398;

- shared Brown's intent to secure a criminal indictment against Dean to assist in recovering the loaned funds, ROA.11234, ROA.11565, ROA.11561-63, ROA.15102-05, ROA.15403, ROA.15416; and

- assisted Brown in meeting with prosecutors, gathering supporting documentation, and filing the formal criminal complaint, ROA.11218-32, ROA.11359, ROA.11540, ROA.11582, ROA.11613-15, ROA.12360-537, ROA.15403-10, ROA.15414-16, ROA.15419-20, ROA.15422-23.

The district court correctly noted, on its review of trial evidence, that Durham and Birnam "knew their allegations against [Dean] were false and that they withheld material exculpatory facts in connection with their criminal referral to the District Attorney's Office." ROA.11950. Based on this record, a reasonable jury could find a specific intent to cause substantial injury or harm to Dean by clear and convincing evidence. *See Richards v. Tebbe*, No. 14-13-00413-CV, 2014 WL 2936425, at *6 (Tex. App.—Houston [14th Dist.] June 26, 2014, no pet.) (mem. op.) (considering evidence supporting claim of malicious prosecution in

determining whether record shows sufficient malice for exemplary damages); *Tranum v. Broadway*, 283 S.W.3d 403, 424 (Tex. App.—Waco 2008, pet. denied) (same).

The record includes further evidence supporting exemplary damages. A reasonable jury could find that:

- Durham lied under oath, at trial, to help bolster his case. Specifically, Durham testified that he recalled Dean being in Durham's offices in the week leading up to the deal, supporting Brown's testimony from trial the day before. ROA.15389. The record includes impeachment showing that Durham had written the opposite years before. ROA.11895, ROA.15392-93.

- Durham's sworn declaration, which was PX-15 at trial, ROA.11585-87, included false statements. Specifically, at trial, Durham testified that he did not remember hearing Dean make any particular misrepresentations. ROA.15451. Durham had testified to the same, under oath, at an earlier deposition. ROA.15452-53. But the sworn declaration states the opposite—that Durham knew that Dean made 10 specific "representations, among others, which [Durham] later learned were false." ROA.11585-86.

- Durham subjectively hoped that Dean would be indicted. ROA.11582 ("The way things came together with the DA was about perfect. Fingers are crossed."), ROA.15410.

The district court correctly noted, on its review of trial evidence, that the jury "heard evidence of [Durham's and Birnam's] pattern of dishonesty." ROA.11951. From this record, considered as a whole, the jury could

find by clear and convincing evidence that Durham and Birnam had the specific intent to cause substantial injury or harm to Dean.

### D. Durham and Birnam Forfeited Arguments Based on Legal Standards Absent from Jury Instructions

Durham and Birnam argue that Veritas and Dean cannot show evidence of malice because the record includes no evidence of (i) "outrageous, malicious, or otherwise reprehensible conduct" by Durham or Birnam, or (ii) an intent to cause substantial injury that is "independent and qualitatively different" from the compensable harms. Br. at 89-90. Their arguments are not persuasive because: (i) these standards for malice were not included in the district court's charge to the jury, (ii) Durham and Birnam did not suggest such instructions at the district court, and (iii) Durham and Birnam do not challenge, on appeal, the district court's definition of "malice" in the jury instructions.

In Texas, "it is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge." *Osterberg v. Peca*, 12 S.W.3d 31, 54 (Tex. 2000) (it is "misguided" to assert that "the appellate court should review the sufficiency of the evidence against the question that the trial court should have submitted—not the one actually submitted" when "the de-

fect was never brought to the court's attention or instruction never requested").[24] Because the charge did not include the legal standards for "malice" that Durham and Birnam press here, the Court cannot look to those legal standards to determine whether sufficient evidence supports the verdict.

In the alternative, the Court should review the sufficiency challenge for plain error only. *United States v. McRae*, 702 F.3d 806, 834-35 (5th Cir. 2012) (when litigant asks court to measure sufficiency of the evidence under different legal standard than unobjected-to jury instructions, sufficiency-of-the-evidence review is for plain error); *United States v. McCoy*, 108 F.4th 639, 644-45 (8th Cir. 2024) (same).

In any event, the record includes evidence meeting the newly raised legal standards for malice. *First*, a jury may reasonably find it outrageous, malicious, or reprehensible that Durham and Birnam helped send Dean to jail (based on false allegations) for the improper purpose of securing repayment of a $400,000 business loan to Total

[24] *See also Akin*, 299 S.W.3d at 112 ("Because there was no objection to the charge as submitted, we assume, without deciding, that the instruction was correct and measure the evidence by the charge as given."); *cf. United States v. House*, 684 F.3d 1173, 1196 (11th Cir. 2021) ("Where a party expressly accepts a jury instruction, such action constitutes invited error and serves to waive his right to challenge the accepted instruction on appeal.").

Operating. The record supports that finding, by clear and convincing evidence. Especially in light of the other evidence supporting specific intent of malice addressed at *supra* § VI(C), this legal standard is met.

*Second*, the record supports a finding that Durham and Birnam intended harm "independent and qualitatively different" than the criminal prosecution itself. Most importantly, the record shows that the criminal prosecution itself was just a means to an end—Durham and Birnam intended to use the criminal prosecution to force *financial* harm, i.e., the personal repayment of the $400,000 loan to Total Operating, for which Dean was not otherwise liable. The record also supports a finding that Durham both lied under oath at trial and lied in a sworn declaration from 2022, both to support his interests in this litigation at Dean's expense. *See supra* § VI(C).

Finally, the record shows that Durham and Brown both denied anonymously sending Dean's mugshot to Dean's parents, but a jury could choose to disregard that testimony, and instead determine that Durham was ultimately responsible for that harassment. ROA.11625 (Durham and Birnam received mugshot from Brown); ROA.14869, ROA.15053 (Dean's parents received mugshot); ROA.12028 (envelope and photo received by Dean's parents); ROA.15124-25 (Brown denies

sending mugshot to parents); ROA.15424 (Durham denies sending mugshot to parents).

Because Durham and Birnam neglected to include these legal standards in the jury instructions, they have forfeited arguments based on the standards. But the record nevertheless supports a finding, by clear and convincing evidence, that these standards were met, especially on a plain-error review. The Court should uphold the jury's award of exemplary damages against Durham and Birnam.

## CONCLUSION

The Court should (i) reverse the district court's dismissal of the claims for conspiracy to commit malicious civil prosecution against Brown, Durham, and Birnam, and remand those claims for trial; and (ii) otherwise refuse to disturb the jury's verdict and the district court's judgment.

Dated: April 23, 2026

Respectfully submitted,

/s/ Anthony M. Garza
BRETT CHARHON
Texas State Bar No. 24040674
bcharhon@ccrglaw.com
STEVEN CALLAHAN
Texas State Bar No. 24053122
scallahan@ccrglaw.com
ANTHONY M. GARZA
Texas State Bar No. 24050644
agarza@ccrglaw.com
**CHARHON CALLAHAN ROBSON & GARZA, PLLC**
3333 Lee Parkway, Suite 460
Dallas, Texas 75219
Telephone: (214) 521-6400
Telecopier: (214) 764-8392

JOHN P. LEWIS, JR.
Texas State Bar No. 12294400
jplewis@haywardfirm.com
**HAYWARD PLLC**
10501 N. Central Expy, Suite 106
Dallas, TX 75231
Tel. (972) 755-7106

PETER MICHAEL JUNG
Texas State Bar No. 11054600
jungm@clarkhill.com
**CLARK HILL PLC**
901 Main St. Ste. 6000
Dallas, Texas 75202
Telephone: (214) 651-4724

*Counsel for Veritas Vincit, LLC & William Berry Dean, III*

## CERTIFICATE OF COMPLIANCE

The document complies with the Clerk's Memorandum dated February 13, 2026, granting the parties leave to file briefs in excess of the word-count limitation, because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.1: this document contains 19,194 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Miller Text font.

/s/ Anthony M. Garza
ANTHONY M. GARZA